SEWARD & KISSEL LLP
John R. Ashmead
Mark D. Kotwick
Laura E. Miller
Andrew J. Matott
Seward & Kissel LLP
One Battery Park Plaza
New York, NY 10004
(212) 574-1200

*Attorneys for Plaintiff Matthew Dundon, Trustee of
the Endo GUC Trust*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>ENDO INTERNATIONAL PLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 22-22549 (JLG)<br><br>(Jointly Administered) |
| MATTHEW DUNDON, TRUSTEE OF THE ENDO GUC TRUST,<br><br>Plaintiff,<br><br>v.<br><br>MCKINSEY & COMPANY, INC. AND MCKINSEY & COMPANY, INC. UNITED STATES,<br><br>Defendants. | Adv. Pro. No. 24-_____ (JLG)<br><br>**COMPLAINT** |

---

1  The last four digits of Endo International plc's tax identification number are 3755. Due to the large number of Debtors in the chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

JURISDICTION AND VENUE .............................................................................. 4

THE PARTIES ........................................................................................................ 5

FACTUAL ALLEGATIONS ................................................................................ 11

I.     Prescription Opioids ................................................................................ 11

II.    Endo's Background in the Manufacture and Sale of Opioids .................. 13

III.   McKinsey's Role in the Opioid Crisis .................................................... 14

       A.    McKinsey's Business Model ......................................................... 14

       B.    McKinsey's Domination of the Pharmaceutical Industry Generally, and
             Opioids Specifically ..................................................................... 17

       C.    McKinsey's Work With Other Opioid Manufacturers ................. 18

             1.    McKinsey's Work With Purdue ......................................... 19

             2.    McKinsey's Work With J&J ............................................... 21

             3.    McKinsey's Work With Teva .............................................. 22

             4.    McKinsey's Work With Mallinckrodt ................................ 23

       D.    McKinsey's Additional Opioid-Related Relationships ................ 23

       E.    McKinsey Advised the Federal Government on Opioids While
             Simultaneously Advising Opioid Manufacturers and Distributors ..... 24

       F.    McKinsey Was Very Familiar With the Dangers of Opioids ........... 28

IV.    McKinsey Begins Advising Endo on its Long-Term Strategic Plan ............ 30

V.     Endo Reformulates Opana ER and Seeks to Stave Off Generic Competition ..... 33

VI.    McKinsey and Endo's Leadership Were Aware of the Widespread Abuse of
       Opana ER ................................................................................................ 37

VII.   McKinsey Devises a Plan to Boost Endo's Sales of Opana ER .................. 41

       A.    De Silva is Named CEO of Endo, and McKinsey Gains Unprecedented
             Access to Endo's Operations ....................................................... 41

       B.    McKinsey Assists Endo With the Preparation and Dissemination of
             Misleading Marketing Materials .................................................. 43

       C.    McKinsey Develops the "Sales Force Blitz" to Boost Opana ER Sales ........... 48

             1.    ███████████████████████████████████ ............. 49

             2.    ██████████████████████████████████████
                   ████████████████████████ ................................. 50

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

3.    ██████████████████████████████.................................... 51

VIII.   McKinsey Continues to Advise Endo on Boosting Opioid Profits in 2016 .................. 53

A.   Endo, With McKinsey's Advice, Expands its Generic Footprint ...................... 53

B.   McKinsey Advises Endo to "Blitz" its Other Branded Opioid .......................... 55

IX.   McKinsey Continues to Advise Endo in the Face of Legal and Regulatory Headwinds ................................................................................................................ 57

X.   The FDA Halts Sales of Reformulated Opana ER ........................................................ 60

XI.   The Aftermath ............................................................................................................... 61

A.   McKinsey Has Acknowledged, and is Slowly Being Held Responsible for, Its Role in Engineering the Opioid Crisis ........................................................... 61

B.   In Exchange for Paying McKinsey ██████ for its "Expert" Services, Endo Has Been Named in Thousands of Lawsuits and Has Suffered Billions of Dollars in Damages .................................................................... 63

XII.   McKinsey Aided and Abetted Endo and Par Management's Breaches of Fiduciary Duties ............................................................................................................................ 64

A.   Endo's Directors and Officers Owed and, With McKinsey's Knowing Participation, Breached Their Fiduciary Duties ................................................. 64

B.   Par Pharmaceutical's Directors and Officers Owed and, With McKinsey's Knowing Participation, Breached Their Fiduciary Duties .................................. 67

XIII.   Endo's Obligations and Transfers .................................................................................. 69

A.   Endo was Insolvent at the Time of the Transactions  and Did Not Receive Reasonably Equivalent Value  from McKinsey in Exchange for the Transactions ..................................................................................................... 72

B.   Multiple Predicate Creditors Hold Allowable  Prepetition Claims Against Endo ................................................................................................................... 77

CAUSES OF ACTION ................................................................................................................ 78

FIRST CAUSE OF ACTION (Contractual Indemnification) ..................................................... 78

SECOND CAUSE OF ACTION (Aiding and Abetting Breach of Fiduciary Duty by the Endo plc Directors) .................................................................................................... 80

THIRD CAUSE OF ACTION (Aiding and Abetting Breach of Fiduciary Duty by the Endo Health Solutions  and Endo Pharmaceuticals Directors) ......................................... 82

FOURTH CAUSE OF ACTION (Aiding and Abetting Breach of Fiduciary Duty by the Endo Health Solutions  and Endo Pharmaceuticals Officers) ......................................... 83

FIFTH CAUSE OF ACTION (Aiding and Abetting Breach of Fiduciary Duty by the Par Pharmaceutical Directors) .......................................................................................... 85

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

SIXTH CAUSE OF ACTION (Aiding and Abetting Breach of Fiduciary Duty by the Par
Pharmaceutical Officers) ................................................................................................. 86

SEVENTH CAUSE OF ACTION Avoidance of Fraudulent Conveyances (11 U.S.C. §
544(b)(1); 12 Pa. C.S.A. §§ 5104(a)(2), 5105) ............................................................... 87

EIGHTH CAUSE OF ACTION Avoidance of Fraudulent Conveyances (11 U.S.C. §
544(b)(1); NYDCL §§ 273-275) ........................................................................................ 88

NINTH CAUSE OF ACTION Recovery of Avoided Conveyances (11 U.S.C. § 550(a)) ......... 89

PRAYER FOR RELIEF ............................................................................................................. 90

Plaintiff, Matthew Dundon, not in any individual capacity but solely in his capacity as the trustee (the "Trustee") for the Endo GUC Trust (the "GUC Trust"), established pursuant to the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Endo International plc and its Affiliated Debtors* [Dkt No. 3849] (the "Plan") and the Endo GUC Trust Agreement, dated April 23, 2024, by and among (i) the Trustee, (ii) UMB Delaware Inc, as Delaware Trustee, (iii) Endo International plc, and (iv) Endo, Inc. (the "Trust Agreement"), acting on behalf of itself and as successor-in-interest to the estates of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") with respect to this litigation, respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.    By this action, Plaintiff seeks to call McKinsey & Company, Inc. and its affiliates, including McKinsey & Company, Inc. United States (individually and collectively, "McKinsey"), to account for its intentional misconduct which destroyed billions of dollars of value of its client, Endo, as part of a broader, industry-wide pattern of intentional misconduct that it perpetrated; caused tens of billions of dollars in costs to be incurred by governments, health care payors and unreimbursed healthcare providers; resulted in the death of hundreds of thousands of Americans; and inflicted misery upon millions.

2.    This story is, unfortunately, a familiar one. In recent years, prescription opioid use for both chronic pain and non-medical use has grown dramatically, resulting in an epidemic that has ravaged communities throughout the United States and ruined the lives of countless Americans. Millions of people have become addicted to opioids and suffered serious health consequences, including overdose and death. In 2023 alone, more than 112,000 people in the United States died from an opioid-related overdose.

3.    McKinsey is a principal architect of this crisis. It embedded itself within Endo (and other large opioid manufacturers) and developed and assisted in implementing aggressive and

1

deceptive sales and marketing schemes to ensure that opioids were prescribed heedless of (or lying about) the risk of abuse and opioid addiction.  McKinsey's actions also effectively ensured that opioids were distributed to so-called "pill mills," which McKinsey knew or should have known were servicing addicts and drug dealers.

4.     McKinsey did all of this even when it was fully aware of the dangers of opioids, and knowing that opioid's addictive properties meant that these products were ripe for abuse.  Indeed, McKinsey's rampant misconduct in perpetrating the opioid crisis is currently the subject of myriad lawsuits brought around the country, and appears to be the subject of an ongoing federal investigation.

5.     Prior to McKinsey's infiltration of the opioid industry, potent analgesics like opioids were prescribed only for patients suffering from serious cancer or end-of-life pain. Historically, doctors had been concerned—rightfully—by the severely addictive properties of these drugs.  McKinsey viewed this as an opportunity to turbocharge opioid sales at its clients in what it saw as an underpenetrated market.  McKinsey leveraged its pharmaceutical expertise and connections to manipulate and reshape every aspect of the industry, from top to bottom, including advising the U.S. Food and Drug Administration ("FDA"), the very regulatory body meant to oversee the pharmaceutical industry.   In short order, McKinsey succeeded in dramatically widening opioid use—and the base of consumer-patients—for everyday ailments such as arthritis, back pain, and sports injuries.

6.     McKinsey deployed its pernicious strategy at every large opioid manufacturer for which it consulted, including not only Endo, but Purdue Pharma ("Purdue"), Johnson & Johnson ("J&J"), Teva Pharmaceuticals ("Teva"), and Mallinckrodt Pharmaceuticals ("Mallinckrodt").

Oftentimes, McKinsey deployed the same partners at different manufacturers, including Arnab Ghatak and Laura Moran, who would eventually lead McKinsey's Endo engagement.

7.     Beginning in the mid-2000s, McKinsey inserted itself into every level of Endo's business, up to and including its most senior management, and from 2015 through at least 2016 spearheaded a "sales force blitz" strategy to increase sales of Endo's flagship opioid product Opana ER.  This strategy included, among other things, deliberately targeting healthcare providers that McKinsey knew prescribed large volumes of opioids, redeploying sales representatives to hit target goals, increasing sales quotas, and focusing on selling higher doses of Opana ER.  Notably, this was the exact playbook that McKinsey had successfully deployed at other manufacturers, to devastating human consequences—but very profitable results for McKinsey.

8.     From its years of experience promoting opioids and consulting with the FDA, McKinsey was all too aware of the danger that opioids like Opana ER posed to the general public if they were not marketed and sold safely and responsibly.  Disregarding these hazards, it shepherded Endo through the implementation of McKinsey's reckless and destructive strategy to proliferate opioid sales throughout the country to the detriment of countless patients, families, and communities.  McKinsey's advice and strategies have been a primary driver for the opioid epidemic and have resulted in extensive harm to Endo and its stakeholders.

9.     As the fallout from widespread addiction to opioids such as Opana ER began to manifest, Endo faced a deluge of lawsuits alleging billions of dollars in damages.  Endo poured money into defending these lawsuits, spending $21 million per month on litigation-related fees and expenses.  These lawsuits outpaced the amount of capital Endo was able to devote to its research and development, with legal expenses costing approximately twice as much as the research and development budget in 2021.  Defending itself from these lawsuits while trying to

turn Endo around was simply not possible, and Endo ultimately sought bankruptcy protection and commenced Chapter 11 proceedings in August 2022.  All told, prior to its Chapter 11 filing, Endo devoted $344 million to defending opioid-based lawsuits and paid at least $242 million in opioid-related settlements—and was shouldered with billions more in liabilities.  And in its Chapter 11 cases, Endo was ordered to pay more than $1 billion to its many opioid victims—including those who fell prey to the marketing and sales campaigns spearheaded by McKinsey.

10.    Through this action, the Trustee seeks to recover damages resulting from the harm McKinsey caused to Endo by developing and helping to implement strategies with respect to the marketing and sales of Endo's Opana ER and other opioid products.  In order to rectify that harm, the Trustee brings the following claims against McKinsey: (1) contractual indemnification for the costs Endo incurred due to McKinsey's reckless opioid marketing and sales strategies; (2) aiding and abetting breaches of fiduciary duty committed by the officers and directors of Endo and its subsidiary, Par Pharmaceutical, both of whom, with McKinsey's knowing participation and/or substantial assistance, sought to drive sales of opioids despite the known risks of addiction and the potential for ruinous litigation;[2] and (3) constructive fraudulent transfers based on the obligations Endo incurred and the payments Endo made to McKinsey for consulting services, when McKinsey's opioid-related advice ultimately led to Endo's bankruptcy.

## JURISDICTION AND VENUE

11.    The Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334 and the Standing Order of the United States District Court for the Southern District of New York (the "Southern District of New York") referring to the Bankruptcy

---

[2]    The Trustee is separately suing some of those officers and directors in the action captioned *Matthew Dundon, Trustee of the Endo GUC Trust v. De Silva*, Adv. Pro. 24-07022. (Bankr. S.D.N.Y. July 26, 2024).

Judges of the Southern District of New York all cases and proceedings arising under and related to title 11 of the United States Code (the "Bankruptcy Code").

12.     This adversary proceeding presents both "core" and "non-core" proceedings under 28 U.S.C. § 157(b) and (c).

13.     Plaintiff consents to the entry of final orders and judgments by the Bankruptcy Court pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  Plaintiff also consents to entry of final orders and judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

14.     This Court has personal jurisdiction over McKinsey under Bankruptcy Rule 7004(f) because McKinsey is domiciled in the United States.

15.     Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with cases commenced under the Bankruptcy Code.

## THE PARTIES

16.     Plaintiff Matthew Dundon is Trustee of the GUC Trust, a Delaware trust which was formed on April 23, 2024, pursuant to the Trust Agreement and Section 6.2 of the Plan.  On April 23, 2024, the Debtors and the holders of the Trust Transferred Assets transferred to the GUC Trust all claims against the GUC Excluded Parties (each as defined in the Plan), including Defendants. The claims asserted here are held by the GUC Trust in this capacity or, in the alternative and as appropriate, as the designated representative of the Post-Emergence Entities (as defined in the Plan).

17.     The GUC Trust's beneficiaries are certain of Endo's unsecured creditors, which include, among others, thousands of women implanted with defective vaginal mesh products, and

5

the proceeds from any award in this litigation benefit these creditors.  Endo's opioid creditors, including victims and their survivors, received hundreds of millions of dollars of cash from the beneficiaries of the GUC Trust and other Endo creditors who otherwise had claim to that cash, in partial exchange for granting the GUC Trust rights to these causes of action.

18.    Defendant McKinsey & Company, Inc. is a corporation organized under the laws of the state of New York.  It is headquartered at 711 Third Avenue, New York, NY 10017.  McKinsey & Company, Inc. is the parent company of McKinsey & Company, Inc. United States.

19.    Defendant McKinsey & Company, Inc. United States is a corporation organized under the laws of the state of Delaware.  It is headquartered at 711 Third Avenue, New York, NY 10017.  McKinsey & Company, Inc. United States is the wholly owned subsidiary of McKinsey & Company, Inc.

20.    The non-party Debtors are pharmaceutical companies that manufactured, marketed, promoted, sold, and distributed Opana ER, a branded extended-release oxymorphone tablet, as well as other opioid products.  The Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court on August 16, 2022.

21.    Non-party Endo International plc ("Endo plc"), the ultimate parent of the Endo enterprise, is an Irish public limited company that is both incorporated and headquartered in Dublin, Ireland.

22.    Non-party Endo Health Solutions Inc. ("Endo Health Solutions") is incorporated in Delaware and headquartered in Malvern, Pennsylvania.  Endo Health Solutions focused on, among other things, developing, manufacturing, marketing and distributing Endo's branded and generic opioids, including Opana ER.  In addition, Endo Health Solutions hired executives involved in the

marketing and/or sale of Endo's branded products, including opioids.  Prior to May 23, 2012, Endo

Health Solutions was known as Endo Pharmaceuticals Holdings Inc.

23.    Non-party Endo Pharmaceuticals, Inc. ("Endo Pharmaceuticals") is incorporated in

Delaware and headquartered in Malvern, Pennsylvania.  Endo Pharmaceuticals was involved in,

among other things, the manufacture, distribution, marketing, and sale of Endo's branded and

generic opioid products, ███████████████████████████████████

█████████████████████.

24.    Non-party Endo U.S. Inc. ("Endo U.S." together with Endo plc, Endo Health

Solutions and Endo Pharmaceuticals, individually and collectively, "Endo") is incorporated in

Delaware and headquartered in Malvern, Pennsylvania.  Endo U.S. was the immediate parent of

Endo Health Solutions and Endo Pharmaceuticals.

25.    Non-party Par Pharmaceutical Holdings, Inc. ("PPHI") is incorporated in Delaware

and headquartered in Chestnut Ridge, New York. PPHI was acquired by Endo plc in September

2015, and during the relevant time period was an operating company of Endo plc.

26.    Non-party Par Pharmaceutical Companies, Inc. ("PPCI") is incorporated in

Delaware and headquartered in Chestnut Ridge, New York.  PPCI is a wholly owned subsidiary

of PPHI.

27.    Non-party Par Pharmaceutical, Inc. ("PPI," together with PPHI, and PPCI,

individually and collectively, "Par" or "Par Pharmaceutical") is incorporated in Delaware and

headquartered in Chestnut Ridge, New York.  PPI is a wholly owned subsidiary of PPCI.

**Non-Party Endo plc Directors**

28.    The following individuals were non-party directors of Endo plc during the relevant

time period, and are referred to in the complaint as the "Endo plc Directors":

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

a.      Rajiv De Silva served as a Director from February 2014 to September 2016, and served as Endo plc's Chief Executive Officer and President between 2013 and 2016.

b.      Douglas S. Ingram served as a Director from May 2016 to November 2017.  During his tenure on Endo plc's Board of Directors, Ingram served as a member of the Compensation Committee, the Operations Committee, and the ▇▇▇▇▇ ▇▇▇▇▇▇▇.

c.      Arthur J. Higgins served as a Director from February 2014 to March 2017.  He served as a member of the Endo plc Board of Directors Operations Committee and the ▇▇▇▇▇▇▇▇▇ from about 2014 through 2017.

d.      Nancy J. Hutson served as a Director from February 2014 to April 2024.

e.      Roger H. Kimmel served as a Director and Chair of the Board of Directors from February 2014 to 2019.  He served as Chair of the Corporate Governance Committee and the Nominating Committee, and as a member of ▇▇▇▇▇ ▇▇▇▇▇, the Audit Committee, the Nominating Committee, the Compensation Committee, and the Corporate Governance Committee.  Kimmel also served as a member or alternate member of the Operations Committee and as ▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇ from at least 2014 through 2018.

f.      William P. Montague served as a Director from February 2014 to April 2024.

g.      Todd B. Sisitsky served as a Director from May 2016 to June 2019.  During his tenure on Endo plc's Board of Directors, Sisitsky served as Chair of the Nominating Committee, and as a member of ▇▇▇▇▇▇▇▇, the Nominating

8

Committee, the Compensation Committee, and the Corporate Governance Committee.

h.       Jill D. Smith served as a Director from February 2014 to June 2018.  During her tenure on Endo plc's Board of Directors, Ms. Smith served as a member of the Audit Committee, the Nominating Committee, and the Corporate Governance Committee.  Ms. Smith served as a member of the Operations Committee from at least 2014 through 2018.  ████████████████████████████

████████████████████████████████.

i.       William F. Spengler served as a Director from February 2014 to June 2017.  During his tenure on Endo plc's Board of Directors, Spengler served as Chair of the Audit Committee, as a member of the Audit Committee, and as an alternate on the Compensation Committee.

29.    The Board of Directors of Endo plc had ultimate oversight and responsibility for and directed the activities of all Endo plc subsidiaries.

**Non-Party Endo Health Solutions Directors And Officers**

30.    Paul V. Campanelli served as a Director and as President and Chief Executive Officer of Endo Health Solutions beginning in 2016 through 2019.

31.    De Silva, a Director of Endo plc, also served as a Director of Endo Health Solutions and as President and Chief Executive officer of Endo Health Solutions during 2015 until late 2016.

32.    Suketu P. Upadhyay served as a Director and as Executive Vice President and Chief Financial Officer of Endo Health Solutions at least during the years 2015 and 2016.

33.    Karen A. Wallace served as a Director of Endo Health Solutions during the years 2016 and 2017.

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

34.     The foregoing individuals are referred to in the Complaint as the "Endo Health
Solutions Directors," and Campanelli, De Silva and Upadhyay are also referred to as the "Endo
Health Solutions Officers."

**Non-Party Endo Pharmaceuticals Directors and Officers**

35.     Campanelli, also a Director of Endo plc and Endo Health Solutions, served as a
Director and President and Chief Executive Officer of Endo Pharmaceuticals during 2016.

36.     De Silva, also a Director of Endo plc and Endo Health Solutions, served as a
Director and as President and Chief Executive Officer of Endo Pharmaceuticals from 2013 until
at least 2016.

37.     Upadhyay, also a Director and Officer of Endo Health Solutions, served as a
Director and as Executive Vice President and Chief Financial Officer of Endo Pharmaceuticals
during 2016.

38.     Brian Lortie served as President of Branded Pharmaceuticals of Endo
Pharmaceuticals from 2014 to 2016.  Prior to that, he served in the roles of Senior Vice President
Branded Pharmaceuticals and Senior Vice President Pain Business.

39.     The foregoing individuals are referred to in the complaint as "Endo Pharmaceutical
Officers," and Campanelli, De Silva and Upadhyay are also referred to as "Endo Pharmaceutical
Directors."  The Endo plc Directors, Endo Health Solutions Directors and Officers and Endo
Pharmaceutical Directors and Officers are referred to, individually and collectively, as the "Endo
Directors and Officers."  As noted in footnote 2, the Trustee has sued certain of the Endo Directors
and Officers.

**Non-Party Par Pharmaceutical Directors and Officers**

40.     Campanelli, also an Endo Director and Officer, served as Chief Operating Officer
and Chief Executive Officer of PPI from 2011 to 2012, and as PPCI's and PPHI's Chief Executive

Officer from 2012 through at least 2019.  He also served as a Director of PPHI, PPCI, and/or PPI, from September 2012 through at least 2019.  From 2015 to 2016, Campanelli served as President of Par Pharmaceutical, where he led Endo's fully integrated U.S. generics business following Endo's acquisition of Par.

41.     De Silva, also an Endo Director and Officer, served as a Director and Chief Executive Officer of PPI, PPHI, and PPCI, starting in 2016.

42.     Upadhyay, also a Director and Officer of Endo Health Solutions and Endo Pharmaceuticals, served as a Director and as Executive Vice President and Chief Financial Officer of PPI during 2016.

43.     Antonio Pera served as a Director of PPHI and PPI in 2016, as Chief Commercial Officer of PPHI, PPCI, and/or PPI from 2014 until at least 2016, and as President of PPI since 2013.  In or around November 2016, Endo plc appointed Pera as President of Par Pharmaceutical. In that role, he led Endo's U.S. Generics business, as well as Par's marketing & business analytics group.

44.     The foregoing individuals are referred to in the complaint as the "Par Pharmaceutical Directors and Officers."  As noted in footnote 2, the Trustee has sued certain of the Par Pharmaceutical Directors and Officers.

## FACTUAL ALLEGATIONS

### I.     Prescription Opioids

45.     The term "opioids" refers to a class of drugs that bind with opioid receptors in the brain, and refers to all drugs derived in whole or in part from the morphine-containing opium poppy plant such as opium and heroin, as well as synthetic opioids such as morphine, codeine, hydrocodone, oxycodone, and oxymorphone.

46.    Synthetic prescription opioids are derived from, or possess properties similar to, opium and heroin, are highly addictive and dangerous, and are regulated by the federal government as controlled substances.  Although heroin and opium became classified as illicit drugs, there is little difference between those drugs and prescription opioids, like oxymorphone (*e.g.*, Endo's Opana) and oxycodone (*e.g.*, Purdue's OxyContin).

47.    Due to concerns about their addictive properties, prescription opioids have usually been regulated at the federal level as Schedule II controlled substances.  Schedule II drugs, while having an accepted medical use, have "a high potential for abuse" and "may lead to severe psychological or physical dependence."  The labels for Schedule II opioids carry black box warnings of potential addiction and "[s]erious, life-threatening, or fatal respiratory depression," as the result of an excessive dose.

48.    The effects of prescription opioids vary.  Long-acting (or "extended release") opioids (like Endo's Opana ER) are designed to be taken once or twice daily and are intended to provide continuous pain relief for up to twelve hours.  Short-acting (or "immediate release") opioids (like Opana IR) are designed to be taken in addition to long-acting opioids to address "episodic" or "breakthrough" pain and provide fast-acting, supplemental pain relief lasting four to six hours.

49.    It was common knowledge that Opana ER could be easily abused by being dissolved and injected, crushed and swallowed, or snorted (*i.e.*, insufflation).  Each of these methods caused the immediate release of all twelve hours' worth of opioids at once, producing an intense high and greatly increasing the risk of addiction and overdose from even a single use.  This resulted in the rampant (and foreseeable) abuse of Opana ER.  A single Opana ER tablet contained far more morphine milligram equivalents than contained in its immediate-release counterpart.

12

50.     Persons taking opioids quickly develop tolerance to the analgesic, or pain relief, effect of opioids. As tolerance increases, a patient typically requires progressively higher doses to obtain the same perceived level of pain reduction.  The same is true of the euphoric effects of opioids, *i.e.*, the "high."  However, opioids depress respiration and, at high doses, can, and often do, arrest respiration altogether.

51.     Discontinuing opioids, even after just a few weeks of taking them, will cause most persons to experience withdrawal symptoms, including severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms.  These symptoms may persist for months after a complete withdrawal, depending on how long the opioids were used.

52.     During much of the latter half of the twentieth century, doctors prescribed opioids sparingly, and only for short-term acute pain resulting from injury or illness, during and immediately after surgery, or for palliative cancer or end-of-life care.  Doctors' reluctance to use opioids for an extended period was due to the legitimate fear of causing addiction in patients.

53.     Beginning in the late twentieth century, however, the use of opioids began to expand dramatically.  The market for long-term chronic pain relief is significantly greater than for short-term acute pain relief, and opioid manufacturers, like Endo, recognized that if they could expand their patient base and sell opioids, not just for short-term acute pain relief, but also for long-term chronic pain relief, they could generate greater revenue.  They also recognized that if their patients became addicted to their opioids, those profits would multiply and could continue indefinitely.

## II.     Endo's Background in the Manufacture and Sale of Opioids

54.     Endo was a leading specialty pharmaceutical company that sold both generic and branded products, including prescription opioids.  In 1959, Endo began selling an immediate

release oxymorphone tablet under the brand name Numorphan, which was colloquially known as "blues" after the color of its pills.  Over the next two decades, Numorphan quickly gained popularity as an abused drug for what addicts described as a quick and sustained effect; indeed, a 1974 report by the National Institute on Drug Abuse found that "a number of patients indicated a preference for [Numorphan] over heroin."  Endo voluntarily withdrew Numorphan from the market in 1982 after it gained notoriety for its rampant abuse.

55.     In the early 2000s, Endo began planning for what was ostensibly a "relaunch" of Numorphan, rebranded as "Opana."  Opana pills were manufactured and sold in two formats: an immediate-release ("IR") tablet, intended to relieve moderate-to-severe acute pain, and an extended-release ("ER") tablet, intended to relieve moderate-to-severe pain when continuous, around-the-clock pain management was needed.  Oxymorphone, the main ingredient in Opana IR and Opana ER, is an opioid analgesic that, when injected, is ten times more potent than morphine. Both versions of Opana were approved by the FDA for launch in 2006.  As set forth in further detail below, McKinsey would quickly come to play a leading role in the reintroduction of Endo's opioids into the marketplace.

## III.   McKinsey's Role in the Opioid Crisis

### A.     McKinsey's Business Model

56.     McKinsey played a pivotal role in the sales and marketing of opioids in the United States, developing and implementing aggressive and deceptive sales and marketing strategies for Endo and every other significant opioid manufacturer, and was directly responsible for turbocharging the sales of opioids in the United States.  McKinsey's strategy or "playbook," successfully implemented at Endo and other major opioid manufacturers, was to maximize the return on investment in sales and marketing efforts for its clients' opioid products, selling as many

pills to as many persons as conceivably possible while turning a blind eye to the resulting devastating human consequences.

57.    McKinsey is one of the oldest, largest, and perhaps most prestigious, management consulting firms in the world.  McKinsey provides strategic advice and direction to managers, directors, and owners of a multitude of companies in myriad industries and has a well-known reputation for working intimately with its clients to implement McKinsey's plans.

58.    While management consulting fundamentally is the business of providing solutions to clients, those solutions and the services offered by consultants take many forms, depending on the needs of the client.  Broadly speaking, there are two schools of management consulting.  The first is the more traditional "strategic" consulting, which involves high level advice across different functions.

59.    Over the last few decades, management consulting has increasingly evolved to "implementation" consulting, which involves not only creating a strategy for a business, but then implementing that strategy.  After a client has adopted the consultant's strategy, the consultant becomes deeply involved in the day-to-day running of the client's business, effectuating the consultant's vision for the company.

60.    By the time McKinsey was working with Endo, McKinsey had incorporated implementation consulting as an integral part of its suite of client services.  More consigliere than one-off advisor, McKinsey touts its consulting model as engaging in "transformational partnerships" with its clients.  Once a strategy is identified, McKinsey and its client act in concert as a seamless and cohesive unit to implement the means to achieve the objective.

61.    A McKinsey consultant once described the relationship between McKinsey and its clients as so intimate that in successful engagements McKinsey bonds with its client to the point

15

where "you can't even tell the difference between a McKinsey team member and one of our clients because we work so cohesively together."   Another senior McKinsey employee described that McKinsey's goal in its client engagements is to "interact[] with every element of that organization, from the welders or mechanics on the front line, all the way up to the board of directors."

62.    Consistent with that approach, McKinsey's analogizes itself to being part of a rowing team.



McKinsey Careers: what's behind McKinsey Implementation's logo and success?
5,507 views • Oct 22, 2018                                                    👍 20    👎 1    ↗ SHARE    ⬇+ SAVE    ⋯

Speaking to what the rowing team symbol represents, a Practice Manager at McKinsey explained in a promotional video that "[t]he rowers symbolized to us being in the boat with the clients, doing real work and being jointly responsible for the success."

63.    A different McKinsey partner boasted in another promotional video commenting on McKinsey's success of implementation consulting that:

> The reason McKinsey implementation works is because clients love it.  The fact that we are staying longer with them, the fact that we're getting into the trenches, the fact that we are there to walk the emotional journey with them when they're going through the tough times and really changing their companies, is what makes McKinsey implementation truly distinctive.

64.     At its core, the transformational partnership McKinsey strives to develop with its

clients, including Endo, is the antithesis of a one-off contract where McKinsey performs a discreet

project for a client and then concludes its business.  Rather, "once McKinsey is inside a client, its

consultants are trained to create a feedback loop through their work that purports to ease executive

anxiety but actually creates more of it."  The long-term result creates "dependence" on the

McKinsey consultants.

B.     **McKinsey's Domination of the Pharmaceutical
        Industry Generally, and Opioids Specifically**

65.     McKinsey has a broad and deep practice in the pharmaceutical industry, and in

particular, the opioid market, with clients ranging from major opioid manufacturers to large

wholesale distributors who purchase and distribute opioids.  More than that, McKinsey leverages

its pharmaceutical expertise to advise government regulators, like the FDA, the federal agency

charged with overseeing the pharmaceutical industry, including opioids.

66.     McKinsey's clients and relationships in the pharmaceutical industry give it

unparalleled access to information, decision makers, and regulators, putting it in the unique

position of influencing and shaping nearly every aspect of the opioid industry, literally from the

factory to the pharmacy.  McKinsey was so pervasive in the opioid industry that, at the height of

the opioid crisis, it has been estimated that its clients accounted for roughly 90% of all opioid pills

sold in the United States.

67.     McKinsey's Pharmaceuticals and Medical Products ("PMP") industry practice

group, one of its most successful and profitable industry groups, is dedicated to "helping clients in

the pharmaceutical industry to maximize commercial value by assisting with product launch,

marketing, sales, and market access."  McKinsey's transformational implementation consulting

strategy was front and center in the PMP practice group, with McKinsey proudly describing on its

PMP practice page that "[o]ur efforts span the entire organization – we can help train and restructure sales forces, work directly in the field to provide coaching, maximize value from back-office services, develop strategies to accelerate short-term sales, and assist with company-wide commercial transformations."

68.     In 2012, McKinsey described the depth and breadth of the knowledge and expertise of the PMP group as having "more than 1,700 consultants with significant healthcare experience, including more than 150 physicians and 250 consultants with advanced degrees in genetics, immunology, biochemical engineering, neurobiology, and other life sciences," and "75 consultants with advanced degrees in public health, healthcare management, and related fields."

69.     That same year, the PMP group published a report entitled *Death of a Sales Model, or Not: Perspectives on the Evolution of Pharmaceutical Field Based Selling*.  In it, McKinsey partner Laura Moran, one of the McKinsey partners on the Endo engagement, as well as one of the partners on McKinsey's engagement with Purdue, co-authored a segment entitled *The Few, The Proud, The Super-Productive: How a 'smart field force' can drive better sales*.  In that piece, Moran described ways a pharmaceutical company could optimize its sales force, laying out the strategies McKinsey incorporated in its advice to Endo with respect to turbocharging the sales of Opana ER, previously perfected in McKinsey's advice to J&J and Purdue with respect to turbocharging the sales of their respective opioid products.

## C.    McKinsey's Work With Other Opioid Manufacturers

70.     McKinsey deployed its implementation consulting style to embed itself within not only Endo, but every other significant opioid manufacturer in the United States, including Purdue, J&J, Teva, and Mallinckrodt, masterminding the turbocharging of opioid sales as the country sank deeper in the opioid epidemic.  McKinsey advised multiple opioid manufacturers on the sales and

marketing of competing branded opioid products using near-identical strategies, increasing the sales of all of the respective opioids.

### 1.    __McKinsey's Work With Purdue__

71.    Perhaps McKinsey's most infamous pharmaceutical client was Purdue. While McKinsey had a longstanding relationship with Purdue, since 2004, McKinsey's sales and marketing work for Purdue focused specifically on creating and implementing strategies to bolster the sale of Purdue's OxyContin. Today, OxyContin (and the methods developed by McKinsey that were used to sell it) is widely considered to be the taproot of the opioid crisis. Notably, Arnab Ghatak, later one of the lead partners on McKinsey's Endo engagement, was also the lead partner on McKinsey's Purdue engagement. McKinsey partner Laura Moran also straddled the two relationships.

72.    McKinsey's work with Purdue with respect to OxyContin is a prime example of its transformational approach to consulting. McKinsey advised Purdue on, designed, and then drove the implementation of strategies to increase the sales of OxyContin.

73.    McKinsey was several years into its relationship with Purdue and its work on OxyContin when, in 2007, McKinsey's sales and marketing strategies for OxyContin resulted in Purdue pleading guilty to federal charges of misbranding OxyContin by falsely marketing and promoting OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal symptoms than other pain medications.

74.    Announcing Purdue's guilty plea in May 2007, the Department of Justice ("DOJ") called out the "fraudulent marketing campaign" McKinsey had designed for OxyContin and the resulting harm it caused:

> Even in the face of warnings from health care professionals, the media, and members of its own sales force that OxyContin was being widely abused and causing harm to our citizens, Purdue, under

19

the leadership of its top executives, continued to push a fraudulent marketing campaign that promoted OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal. In the process, scores died as a result of OxyContin abuse and an even greater number of people became addicted to OxyContin; a drug that Purdue led many to believe was safer, less subject to abuse, and less addictive than other pain medications on the market.

75.     Purdue agreed to pay over $600 million in criminal and civil penalties to the DOJ for its false and deceptive marketing of OxyContin, and three Purdue senior executives pleaded guilty to a misdemeanor charge of misbranding and collectively agreed to pay $34.5 million in penalties. Concurrent with its guilty plea, Purdue entered into a Corporate Integrity Agreement with the Office of Inspector General of the U.S. Department of Health and Human Services that was intended to impose constraints on its sales and marketing practices with respect to OxyContin.

76.     Following Purdue's guilty plea and its Corporate Integrity Agreement, sales of OxyContin languished, with a Purdue senior manager acknowledging that OxyContin revenue was dropping in part "due to less abuse" by OxyContin users. Purdue turned to McKinsey to help reverse the declining sales of OxyContin.

77.     While the Corporate Integrity Agreement was in place, and with full knowledge of that agreement, McKinsey helped devise a sales and marketing strategy to keep sales of OxyContin increasing. Then, in 2013, when the Corporate Integrity Agreement expired, McKinsey pushed a more aggressive sales and marketing strategy for OxyContin, urging Purdue to go on the "offense" in marketing OxyContin and "turbocharge" its OxyContin sales. In other words, rather than heeding Purdue's legal and regulatory headwinds, McKinsey directed Purdue to "double down" on the very activity that got Purdue in trouble in the first place.

78.     McKinsey also advised Purdue that it could "band together" with other opioid makers—the majority of which were McKinsey clients—to head off "strict treatment" of opioids by the FDA (yet another McKinsey client).

79.    At the direction and with the assistance of McKinsey—McKinsey's Ghatak noting that McKinsey was "now deeply involved in nearly every facet of the company"—Purdue launched "Project Turbocharge," implementing McKinsey's marketing tactics that reinvigorated the misuse and abuse of OxyContin and presaged McKinsey's work with Endo two years later.

80.    Riding the wave of the McKinsey-orchestrated "Project Turbocharge," OxyContin sales skyrocketed, peaking at $5 billion in 2013.  This was five times the revenue generated by OxyContin in 2007, the year Purdue pled guilty to misbranding OxyContin and ostensibly agreed to limit its sales and marketing activities associated with OxyContin.  Notably, this five-fold increase in revenue occurred three years after *overall* opioid prescriptions had peaked in 2010.  In essence, McKinsey guided Purdue in working around the guardrails intended to manage the use and abuse of OxyContin in order to maximize the profits generated by OxyContin.

2.    **McKinsey's Work With J&J**

81.    McKinsey's success in "turbocharging" sales of OxyContin was not its first foray into developing and implementing an aggressive sales and marketing plan for an opioid manufacturer.  Several years earlier, in 2011, and during the same time it was advising Endo and Purdue, McKinsey launched a project to "turbocharge" the sales of J&J's flagship opioid Nucynta.

82.    Notably, Ghatak and Moran, two of the lead partners on McKinsey's Endo engagement (in addition to McKinsey's Purdue engagement), as well as Aamir Malik, another McKinsey partner on the Endo engagement, all advised on the strategy to turbocharge the sales of J&J's Nucynta.

83.    The marketing tactics deployed by McKinsey on behalf of J&J presaged the strategies for increasing sales of Purdue's OxyContin and Endo's Opana ER, and also included urging J&J to pursue so-called "unbranded promotion," which encouraged doctors to continue to prescribe more opioids regardless of brand.

84.     At the direction of McKinsey, J&J sought to persuade doctors that pain was under-

treated, training sales representatives to use "emotional selling" to get across the idea that patients

were being harmed by undertreatment.  Another tactic pioneered by McKinsey was the concept of

"pseudoaddiction," or the idea that if patients were asking a doctor for higher doses of a painkiller,

they were not necessarily addicted, but rather needed more of the drug to treat their pain.

85.     To drive sales and prescriptions of Nucynta, McKinsey encouraged J&J sales

representatives to identify "high potential physicians," *i.e.,* physicians likely to prescribe high

volumes of opioids.  McKinsey also advised J&J to create contests and other incentives for its

sales representatives to reach certain prescription-writing goals for Nucynta, recommending

rewarding the salespersons for their efforts and tailoring compensation based on the "high-

potential [prescription] writers."

3.     **McKinsey's Work With Teva**

86.     McKinsey also enjoyed a longstanding consulting relationship with Teva, the

largest manufacturer of generic drugs in the world that has been sued by more than 2,500 political

subdivisions related to its role in the opioid crisis.

87.     Teva's involvement in the U.S. opioid market dates back to at least 2004, when its

generic version of OxyContin was approved by regulators and held a small market share.  Teva's

opioid market share increased significantly following its acquisition of Cephalon, another

manufacturer of opioids (including a lollipop containing fentanyl) in 2011, and Actavis, the

second-largest U.S. producer of opioids, in 2016.

88.     McKinsey has consulted for Teva for, at a minimum, almost two decades on a wide

range of matters similar to its other opioid manufacturer clients, including sales and marketing

strategies to increase market share and enhance customer engagement.  This involved analyzing

market trends, customer behaviors, and competitive dynamics to develop targeted marketing

campaigns and sales approaches, along with advice concerning the process of authorizing medication requests with insurance companies.

### 4.      **McKinsey's Work With Mallinckrodt**

89.     McKinsey was also a trusted advisor to Mallinckrodt, a leading manufacturer of generic opioids, which McKinsey advised on boosting sales of its opioid products like generic hydrocodone, oxymorphone, and morphine.  Upon information and belief, McKinsey consultants were tasked with walking Mallinckrodt's factory floors, monitoring production data, and recommending ways to increase yields from raw materials and expedite manufacturing processes for its opioids.

90.     In addition, in 2016, McKinsey prepared Mallinckrodt for negotiations related to selling their generic drugs, including opioids, to Walmart and CVS.  McKinsey also advised Mallinckrodt on dealing with the U.S. Drug Enforcement Administration ("DEA"), which had set production limits to prevent an oversupply of opioid pills.  Specifically, McKinsey advised Mallinckrodt as to how it could use logistical tactics to secure a higher quota while maintaining a friendly relationship with the DEA.

91.     Notably, upon information and belief, many of the same McKinsey consultants who worked with Mallinckrodt also consulted with the FDA on regulatory advice and the oversight of opioid-related programs.  According to a congressional report, discussed below, at least one McKinsey consultant simultaneously worked with the FDA and Mallinckrodt between 2008 and 2022.

### D.      **McKinsey's Additional Opioid-Related Relationships**

92.     McKinsey's relationships and influence went far beyond opioid manufacturers. McKesson Corporation ("McKesson"), AmerisourceBergen ("Amerisource") (now Cencora, Inc.), and Cardinal Health, Inc. ("Cardinal") distributed almost half of the country's supply of

prescription opioids.  The three, referred to as the "Big Three" opioid distributors, are named in nationwide opioid-related lawsuits, alleging that they contributed to the opioid epidemic by failing to monitor and control the distribution of opioids, failing to report suspicious orders of opioids, and ignoring red flags of diversion.  Not surprisingly, McKinsey had a consulting relationship with each of the three.

93.     While McKinsey's advice to McKesson, Amerisource, and Cardinal covered numerous subjects, the common denominator, on information and belief, was that McKinsey advised them all on opioid distribution practices and regulatory compliance, the short fallings of which resulted in them being named in opioid litigation throughout the country.

94.     In addition to client relationships with opioid-related companies, McKinsey served as a revolving door for executives in the opioid industry, with numerous McKinsey opioid-related clients hiring former PMP partners to fill senior executive positions.  In addition to Endo hiring as its CEO Rajiv De Silva, a former leader with McKinsey's PMP Group, former McKinsey partners held senior positions at, among others, J&J, Mallinckrodt, Teva, Allergan, Cardinal, Amerisource and McKesson.  These relationships provided McKinsey with an entrée into the C-suites of the most significant opioid-related companies in the country, and unmatched influence and access to information.

### E.      McKinsey Advised the Federal Government on Opioids While Simultaneously Advising Opioid Manufacturers and Distributors

95.     At the same time McKinsey was designing and implementing deceptive sales and marketing for its opioid manufacturer clients, and advising opioid distributors on strategies for distributing opioids, it was advising government regulators, including the FDA, the drug industry's primary regulator, on opioid-related issues.

96.     The Committee on Oversight and Reform of the U.S. House of Representatives laid bare McKinsey's "pervasive conflicts of interest" in a damning report released on April 13, 2022, entitled, *The Firm and the FDA: McKinsey & Company's Conflicts of Interest at the Heart of the Opioid Epidemic* (the "Committee Report").   The Committee Report detailed McKinsey's duplicity and conflicting work for opioid manufacturers and the federal government, outlining McKinsey's role in the nation's opioid epidemic.

97.     From 2006 to 2019, McKinsey received more than $900 million in taxpayer funds from the federal government.   Between 2008 and 2022, the FDA alone paid McKinsey more than $140 million, including $40 million in connection with the FDA's Center for Drug Evaluation and Research ("CDER"), which oversees numerous opioid-related programs.

98.     CDER's Office of Surveillance and Epidemiology ("OSE") is the principal division responsible for evaluating the safety of drugs sold to the public, including opioids.   The OSE, among other things, maintains a system of post-approval surveillance programs to identify adverse effects of drugs that did not appear during the drug's development process.   McKinsey advised the FDA on the operations of OSE, including developing Risk Evaluation and Mitigation Strategies ("REMS") for products.   McKinsey was tasked with defining the "strategic goals and objectives for CDER and OSE related to drug safety," including their weighing of "the adverse impact of drugs on health in the U.S."   During the time McKinsey was engaged on that matter, CDER and OSE were implementing the REMS for opioids.   Upon information and belief, in this role, McKinsey gained unique access to information regarding the overarching threat opioids posed to the American public.

99.     CDER also oversees the FDA's Sentinel Initiative, which assesses a drug's safety, including opioids, once the drug is in the market.   Sentinel is "a core component of [the FDA's]

25

evolving safety surveillance system." During the time McKinsey was advising CDER on the Sentinel Initiative, the FDA was implementing Sentinel to understand patterns of the use and abuse of opioids.

100.    During the time it was advising the FDA on these opioid-related matters, among others, McKinsey served as a consultant for nearly every significant participant in the opioid industry, including, Endo, Purdue, Mallinckrodt, and J&J. Indeed, McKinsey repeatedly allowed employees and partners who advised opioid manufacturers to also consult for the FDA on opioid-related matters.

101.    The Committee Report identified at least 22 McKinsey consultants, including senior partners, who worked for both the FDA and opioid manufacturers on related matters, including some at the same time. Among those who advised both the FDA and McKinsey's opioid manufacturer clients were McKinsey senior partner Arnab Ghatak, one of the leaders of McKinsey's engagement with Endo, and Sastry Chilukuri, another McKinsey senior partner on the Endo engagement.

102.    McKinsey's consulting for the FDA positioned itself as an expert in navigating and circumventing federal oversight for its private sector clients. McKinsey touted its FDA experience and government relationships in presentations to McKinsey's private clients, including opioid manufacturers, highlighting its relationship with the FDA and stressing "who we know and what we know." The Committee Report noted that it "uncovered several instances in which McKinsey consultants appear to have received information from the FDA related to the agency's regulation of opioids, which the consultants then shared with McKinsey colleagues working for private sector opioid clients."

26

103.    The Committee Report noted that there was evidence that McKinsey advised at least one of its opioid manufacturer clients on its specific interactions with the FDA, and in one case helped its client secure FDA approval of a new opioid product.

104.    In a statement accompanying the release of the Committee Report, Representative Carolyn Maloney stated:

> Today's report shows at the same time the FDA was relying on McKinsey's advice to ensure drug safety and protect American lives, the firm was also being paid by the very companies fueling the deadly opioid epidemic to help them avoid tougher regulations of these dangerous drugs.

105.    McKinsey's relationship with the federal government was not limited to the FDA. From 2009 onwards, McKinsey had a lucrative consulting relationship with the Department of Veterans Affairs ("VA") on matters related to healthcare services for veterans.  Upon information and belief, in this role, McKinsey also gained unique access to specialized information regarding the threat opioids posed to the most vulnerable members of the American public.

106.    At the same time it was advising the VA, McKinsey was also counseling opioid manufacturers like Purdue and Endo on how to target the VA for increased opioid sales.  In the 2010s, McKinsey "wrote presentations for these pharmaceutical clients that recommended that they aim for the agency to accept their new opioid products to veterans or to increase sales of their opioid products that the agency had already accepted."

107.    Similarly, in a June 2013 presentation for Purdue entitled *OxyContin Growth Opportunities*, McKinsey consultants advised Purdue to "explore institutional sales channels and ways to engage large institutions (*e.g.,* long-term care, VA hospitals)."  In July 2013, McKinsey gave another presentation directing Purdue to specifically target the VA for increased sales.

108.    Veterans paid the price for McKinsey's duplicity—veterans were reported to be at the forefront of the opioid epidemic in the 2010s, with almost 900,000 veterans prescribed opioids

in 2012. The VA has acknowledged the large population of veterans who became addicted to opioids as a result of overprescribing these drugs for injuries and post-traumatic stress disorder. But rather than helping this at-risk population, McKinsey exploited it to further line its pockets and drive short-term revenue for its opioid-related clients.

F.    **McKinsey Was Very Familiar With the Dangers of Opioids**

109.    Throughout the time it was advising Endo with respect to the marketing and sales of its opioid products, McKinsey was advising other opioid manufacturers, opioid distributors, and the FDA. As a result, McKinsey was intimately aware that opioids, and especially Endo's Opana, pure oxymorphone twice as potent as Purdue's OxyContin, were highly addictive and unsafe for the treatment of long-term chronic pain.

110.    It was well known to even casual observers that oxymorphone was not a new opioid, and Opana was not Endo's first oxymorphone product. Oxymorphone had been synthesized more than a century ago in Germany, and Endo's predecessor began selling it in the United States in 1959 under the brand name Numorphan—until it was withdrawn from the market in 1982 following widespread reports of its rampant abuse.

111.    McKinsey knew well that opioid therapy after a serious injury could lead to opioid dependency and addiction. For example, in a 2011 presentation to Endo, McKinsey detailed the "opioid dependence treatment pathway," highlighting the step-by-step process by which a patient becomes addicted to opioids. The presentation describes patients beginning opioid treatment, increasing dosage when pain is not managed, and eventually needing methadone or suboxone for dependency and addiction.

112.    McKinsey's lengthy relationship with Purdue and its work on OxyContin also gave McKinsey firsthand knowledge of the dangers of opioids. And Purdue's May 2007 guilty plea to criminal misbranding of OxyContin put McKinsey on particular notice of the risks to a

28

manufacturer associated with McKinsey's aggressive and deceptive opioid marketing and sales strategies.

113.    In that last regard, in Purdue's plea agreement, the DOJ specifically called out that it was well known "that OxyContin was widely abused" and that "OxyContin was the child of marketeers and bottom line financial decision making."  The DOJ also prominently highlighted the addictiveness of OxyContin, stating that Purdue had "unleashed a highly abusable, addictive, and potentially dangerous drug on an unsuspecting and unknowing public."  While not naming McKinsey, the plea agreement went to the heart of McKinsey's "Project Turbocharge."  And anyone familiar with opioids and prescription painkillers knew that Opana ER was twice as potent as OxyContin.

114.    Further, McKinsey's extensive work with the FDA gave McKinsey insight as to the dangers of opioids and the government's efforts to mitigate the risks associated with opioids. Notably, in materials provided to several of its clients, McKinsey repeatedly referred to the government's scrutiny of opioids and the complex regulatory framework for pharmaceutical marketing as obstacles to circumvent.

115.    McKinsey, moreover, worked with Purdue to push back on doctors' and patients' concerns about the significant risks of OxyContin.  In September 2013, McKinsey briefed Purdue on the concerns regarding OxyContin addiction and diversion among prescribers, noting that "side effects and addiction are concerns" of prescribers, that "[m]ost prescribers are concerned about abuse, but attempt to establish measures to protect themselves," and that "diversion, abuse and regulatory concerns continue to weigh on prescribers."  Rather than working to limit these disastrous effects, McKinsey developed new messaging to boost sales.

116.    Notably, McKinsey partners were aware that their advice to opioid manufacturers was crossing the line and that McKinsey risked being held accountable for their work. For example, in a text exchange with Ghatak in May 2017, McKinsey senior partner Moran said she would not email slide decks to an opioid manufacturer, but would instead provide printed copies, saying "these guys will be deposed.  Best our emails are not sucked into it."  Ghatak and Moran were lead partners on McKinsey's Endo engagement.

117.    McKinsey, moreover, was so concerned about its role in the marketing and sales of opioids that at least some of its partners went so far as to destroy documents to erase their tracks. In 2018, after Purdue had been sued over its marketing of OxyContin, Martin Elling, a leader in the PMP Group, sent an email to himself that simply said "delete old [Purdue] documents from laptop."  Elling and Ghatak were ultimately fired by McKinsey after it was reported in the press that Elling sent an email to Ghatak asking whether they "should be doing anything" other than "eliminating all our documents and emails" related to their opioid work, to which Ghatak replied "Thanks for the heads up.  Will do."

118.    In sum, there is no legitimate dispute that McKinsey, perhaps more than anyone, had a panoramic view of the dangers and risks associated with opioids, and chose to ignore them, and in many respects, instead relied on them to drive sales of opioids, benefitting itself and driving short-term profits for its clients.

## IV.    McKinsey Begins Advising Endo on its Long-Term Strategic Plan

119.    Following the FDA's approval of Opana in 2006, ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

████████████████████████████████████████████████████████

████████████████    Over the next decade, it became clear that McKinsey's advice █

████████████████████████ centered on aggressively shifting Endo's resources to the promotion

and sale of Endo's branded and generic opioid products, using the same tactics it had successfully

employed at Endo's competitors.

120.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

121.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]



122.

123.

32

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

124.    As set forth below, however, rather than fulfilling its commitments to Endo, McKinsey instead harmed Endo by recklessly steering Endo's leadership to boost opioid sales and disregard red flags and regulatory obligations, all of which ultimately led to Endo's bankruptcy, just as McKinsey's work had contributed to the Purdue bankruptcy in September 2019 and the Mallinckrodt bankruptcy in October 2020.

## V.    Endo Reformulates Opana ER and Seeks to Stave Off Generic Competition

125.    Following Endo's U.S. launch of Opana ER in late 2006, ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

126.    It soon became apparent, however, that Opana ER, like Numorphan before it, had a significant potential for abuse, in large part because it could be easily crushed and snorted, or dissolved in water and injected, releasing all twelve hours' worth of opioids at once.  A cascade of articles and investigations were published regarding the dangers of Opana ER, including a July 2012 report by USA Today that Opana ER had become the drug of choice for people seeking narcotics.

127.    Additionally, states such as New York, Tennessee, and Kentucky began to issue public health alerts concerning the increasing abuse of Opana and rising overdose deaths.  For example, in 2011, toxicology tests identified oxymorphone in the blood of 23% of Kentucky's overdose victims—up from only 2% in 2010.  And in May 2011, Nassau County, New York issued a public health alert after Medicaid data for the county found that prescriptions for Opana ER had increased 45% in six months.  This alert warned that "[r]eports from around our nation are giving an increasing indication that Opana is a dangerous narcotic highly susceptible to abuse and illicit

33

trade," that Opana ER "lacks the tamper-proof mechanisms that have begun to limit the abuse of other painkillers," and that county executives were "deeply concerned at the rapid rise of Opana ER prescriptions."

128.    Negative press, however, was not the only problem Endo faced regarding Opana ER.  After just a few short years on the market, the patent for Opana ER was nearing expiration. This, in turn, would open the floodgates to much cheaper generic equivalents, and while Endo's subsidiary Qualitest Pharmaceuticals, Inc. ("Qualitest"), which manufactured generic drugs, might stand to benefit, it would place Endo's profits from the branded Opana ER at significant risk. ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ .

129.    In response to these threats, Endo, in consultation with McKinsey, devised a plan: reformulate Opana ER into a purportedly "crush-resistant" tablet ("Reformulated Opana ER") and submit a Supplemental New Drug Application ("sNDA") to the FDA.

130.    Notably, to get approval from the FDA, a generic manufacturer must submit an Abbreviated New Drug Application ("ANDA") showing, among other things, that the active ingredient in its version is bioequivalent to the branded drug.  As such, Endo and McKinsey hoped that the approval of Reformulated Opana ER would extend Opana ER's patent protection and stave off generic entrants, as well as assuage public concerns regarding the abuse of Opana ER.  Upon information and belief, McKinsey participated in and advised on, from start to finish, Endo's attempt to reformulate Opana ER to be "abuse-deterrent."

131.    This joint effort, however, proved to be a failure.  In December 2011, although the FDA approved Endo's sNDA for Reformulated Opana ER, it denied Endo's request to include in

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

product labeling a description of its purported abuse-deterrent properties.  Critically, the FDA found that the drug did *not* meet the agency's standards to be considered abuse-deterrent.  The FDA explained that:

> While the new formulation has demonstrated a minimal improvement in resistance to tampering by crushing, thereby limiting the likelihood of abuse by crushing followed by ingestion, and by insufflation (snorting) to some degree, *it can still be…cut…rendering it readily abusable by ingestion and intravenous injection, and possibly still by insufflation*; although whether … tablets can be snorted was not studied. Of more concern, when chewed … *the new formulation essentially dose dumps like an immediate-release formulation*. (emphasis added)

132.    In other words, the FDA determined that Reformulated Opana ER was, by and large, no less subject to abuse than the prior formulation of Opana ER.  And both Endo and McKinsey knew this, given that the very studies Endo submitted to the FDA in connection with its application demonstrated that Reformulated Opana ER could be chewed or even ground with a coffee grinder.

133.    In 2012, Endo took another run at beating back generic competition, submitting a "citizen petition" requesting that the FDA determine that the original Opana ER was withdrawn from the market due to safety concerns (which would benefit Endo because generic equivalents to Opana ER would be required to be withdrawn from the market).  In light of McKinsey's familiarity with the FDA, on information and belief, Endo consulted with McKinsey in connection with that petition.

134.    The FDA, however, denied Endo's citizen petition in 2013, finding that there was insufficient data to conclude that the original formulation posed an increased risk of abuse compared to Reformulated Opana ER, reiterating what it had concluded a year earlier when it had rejected Endo's efforts to promote Opana ER as resistant to abuse.  Indeed, any improvement in

abuse deterrence between original Opana ER and Reformulated Opana ER was, in the FDA's words, "minimal."

135.    In fact, far from being a safer formulation, Reformulated Opana ER showed signs of being *more* susceptible to abuse by injection and other methods.  In 2013, the FDA issued a statement concluding, among other things, that:

- While there was "an increased ability of the reformulated version of Opana ER to resist crushing relative to the original formulation, study data showed that the reformulated version's extended-release features can be compromised when subjected to other forms of manipulation, such as cutting, grinding, or chewing, followed by swallowing;"

- "Reformulated Opana ER can be readily prepared for injection, despite Endo's claim that these tablets have 'resistance to aqueous extraction (i.e., poor syringeability).'  It also appears that reformulated Opana ER can be prepared for snorting using commonly available tools and methods;" and

- One of Endo's postmarketing investigations "suggests the troubling possibility that a higher percentage of reformulated Opana ER abuse is via injection than was the case with the original formulation."

136.    The FDA's warnings proved prescient. Almost immediately upon its release, reports emerged of rampant abuse of Reformulated Opana ER.  Although Reformulated Opana ER could still be easily crushed, the most common method of abusing Reformulated Opana ER was via injection, which made Reformulated Opana ER even more deadly than the original formulation.  Among other things, injection introduced the risks of HIV and Hepatitis C and, unique to Reformulated Opana ER, the risk of the rare blood-clotting disorder thrombotic thrombocytopenic purpura ("TPP"), which can cause kidney failure when the protective coating of Reformulated Opana ER tablets was inadvertently dissolved with the tablet itself.  Reports of HIV, Hepatitis C, and TPP outbreaks quickly surfaced.  For example, in January 2013, the Centers for Disease Control and Prevention reported a TTP outbreak in Tennessee that was traced to

intravenous abuse of Opana ER, and in Austin, Indiana in 2016, intravenous abuse of Opana was linked to an outbreak of at least 200 HIV cases in a town with a population of only 4,500.

## VI. McKinsey and Endo's Leadership Were Aware of the Widespread Abuse of Opana ER

137. The rampant abuse of Opana ER could not have come as a surprise to either McKinsey or Endo. As set forth above, both companies had decades of experience in the opioid industry, which provided them with a deep institutional knowledge and understanding of the abuse potential—and reality—of Opana ER.

138. Indeed, Endo and McKinsey discussed the dangers of Opana ER before the drug was even launched. In an internal presentation dated May 10, 2006 (prior to the FDA's approval of Opana), Endo set forth various "Crisis Scenarios" that might accompany the launch of its oxymorphone product, which included "Death of abuser (adult, teen, celebrity)," "Celebrity addiction makes news," "Dateline NBC or 60 Minute type investigation into the approval of another abusable opioid," "strong warnings" from the DEA "about [oxymorphone] abuse potential," and a "Dear Doctor" letter from the FDA concerning the "abuse potential" of Endo's product.

139. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████

140. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

141. ████████████████████████████████████

████████████████████████████████████████████████

141.  Endo's various Boards were repeatedly informed of the abuse and misuse of its

opioid products over the years, including when Endo was working with McKinsey. ██████████



All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

143. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████



144. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

[4] ████████████████████████████████████████████████

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

████████████████████████████████████████████████████████████

████████████████████████████████████████████████    Meanwhile, and as set forth in

more detail below, McKinsey recommended that Endo target high-prescribing doctors to write

even more Opana ER prescriptions for an increasingly-addicted population.

145.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

146.    Likewise, both Endo and McKinsey were aware that contemporaneous data showed

that between October 2012 and March 2014, 64% of individuals who abused Reformulated Opana

ER did so by injection—a significant increase from the 36% who had abused the original

formulation by injection.  Reformulated Opana ER was so widely abused that, by 2012, Opana ER

had surpassed abuse rates of OxyContin.  FDA data further demonstrated that per dosing unit,

Reformulated Opana ER had four times as many incidents of intentional abuse of OxyContin

between 2013 and 2016.

147.    McKinsey also had good reason to know that Reformulated Opana ER was not

abuse-deterrent or resistant.  ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████    Yet McKinsey,

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

seemingly without hesitation, continued to advise Endo to aggressively market this highly abusive drug.

**VII.**   <u>**McKinsey Devises a Plan to Boost Endo's Sales of Opana ER**</u>

148.    Unbothered by the evidence that Opana ER was being abused, McKinsey focused on what had always served as its mandate: improving Endo's bottom line.  After Reformulated Opana ER was introduced, and the FDA declined to designate that the original formulation of Opana ER was removed for safety reasons, an influx of generic oxymorphone flooded the opioid market, causing sales of Reformulated Opana ER to plummet.

149.    This created a problem that McKinsey was up to solving: how to stabilize and, ultimately, increase sales of Reformulated Opana ER.  Thanks to its work with opioid manufacturers such as Purdue and J&J, McKinsey already had the playbook to save Endo's flagship opioid product.

    **A.**    **De Silva is Named CEO of Endo, and McKinsey**
              <u>**Gains Unprecedented Access to Endo's Operations**</u>

150.    As concerns about Opana's sales grew, De Silva, a former leader in McKinsey's PMP group, was hired as CEO of Endo in February 2013. ███████████████

████████████████████████████████████████

████████████████████████████████████████

███████

151.    ██████████████████████████████████

████████████████████████████████████████

███████████████████████████████     ████

████████████████████████████████████████

████████████████████████████████████████

41

152.    De Silva's appointment cemented McKinsey's role in Endo's management and operations and driving its opioid strategy. ███████████████████████████████████████

153.    ███████████████████████████████

154.    ███████████████████████████████

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]



**B.     McKinsey Assists Endo With the Preparation and
        Dissemination of Misleading Marketing Materials**

156.    Now fully enmeshed in Endo's operations, McKinsey was instrumental in guiding Endo through its response to the FDA's 2013 findings that Reformulated Opana ER was susceptible to abuse.  Upon information and belief, Endo sought to leverage McKinsey's deep ties to the FDA, which McKinsey was advising at the same time concerning the opioid market, including drug safety issues.  *See supra* at Sec. III(E).   Indeed, two McKinsey senior partners on the Endo engagement—Ghatak and Chilukuri—were advising both Endo and the FDA concurrently.

157.    Upon information and belief, McKinsey encouraged Endo's leadership to effectively work around the FDA's concerns about the ability to abuse Reformulated Opana ER and disseminate marketing that implied what Endo was not permitted to say outright—that Reformulated Opana ER was abuse-deterrent or -resistant, and thus could be prescribed safely. Such deceptive marketing included:

- Failing to disclose the FDA's labeling denial on the Opana ER website or other written marketing communications concerning Opana ER.

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

- ████████████████████████████████████████████████████████

- Failing to inform health care providers and potential users that Opana ER was neither abuse deterrent, nor crush resistant.

- ████████████████████████████████████████████████████████

158.    Endo's touting of "Opana ER with INTAC Technology"—which by its very name implied that Reformulated Opana ER stayed "intact" when attempted to be crushed or chewed—had drawn particular ire from the FDA.  In April 2012, Endo received a notification from the FDA advising that Endo's claims about Opana ER's INTAC technology were misleading, despite the inclusion of a disclaimer:

> The proposed detail aid contains numerous claims and presentations describing Opana ER's new formulation and its INTAC™ technology. . . . The totality of these claims and presentations suggest that, as a result of its new formulation Opana ER offers a therapeutic advantage over the original formulation when this has not been demonstrated by substantial evidence or substantial clinical experience. *In addition, these claims misleadingly minimize the risks associated with Opana ER by suggesting that the new formulation's "INTAC™ technology" confers some form of abuse deterrence properties when this has not been demonstrated by substantial evidence.* Although we acknowledge that there is evidence to support some limited improvement in mechanical stability and strength attributable to the new technology as well as a minimal improvement in resistance to tampering in efforts to abuse Opana ER intranasally, *there are several limitations to this data*. . . . We acknowledge that the proposed detail aid presents statements such as, "The clinical significance of INTAC technology or its impact on abuse/misuse has not been established for the new formulation of Opana ER" on various pages of the piece; *however, these and similar statements do not mitigate the overwhelming misleading impression.* Therefore, [the FDA's Division of Professional Drug Promotion] recommends that these claims and presentations regarding Opana ER's new formulation be deleted from the proposed detail aid. *We are especially concerned from a public health perspective because the presence of this information in the detail aid could result in health care practitioners or patients thinking that the new*

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

*formulation is safer than the old formulation, when this is not the*
*case.* (emphasis added)

159.    Nevertheless, with the encouragement of McKinsey, Endo's sales representatives were directed to continue marketing Opana ER's INTAC technology as "designed to be crush-resistant," and to conversely deride generic versions of Opana ER as "not designed to be crush-resistant."   In some instances, as Endo and McKinsey were aware, sales representatives simply used the phrase "crush resistant" to misleadingly describe Opana ER.

160.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████, and (iii)

the FDA's findings that Reformulated Opana ER was easier to inject than original Opana ER. Further, upon Endo's announcement in July 2017 that it would withdraw Reformulated Opana ER, *see* paragraph 213 below, ████████████████████████████████████

████████████████████████████████████████.

161.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

45

162.    With McKinsey's assistance, Endo disseminated these deceptive messages through websites, publications, and "Key Opinion Leaders," who were physicians paid by Endo to speak at or attend events designed to promote certain opioid products, deliver scripted talks, present continuing medical education programs, and serve in leadership positions of professional societies and patient advocacy groups.  Although the FDA rejected the "abuse deterrent formulation" label for Reformulated Opana ER in 2011, ███████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████.

163.    ███████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████.

164.    In addition to distributing misleading messaging, McKinsey also encouraged Endo to sponsor and distribute opioid marketing materials that downplayed opioids' risks and addictiveness.  ███████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

████████████████████████████████████████

████████████████████

165.    Notably, NIPC, ████████████, disseminated numerous messages that reached tens of thousands of people downplaying the addictiveness of opioids, including statements that "[p]eople who take opioids as prescribed usually do not become addicted," and "people who have no history of drug abuse, including tobacco, and use their opioid medication as directed will probably not become addicted."

166.    Endo also commissioned and distributed a supplement available for Continuing Medical Education credit in the Journal of Family Practice called "Pain Management Dilemmas in Primary Care: Use of Opioids," in which it minimized the risk of addiction by emphasizing the effectiveness of risk screening tools, claiming that with the use of such tools, even patients at high risk of addiction could safely receive chronic opioid therapy.

167.    Endo further co-sponsored and distributed copies of the Federation of State Medical Board's Responsible Opioid Prescribing, which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding—which are actual signs of genuine addiction—were all really signs of "pseudoaddiction," a concept McKinsey had developed in advising J&J to turbocharge its sales of Nucynta, which suggests that the under-treatment of pain, rather than addiction, is the core problem underlying the opioid crisis.

168.    In a patient education pamphlet titled "Understanding Your Pain: Taking Oral Opioid Analgesics," Endo deceptively minimized the risks of addiction, stating, "[a]ddicts take opioids for other reasons, such as unbearable emotional problems.  Taking opioids as prescribed for pain relief is not addiction."

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

C.      **McKinsey Develops the "Sales Force Blitz"
        to Boost Opana ER Sales**

169.    At the core of McKinsey's scheme to boost Opana ER profits, however, was a complete overhaul of Endo's sales and marketing tactics for the drug, which McKinsey dubbed "Sales Force Blitz."

170.    In reality, "Sales Force Blitz" was simply a repackaging of the "Project Turbocharge" that McKinsey had implemented the previous year to boost Purdue's sales of OxyContin, which itself was modeled on the advice McKinsey had provided to J&J with respect to Nucynta.  Indeed, McKinsey's Ghatak, who had led Project Turbocharge for Purdue, was placed at the helm of Endo's Sales Force Blitz, and McKinsey's Moran similarly worked on both initiatives.

171.    McKinsey's presentations to Endo on the proposed Sales Force Blitz were, unsurprisingly, based on the Purdue Project Turbocharge slides.  For instance, on June 28, 2015, Sherin Ijaz of McKinsey emailed Ghatak, Nicholas Mills, and Moran, circulating a draft proposal for an "Endo sales force transformation" PowerPoint presentation.  Ijaz explained, "Laura, I heavily leveraged what you send [sic] from Purdue as it was all applicable." All three of the recipients of Ijaz's email had worked on the Purdue account for years.

172.    Sales Force Blitz, like Project Turbocharge, was a targeted marketing and sales overhaul.  The plan for Sales Force Blitz was to assign more sales representatives to push Opana ER to prescribers via "targeting" the "sweet spot of doc[tors]" amenable to prescribing the drug in greater quantities.  In other words, McKinsey's plan was to convince doctors who were *already* over-prescribing highly-addictive and abused opioids to increase their prescriptions even *more*.

173.    To that end, McKinsey developed and advised Endo on three principal marketing tactics: (1) the development and usage of granular sales and marketing data to determine which

prescribers to target; (2) ████████████████████████████████████████████

████████████████████████████████; and (3) an increase in the overall number of

calls that Endo's sales representatives placed to prescribers.

174.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

175.    Under McKinsey's direction, Endo implemented each of these tactics. ██████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

176.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

    1.    ████████████████████████████████████

177.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

49

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

178. 

179.

2.

180.

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]



181.

3.

182.

183.

184.

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

185.

186.

187.    McKinsey also encouraged Endo to reallocate sales force resources to Opana from other Endo products such as Sumavel, a migraine medication, and Voltaren, an anti-inflammatory.

Endo followed this instruction.  Writing to the McKinsey team in late 2015, Endo's Alicia Logan stated the joint mission: "I agree that our main goal is to maximize the increased promotional efforts for [Reformulated Opana ER] without disrupting/sacrificing [Sumavel] or [Voltaren] TRx volume and it appears that we [can] accomplish this with your recommendation of addition another 500 targets."

188.    McKinsey also took advantage of its close relationship with De Silva to have him exert direct influence over Endo's sales force.  In an April 2016 email, not only did Ghatak

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

encourage the Endo CEO to "push" his employees for more information on health care provider call attainment, he chastised the Endo sales force efforts, writing "[t]here is clearly a problem with the field *not going after the new targets aggressively enough"* (emphasis added).

189.    McKinsey and Endo's joint efforts in implementing Sales Force Blitz and driving the sales of Opana ER paid off—at least in the short term.  Primarily as a result of McKinsey's tactics to aggressively target high-prescribing doctors and push false messaging that Reformulated Opana ER was safer than its original formulation and less likely to be abused or diverted, in 2016, Opana ER sales, which had been declining due to generic oxymorphone competition, began to stabilize.  Indeed, ███████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
████████████

## VIII.    Mckinsey Continues to Advise Endo on Boosting Opioid Profits in 2016

### A.    Endo, With McKinsey's Advice, Expands its Generic Footprint

190.    Notably, McKinsey's efforts to maximize Endo's opioid profits did not stop with Endo's branded opioids.  Upon information and belief, in 2014, after failing to stave off generic entrants, Endo decided to increase its share of the generic opioid market.  Endo achieved this through the $8 billion acquisition of Par Pharmaceutical, which closed in September 2015.  Upon information and belief, McKinsey advised Endo on this transaction as part of its broader strategy to boost Endo's profits through the sale of opioids—both branded and generic.

191.    Prior to its acquisition by Endo, Par Pharmaceutical was one of the leading generic opioid producers, manufacturing (or acquiring and distributing) generic oxymorphone, oxycodone, hydrocodone, Endocet (generic Percocet), and two forms of fentanyl.  In fact, between 2006 and 2014, Par Pharmaceutical manufactured some 18% of the nation's total opioid pills, second only

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

to Mallinckrodt and Actavis.  As reported by the Washington Post, a review of DEA data and other documents show that Par Pharmaceutical "and other generic-pain-pill makers rushed to gain market share as the nation's deadliest drug epidemic spun out of control."

192.    Upon information and belief, like Endo's Directors and Officers, Par Pharmaceutical's Directors and Officers were aware of the abuse and misuse of the opioid products that Par was selling. From at least the time of Endo's acquisition of Par in 2015, the Par Pharmaceutical Directors and Officers knew of (i) the risk of addiction that Par Pharmaceutical opioid products posed to the general public and (ii) the prospect of abuse and diversion of opioids that Par Pharmaceutical sold, including, but not limited to, generic oxycodone and hydrocodone.

193.    Endo had previously manufactured and sold generic opioids, including generic oxymorphone, through its subsidiary, Qualitest, although its share of the generic opioid market was relatively small.  After acquiring Par Pharmaceutical, however, between its branded and generic opioids, Endo became the country's third largest opioid producer.

194.    Following the acquisition of Par Pharmaceutical, the Boards and management of Endo and Par began to overlap.   In particular, Endo Health Care Solutions and Endo Pharmaceuticals President and CEO De Silva and CFO Upadhyay were installed on the PPI Board and assumed senior roles in PPI's management.  Campanelli, who was PPCI's CEO at the time of its acquisition and served as President of Par Pharmaceutical from 2015 to 2016, was named President and CEO of Endo Health Solutions and Endo Pharmaceuticals in 2016.  As such, Endo and Par Pharmaceutical were effectively operated as a single entity, with a single vision and strategy to maximize the sale of opioids and the resulting profit—a strategy that was, in turn, heavily influenced by McKinsey's consulting work.

195. 

196.

197.

**B.**     **McKinsey Advises Endo to "Blitz" its Other Branded Opioid**

198.     In 2016, McKinsey also helped Endo further expand its branded pain presence by launching a "blitz" for Belbuca, an opioid-based buprenorphine film used to treat long-acting pain. Endo had purchased the rights to sell Belbuca via a licensing agreement with BioDelivery Sciences International, and, upon information and belief, McKinsey had been assisting Endo with its plans to launch Belbuca in the years leading up to the licensing agreement.  Notably, McKinsey was advising Endo on Belbuca at the same time McKinsey was advising Purdue on the sale of its own

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

buprenorphine product, Butrans, further underscoring McKinsey's pervasive presence in the opioid market at this time.

199.    By February 2016, the Belbuca launch was underway.  When sales of the opioid initially lagged, McKinsey conceived of a new strategy—use Belbuca as a "bridge" to convert users to long-acting opioids other than buprenorphine, such as Reformulated Opana ER.  Indeed, in internal presentations, McKinsey and Endo conceived of Belbuca as an "Initial [Anatomical Therapeutic Chemical] Opioid Therapy" that would be positioned as "the first [Long-Acting Opioid] for poorly controlled or dissatisfied chronic pain patients transitioning from short-acting to long-acting opioids."  Opana ER, in turn, would be the drug of choice "[f]or poorly-controlled chronic pain patients transitioning from their initial LAO therapy," *i.e.*, Belbuca.



200.    In other words, McKinsey saw promoting Belbuca as a bridge to the more lucrative and addictive Reformulated Opana ER.  McKinsey internally described this as a "moonshot," referencing the leap that users would make from Belbuca to Opana ER, in essence using Belbuca as a "gateway drug" to Opana ER.

IX.    **McKinsey Continues to Advise Endo in the Face of
       Legal and Regulatory Headwinds**

201.    Throughout 2016, McKinsey continued to steer Endo's business plan to maximize

profits from opioid sales, ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████    Notably, this continued even after federal and state

authorities, concerned about Opana ER's rampant abuse, began honing in on the drug's highly

deceptive marketing.

202.    In March 2016, Endo Health Solutions and Endo Pharmaceuticals entered into an

Assurance of Discontinuance with the New York State Attorney General concerning their

improper marketing practices for Opana ER, practices largely developed by McKinsey for Endo.

The Attorney General's investigation focused not only on what McKinsey had recommended to

Endo, but what McKinsey was helping Endo to implement.  The Assurance of Discontinuance

stated, among other things, that "[t]he Attorney General found that Endo improperly marketed

Opana ER to be crush resistant, when Endo's own studies showed that the pill could be crushed

and ground."

203.    The Assurance of Discontinuance also stated that the state's investigation "revealed

that Endo had no meaningful program in place to ensure that its sales representatives were not

encouraging health care providers engaged in abuse and diversion to write more prescriptions for

Opana ER."  As part of the settlement with the New York State Attorney General, Endo agreed to

"stop improperly marketing Opana ER as being crush resistant."

204.    Shortly after Endo executed the Assurance of Discontinuance, ████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

205.    Although the writing was on the wall, McKinsey pushed Endo's salesforce to continue its "Blitz" and pursue high volume prescribers of Opana ER more "aggressively."  Endo and McKinsey together oversaw the deployment of Endo's Opana ER sales force and received detailed information about their performance.   In an April 29, 2016 email to De Silva, Ghatak wrote pointedly that sales associates "have to feel accountability to deliver" on reaching Opana ER sales targets.  With McKinsey at its side, all efforts were to keep the profits from Opana ER flowing for as long as possible.

206.

207.    Endo Directors and Officers, as well as McKinsey, also received information concerning problematic sales practices.

58

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

████████████████████████████████████████████. Failure to give healthcare providers information as part of Endo's anti-abuse and anti-diversion efforts increased the likelihood that Endo's opioids would be overprescribed and abused or diverted. ██████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████.

208.    ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████

209.    ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████

210.    The continued availability of Opana ER continued to make headlines in fall 2016. In September 2016, Endo received a report from a Florida detective describing an "Opana sales and use ring," and stating that 50 people had been arrested and two people had died. This email chain reached all the way to Campanelli, who by this time was President, CEO, and Director of Endo Health Solutions and Endo Pharmaceuticals. This news had no apparent impact on either Endo or McKinsey; on the same day that Endo received this report, the Endo Northeast Leadership team received an email stressing that "it is very important that our teams are selling Opana ER on every call."

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

**X.    The FDA Halts Sales of Reformulated Opana ER**

211.    In March 2017, an independent FDA advisory committee determined that the benefits of Reformulated Opana ER no longer outweighed its risks.  Members of the advisory committee found that any benefits of Reformulated Opana ER "were overshadowed by the continuing public health concerns around the product's misuse, abuse, and diversion."

212.    Even though Endo subsequently stopped actively marketing Reformulated Opana ER, it nevertheless continued selling Reformulated Opana ER.

213.    Consequently, in an unprecedented action, in June 2017, the FDA requested that Endo remove Reformulated Opana ER from the market.  The FDA noted that this was "the first time the agency has taken steps to remove a currently marketed opioid pain medication from sale due to the public health consequences of abuse."  A month later, in July 2017, Endo agreed that it would remove Reformulated Opana ER from the market.

214.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

215.    Even after deciding to withdraw Reformulated Opana ER from the market, and once again putting profits over compliance, Endo took steps to ensure that it would make money on its remaining Reformulated Opana ER inventory.  ████████████████████████

████████████████████████████████████████████

60

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

████████████████████████████████████████████████████████

███████████████████████████████████████

216.    Notably, unlike the branded Opana, generic oxymorphone was not withdrawn from the market, and Endo still controlled and (and, upon information and belief, to this day controls) critical oxymorphone patents.  Focusing again on its bottom line rather than the health epidemic it was fueling, within a month of pulling Reformulated Opana ER off the market, Endo reached an agreement with Impax Laboratories, LLC ("Impax") to sell generic oxymorphone and pay Endo royalties equal to a percentage of Impax's oxymorphone profits, an amount estimated by Endo in 2017 to be some $265 million through 2029.

217.    ████████████████████████████████████████████████████████ Endo's residual sales of Opana ER continued into 2018.

218.    From the launch of Opana ER in 2006 until sales ceased—including from 2016 forward—Endo realized hundreds of millions of dollars in profits through the sale of Opana ER (while concomitantly amassing even greater amounts of contingent liabilities).  And McKinsey, as an architect of Endo's opioid strategy, received millions of dollars for its consulting services in developing and implementing that strategy.

## XI.    The Aftermath

### A.    McKinsey Has Acknowledged, and is Slowly Being Held Responsible for, Its Role in Engineering the Opioid Crisis

219.    In an outrageous example of "way too little and way too late," McKinsey in 2019 announced that it would no longer advise clients on any opioid-related business, stating, in part, "[w]e recognize the terrible consequences of the opioid epidemic and have acknowledged our role in serving opioid manufacturers . . . [and] have apologized for it."  Acknowledging its

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

responsibility and apologizing for its role in the opioid epidemic does not, however, absolve itself of its past misconduct and the devastation for which it is responsible.

220.   McKinsey has been named in hundreds of lawsuits across the country arising from its advice to its opioid manufacturing clients and its role in engineering the opioid crisis.  The suits against McKinsey are so many, and so widespread, that there is a multidistrict litigation case dedicated to its role in providing advice to opioid manufacturers.  Plaintiffs in that multidistrict litigation are cities, counties, tribal governments, health care providers and other entities alleging various claims against McKinsey, including public nuisance, negligence, fraud, unjust enrichment, violation of consumer protection statutes and federal RICO claims.

221.   Since 2021, McKinsey has paid nearly $1 billion to settle just a fraction of the lawsuits brought against it for its opioid-related activities.  In February 2021, McKinsey settled a lawsuit brought by 47 states, the District of Columbia, and five territories for $573 million. McKinsey separately settled lawsuits brought by two other states—Washington State and West Virginia—for $13.4 million and $10 million, respectively.  The underlying claims were based on McKinsey's efforts to instruct Purdue on "turbocharging" its OxyContin sales.

222.   In September 2023, McKinsey paid $230 million to settle a lawsuit brought by hundreds of U.S. local governments and school districts, similarly alleging that McKinsey fueled the opioid epidemic through its work with Purdue and other opioid manufacturers.

223.   Similarly, in December 2023, McKinsey paid $39.5 million to settle a lawsuit brought by federally recognized Native American tribes over its role in the opioid crisis.  That same month, McKinsey agreed to pay $78 million to resolve claims brought by U.S. health insurers and benefit plans alleging that McKinsey's work with Purdue and other opioid manufacturers fueled the opioid crisis.

224.   It has also been reported that the federal government has been investigating McKinsey's role in advising manufacturers in the sale of opioids.  In that regard, Endo reported in a 2021 regulatory filing that it had received a subpoena in December 2020 from the Western District of Virginia U.S. Attorney's Office seeking information about its relationship with McKinsey.

**B.**   **In Exchange for Paying McKinsey ███ for its**
**"Expert" Services, Endo Has Been Named in**
**Thousands of Lawsuits and Has Suffered Billions of Dollars in Damages**

225.   As a direct consequence of McKinsey's strategic directives concerning the marketing and sales of Opana and its other opioid products, Endo has been named in more than 3,500 lawsuits and ultimately was forced to file for bankruptcy.

226.   Endo has spent $344 million defending those suits and paid more than $240 million in professional fees during its bankruptcy (through July 2028).

227.   Endo has paid at least $242 million in opioid-related settlements prior to its bankruptcy filing, including:

a.   New York: $200,000 (March 2016);

b.   County of Cuyahoga, Ohio and the State of Ohio: $10 million (September 2019);

c.   Oklahoma: $8.75 million (January 2020);

d.   The State of New York, Nassau County New York, and Suffolk County, New York: $50 million (September 2021);

e.   Texas: $63 million (December 2021);

f.   Florida: $65 million (January 2022); and

g.   West Virginia: $26 million (March 2022).

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

228.    Endo has settled two securities class actions brought against it and various of its officers and directors related to opioid allegations, paying: (a) $82.5 million, approved in December 2019, and (b) $63.4 million, approved in October 2021.

229.    In addition, as part of the order confirming its chapter 11 plan, Endo paid the following opioid-related amounts:

a.    $200 million to the Department of Justice;

b.    $273.6 million to state opioid plaintiffs; and

c.    $89.2 million to private opioid plaintiffs.

## XII.    McKinsey Aided and Abetted Endo and Par Management's Breaches of Fiduciary Duties

### A.    Endo's Directors and Officers Owed and, With McKinsey's Knowing Participation, Breached Their Fiduciary Duties

230.    The Endo Directors and Officers owed fiduciary duties to their respective companies to, among other things, act in good faith and in the best interests of Endo and refrain from activities that would expose Endo to significant liabilities; oversee and manage Endo's affairs with appropriate care, skill and diligence; and ensure Endo's compliance with all laws and regulations.  The Endo Directors and Officers failed in carrying out these duties and protecting Endo and its stakeholders.

231.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

████████████████████████████████████████████████████

██████████████████████████████████

232.    As an opioid manufacturer, Endo was subject to extensive regulation by both the federal government and each of the states within which it operated.  For example, Endo's annual reports disclosed that:

> In the United States, the development, testing, manufacture, holding, packaging, labeling, distribution, marketing, and sales of our products and our ongoing product development activities are subject to extensive and rigorous government regulation.  The Federal Food, Drug and Cosmetic Act (FFDCA), the Controlled Substances Act and other federal and state statutes and regulations govern or influence the testing, manufacture, packaging, labeling, storage, record keeping, approval, advertising, promotion, sale and distribution of pharmaceutical products.  Noncompliance with applicable requirements can result in fines, recall or seizure of products, total or partial suspension of production and/or distribution, injunctions . . . civil penalties and criminal prosecution.

233.    Endo's annual reports also disclosed that Endo's opioid products are subject to "certain security and record keeping requirements by the . . . DEA," and these requirements are meant to "prevent loss and diversion" of these controlled substances.  Variations of these disclosures appeared on every one of Endo's Form 10-Ks dating back to at least 2006, following the launch of Opana.  Campanelli and De Silva signed certain of Endo's Form 10-Ks making these disclosures from 2015 through 2021.

234.    In addition, Endo was required to comply with the statutory requirements imposed by the Comprehensive Drug Abuse Prevention and Control Act of 1970 (the "CSA"), 21 U.S.C. § 801 *et seq.*, and the regulations promulgated pursuant to the CSA, 21 C.F.R. § 1300, *et seq.*  Congress enacted the CSA in 1970 to (a) promote public health by making medications available to patients, and (b) protect public safety by abating illegal diversion of controlled substances.

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

235.    To discharge their duties, the Endo Directors and Officers were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of Endo.  Pursuant to those duties, the Endo Directors and Officers were required among other things:

    a.  to exercise good faith to ensure that the affairs of Endo were conducted in an efficient, business-like manner to make it possible to provide the highest quality performance of their business;

    b.  to exercise good faith to ensure that Endo was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements; and

    c.  when put on notice of problems with Endo's business practices and operations, to exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

236.    Endo has admitted that it did not meet these requirements.  In his First Day Declaration in the bankruptcy proceedings, Endo's Chief Financial Officer stated, "[t]he Debtors had limited insight into precisely where their products ended up, who used them, or whether anyone abused them contrary to their FDA-approved labeling."  This statement is an admission of Endo's failure to monitor properly the problem of abuse and diversion, as required by law.  In key respects, the statement is also false.  As pleaded above, the Endo Directors and Officers could not have been unaware of the extensive abuse of Opana ER unless they consciously ignored and/or improperly closed their eyes to that abuse.

237.    Endo, with the knowledge and assistance of McKinsey at every step of the way, misleadingly promoted Opana ER products as having a lower potential for abuse, hired sales representatives to target high volume prescribers of Opana ER and designed compensation structures to encourage them to push the sales of Opana ER, utilized a speaker program to pay millions of dollars to prescribers, and promoted misleading and harmful narratives about "pseudoaddiction."  Endo, with the knowledge and assistance of McKinsey, maintained many of these practices at least through December 2016.

66

238.     Moreover, even though the FDA rejected Endo's request to allow Endo to market Reformulated Opana ER as abuse deterrent, the Endo Directors and Officers, working with McKinsey, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

239.     Upon information and belief, each of the Endo Directors and Officers participated in the misconduct alleged herein, and McKinsey knowingly participated in and/or substantially assisted in their breaches of fiduciary duty.

**B.      Par Pharmaceutical's Directors and Officers Owed and, With McKinsey's Knowing Participation, Breached Their Fiduciary Duties**

240.     Like the Endo Directors and Officers, the Par Pharmaceutical Director and Officers owed fiduciary duties to their respective companies to, among other things, act in good faith and in the best interests of Par and refrain from activities that would expose Par to significant liabilities; oversee and manage Par's affairs with appropriate care, skill and diligence; and ensure Par's compliance with all laws and regulations.  The Par Pharmaceutical Directors and Officers failed in carrying out these duties and protecting Par and its stakeholders.

241.     On information and belief, Par Pharmaceutical's Directors and Officers were aware of their obligation to ensure Par Pharmaceutical's compliance with laws and regulations governing the manufacture and sale of opioid products. For example, prior to Par Pharmaceutical's 2015 acquisition by Endo plc, PPCI's annual reports disclosed that:

> The development, manufacturing, sales, marketing and distribution of our products are subject to extensive regulation by the U.S. federal government, principally the FDA, and, as applicable, the Drug Enforcement Agency, FTC and state and local governments. For both currently marketed and future products, failure to comply with applicable regulatory requirements can, among other things, result in suspension of regulatory approval and possible civil and criminal sanctions. Regulations, enforcement positions, statutes and legal interpretations applicable to the pharmaceutical industry are constantly evolving and are not always clear. Significant changes in regulations, enforcement positions, statutes and legal interpretations could have a material adverse effect on our financial condition and results of operations.
>
> . . . .
>
> The FDCA, the Controlled Substances Act and other federal statutes and regulations govern the development, testing, manufacture, safety, effectiveness, labeling, storage, record keeping, approval, import and export, and advertising and promotion of our products. Non-compliance with applicable regulations can result in judicially and/or administratively imposed sanctions, including the initiation of product seizures, injunctions, fines and criminal prosecutions.

Variations of these disclosures appeared on every one of PPCI's Form 10-Ks dating back to least 2010.   Par Pharmaceutical CEO and President Paul Campanelli signed certain of Par Pharmaceutical's SEC filings making these disclosures from 2014 through 2015.

242.   Like Endo, Par Pharmaceutical too was required to comply with the statutory requirements imposed by the CSA, the regulations promulgated pursuant thereto, including 21 C.F.R. § 1301.74(b).

243.   To discharge their duties, the Par Pharmaceutical Directors and Officers were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of Par.  Pursuant to those duties, the Par Pharmaceutical Directors and Officers were required among other things:

> a.   to exercise good faith to ensure that the affairs of Par were conducted in an efficient, business-like manner to make it possible to provide the highest quality performance of their business;

68

    b.    to exercise good faith to ensure that Par was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements; and

    c.    when put on notice of problems with Par's business practices and operations, to exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

244.    Endo's admission that it did not meet these requirements, described in paragraph 240 above, includes Par Pharmaceutical, thus Endo has admitted Par Pharmaceutical's failure to monitor properly the problem of abuse and diversion, as required by law. As pleaded above, the Par Pharmaceutical Directors and Officers could not have been unaware of the extensive abuse of the opioids produced and/or distributed by Par Pharmaceutical unless they consciously ignored and/or improperly closed their eyes to that abuse.

245.    The Par Pharmaceutical Directors and Officers were aware—or had reason to know—that opioids like the ones it sold were being diverted and abused on a massive scale. Indeed, De Silva held this knowledge at least as early as 2013, when he became CEO and President of Endo Pharmaceutical.  Likewise, Campanelli admitted in deposition testimony in a multidistrict litigation in which both PPI and PPCI were defendants that the opioid abuse epidemic had "resonated" with him by at least 2015.  Notwithstanding this knowledge, the Par Pharmaceutical Directors and Officers maintained and/or increased production of Par's opioid product lines after its acquisition by Endo in 2015 through at least 2016.

246.    Upon information and belief, each of the Par Pharmaceutical Directors and Officers participated in the misconduct alleged herein and McKinsey knowingly participated in and/or substantially assisted in their breaches of fiduciary duty.

**XIII.**  **Endo's Obligations and Transfers**

247.    ███████████████████████████████████████████████

███████████████████████████████████████████████████████

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]



Instead of delivering this, McKinsey led Endo, and countless other pharmaceutical manufacturers, down a dark, dangerous path that resulted in today's current opioid epidemic and the financial ruin of Endo and many other pharmaceutical manufacturers.

248.

Indeed, Endo entities had overlapping officers, directors, and personnel, shared common office space and contact information, and held themselves out to creditors as a single business enterprise. Endo subsidiaries exercised a limited amount of business discretion and there was a lack of arm's length dealing between Endo plc, Endo Health Solutions, and their subsidiaries—which largely shared in profits and losses, and were routinely financed through a central cash management system at the behest of their parent entities.

the Endo entities were each other's alter ego and their legal distinction was commonly blurred.

249.

listed on **<u>Schedule A</u>**[5] (collectively, the "<u>Obligations</u>").

---

[5]    Upon information and belief, based on the nature of the work of McKinsey and correspondence between McKinsey and Endo, there are additional agreements that govern the services McKinsey was to provide Endo around the same time period.

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

250.    ████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████    In

reality, however, the services provided by McKinsey did not create "value" and instead prioritized

the illusion of profits over the short term while creating a ticking time bomb of liability for Endo.

251.    The advice McKinsey provided was akin to professional malpractice.  Instead of

providing Endo with a strategy to achieve long-term growth, McKinsey implemented a dangerous

sales strategy that ultimately resulted in massive liabilities for Endo, ███████████████████

██████████████████████████████████████████████████████

████████████████████    In doing so, McKinsey seized on the addictive nature of Endo's

opioid products and placed short-term gains for shareholders and itself over the long-term

prospects of Endo.  McKinsey knew better than all others about the dangers associated with the

opioid strategy it peddled.  As outlined above, McKinsey was intimately familiar with the extreme

dangers of opioids from its history of advising other opioid manufacturers as well as the federal

government. █████████████████████████████████████████████

McKinsey knew or should have known that the advice it provided under the various agreements

with Endo would result in substantial liabilities and be the demise of Endo—just as it was for

Purdue and Mallinckrodt.  McKinsey, however, was content to rake in its profits.  In doing so,

McKinsey carried out the services it agreed to provide Endo unfaithfully.

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

252.    Despite the fact that McKinsey failed to adhere to its end of the bargain under the Obligations—it did not create value, but destroyed it—Endo paid exorbitant fees to McKinsey for its short-sighted and destructive advice.  Upon information and belief, these fees were directed to be paid by directors and officers, such as De Silva, who was previously a "McKinsey man" himself and who prioritized short-term profits instead of lasting growth and long-term financial stability.

253.     as reflected on **Schedule B** (collectively, the "Transfers" and together with the Obligations, the "Transactions").

**A.    Endo was Insolvent at the Time of the Transactions and Did Not Receive Reasonably Equivalent Value from McKinsey in Exchange for the Transactions**

254.    Endo, ██████████████████████████████████████████, received no consideration in exchange for the Transactions except for the keys to its own destruction.  The Transactions led to Endo being saddled with massive liabilities that eventually caused Endo's bankruptcy filing and left creditors holding the bag—as both McKinsey and Endo should have foreseen at the time of the Transactions.

255.    At the time of the Transactions, McKinsey was aware of all of the problems with opioids and ignored the disastrous effect its advice would produce in the long term, and Endo, ██ ████████████████████████████████████████████████, should

---

6  ████████████████████████████████████████████████
████████████████████████

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

have foreseen the scope of the massive litigation liability related to its opioid products that it

already faced, and which was worsening, at the time of the Transactions.

256.    At the time of the Transactions, Endo, ███████████████████████████

███████████████████, and Endo U.S. Inc., among other affiliated entities, had already

been the subject of lawsuits and government investigations with respect to its marketing and sale

of opioid products, including Opana, as well as its products generally.  Many plaintiffs, including

government entities, sought very substantial recoveries for costs they incurred or expected to incur

in the future to address the consequences of opioid-related addiction, including the provision of

various public services related to opioid addiction or to abate the opioid crisis.  For example, the

lawsuits against Endo, ████████████████████████████████████████████████

████████████████, among other affiliated entities, sought various remedies, including: (a)

declaratory and/or injunctive relief; (b) compensatory, punitive and/or treble damages; and (c)

restitution, disgorgement, civil penalties, abatement, and attorneys' fees and costs, and had been

filed against Endo in multiple forums as early as 2014.  Those lawsuits asserted, among other

claims, common law tort claims based on misrepresentations in connection with sales and

marketing of Endo's opioid products.   In reality, for every dollar that Endo, ████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████, paid McKinsey and for every dollar in revenue

that Endo, ████████████████████████████████████████████████████████

███, and potentially other affiliated entities acting by its direction and on its behalf, received for

the sale of opioids based on McKinsey's advice, Endo ███████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████, was accruing far greater liability.

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

257.    The litigation exposure of Endo, ████████████████████████

████████████████████████████████████████████, at or around the time of the Transactions also extended to matters unrelated to

the opioid lawsuits, including myriad claims related to generics price-fixing, transvaginal mesh

product liability, other antitrust claims, and ranitidine product liability.  Endo, ██████████

████████████████████████████████████████████, was facing billions of dollars of liabilities from these

issues.  And the advice provided under the Obligations increased the exposure to Endo, ████████

████████████████████████████████████████████

██████████████████████████.

258.    As further detailed above, Endo's Directors and Officers were aware of (i) the risk

of addiction that Endo's opioid products posed to the general public and (ii) the prospect of abuse

of Opana ER as early as 2012—██████████████████.  The public admissions made by

Endo during this time frame highlight the massive and growing litigation liabilities Endo faced.

For example, Endo made the following representations as early as 2016:

> Our business exposes us to significant potential risk from product
> liability claims, other significant litigation matters, government
> investigations or product recalls, including, but not limited to, such
> matters associated with the testing, manufacturing, marketing and
> sale of our products.
>
> We have been in the past, and continue to be, subject to various
> product liability cases, other litigations and/or government
> investigations.
>
> [W]e could expect that any significant product liability litigation or
> mass tort in which we are a defendant will have a larger number of
> plaintiffs than such actions have seen historically because of the
> increasing use of wide-spread and media-varied advertising.
>
> If we are found liable on a product liability claim or series of claims,
> defaults could be declared under our debt agreements, we could

74

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

suffer reputational damage, and we could incur losses, any of which could materially and adversely impact our business, financial condition, results of operations and cash flows.

259.    Nonetheless, despite the growing number of lawsuits against Endo, ███████

████████████████████████████████████████████████████

███████████████████████████████, and concomitant exposure to massive liability,

between 2014 and 2017, Endo, ██████████████████████████

████████████████████████████████████████████████████

██████, consistently underreported the full scope of the liabilities it faced in order to maintain the

façade that its assets exceeded its liabilities.  On or about the time of the Transactions, Endo,

████████████████████████████████████████████████████

███████████████████████████████, apparently was also underreporting its

tax liability by billions of dollars to paint a false picture of financial stability and success.

260.    Not only did Endo, ██████████████████████████

████████████████████████████████████████████████████

██████, fail to properly account for the size of its liabilities, given that it faced such huge exposure,

the fair market value of its assets was grossly exaggerated by several billions of dollars.  Indeed,

at or around the time of the Transactions, more than two thirds of such "assets" were comprised

of good will and general intangibles—which could not have the values ascribed given the massive

wall of liability these Endo entities faced.  In reality, at the time of the Transactions, the fair market

value of Endo's assets, ██████████████████████████████████

████████████████████████████████████████████████████

██████, was substantially less than its liabilities.

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

261.   Undoubtedly, Endo's financials were skewed to benefit management, shareholders and to paint Endo as a more worthy suitor for certain transactions, such as the 2015 merger with Par Pharmaceutical.

262.   Eventually Endo could no longer conceal its financial condition from the public. As Endo subsequently reported in its disclosure statement filed in the Chapter 11 Cases on January 16, 2024:

> As of June 30, 2022, the Company had approximately $8.15 billion of funded debt outstanding, approximately 700% of its prior twelve months of adjusted EBITDA (approximately $1.22 billion) and greater than 1,000% of its anticipated 2022 EBITDA (approximately $775 million). **Such figures exclude contingent liabilities that could potentially significantly increase such leverage figures**. (emphasis added).

263.   On August 16, 2022, Endo had no choice but to file for bankruptcy, stating in its First Day Declaration, "the continued litigation of the Opioid Lawsuits [wa]s simply unsustainable." As of the Petition Date, Endo had paid approximately $242 million to secure only a handful of opioid related settlements, incurred $344 million of legal expenses defending those lawsuits, and reported over 3,100 lawsuits "and the potential for significant further lawsuits from a variety of plaintiffs" seeking to hold them liable for their marketing and sale of their opioid products remained pending. As part of the bankruptcy, Endo faced several billions of dollars in claims related to the very same liability that it was creating or exacerbating at the time of the Transactions. As part of the bankruptcy, Endo owed opioid-related liabilities, among others, exceeding billions of dollars.

### B.   Multiple Predicate Creditors Hold Allowable
#### Prepetition Claims Against Endo

264.   Creditors of the Debtors existed at all relevant times who could avoid the Transactions under applicable non-bankruptcy law, including but not limited to the Internal Revenue Service ("IRS") and U.S. Department of Health and Human Services ("HHS").

265.   From January 19, 2023 through and including May 20, 2023, the IRS timely filed several proofs of claim in the Chapter 11 Cases, all of which are incorporated herein by reference, including but not limited to the following proofs of claim (collectively, the "IRS Proofs of Claim") filed against the Endo entities party to the Transactions:

| Proof of Claim | Creditor | Debtor |
|---|---|---|
| #494 | Department of Treasury - Internal Revenue Service | Endo U.S. Inc. |
| #507 | Department of Treasury - Internal Revenue Service | Endo U.S. Inc. |
| #515 | Department of Treasury - Internal Revenue Service | Endo Health Solutions Inc. |
| #519 | Department of Treasury - Internal Revenue Service | Endo Pharmaceuticals Inc. |
| #3289 | Department of Treasury - Internal Revenue Service | Endo U.S. Inc. |

266.   The IRS Proofs of Claim list obligations owed by the Debtors for unpaid prepetition corporate income tax obligations for the fiscal periods ending 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2016, 2017, 2018, 2020, and 2021, which were due and owing at all relevant times, including but not limited to August 16, 2012, through and including the Petition Date (the "IRS Claims").

267.   The IRS Claims, as set forth in the timely-filed IRS Proofs of Claim, are allowable claims under section 502 of the Bankruptcy Code.

268.   The IRS Claims are debts owed to the United States of America.

269.    The IRS is a predicate "creditor" within the meaning of section 544(b) of the Bankruptcy Code.

270.    On May 31, 2023, HHS also timely filed a proof of claim in the Chapter 11 Cases, which is incorporated herein by reference, including but not limited to the following proof of claim (the "HHS Proof of Claim"):

| Proof of Claim | Creditor | Debtor |
|---|---|---|
| #3636 | U.S. Department of Health and Human Services, Indian Health Service | Endo International plc and its affiliated debtors |

271.    The HHS Proof of Claim lists valid obligations owed by the Debtors, pursuant to the Federal Medical Care Recovery Act and the Indian Health Care Improvement Act, for the reasonable value of medical care and treatment furnished or paid for by HHS in connection with injuries and diseases sustained as a direct result of the Debtors' tortious conduct, which were due and owing at all relevant times, including but not limited to August 16, 2016, through and including the Petition Date (the "HHS Claims").

272.    The HHS Claims, as set forth in the timely-filed HHS Proofs of Claim, are allowable claims under section 502 of the Bankruptcy Code.

273.    The HHS Claims are debts owed to the United States of America.

274.    HHS is a predicate "creditor" within the meaning of section 544(b) of the Bankruptcy Code.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Contractual Indemnification)

275.    Plaintiff repeats and realleges each and every allegation stated in the previous paragraphs as though fully set forth herein.

276. 

277.

278.

279.

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]



280.    The Losses suffered by Endo as a result of implementing McKinsey's opioid-related strategies, and for which McKinsey is primarily responsible, include Endo's payment in excess of $1.2 billion in damages and settlements in opioid related litigation and incurring an additional some $344 million in defense costs in defending opioid-related lawsuits.

281.    For these reasons, judgment should be entered against McKinsey in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty by the Endo plc Directors)

282.    Plaintiff repeats and realleges each and every allegation in the previous paragraphs as though fully stated herein.

283.    Each of the Endo plc Directors owed fiduciary duties of loyalty and care under the Irish Companies Act and otherwise, including the obligation to (i) act in good faith in the best interest of Endo plc, (ii) act honestly and responsibly in relation to the conduct of the affairs of Endo plc, (iii) exercise his or her powers only for purposes allowed by law, and (iv) exercise the care, skill, and diligence which would be exercised in the same circumstances by a reasonable person having the knowledge and experience reasonably expected of a person in the same circumstances and with the knowledge and experience possessed by the director.  In addition, the

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

Endo plc Directors had specific fiduciary duties set out in Endo's corporate governance documents.

284.    As described above, the Endo plc Directors, acting both individually and collectively, breached their duties of loyalty and care by, among other things:

- Failing to act honestly, responsibly, and in good faith in the interests of Endo.

- Causing, or ignoring red flags and failing to prevent, Endo's deceptive and unlawful sales and marketing practices, which involved mismarketing Opana ER, exaggerating its benefits, and downplaying its risks, thus causing widespread addiction, harm and death and exposing Endo to hundreds of millions of dollars of resulting liability.

- Repeatedly and systematically prioritizing profits over compliance with the law.

285.    McKinsey knew that the Endo plc Directors had the aforementioned fiduciary duties.

286.    McKinsey knowingly participated and/or substantially assisted in those breaches of fiduciary duty by the Endo plc Directors by, among other things, (i) advising Endo with respect to the reformulation of Opana ER and marketing it as "designed to be crush-resistant," (ii) developing and assisting Endo in implementing aggressive sales and marketing strategies for its opioid products that were deceptive and misleading as to the efficacy and risks associated with opioids, (iii) failing to adequately counsel Endo on compliance with statutes and regulations prohibiting the deceptive marketing of its opioid products, and (iv) advising Endo to increase its presence in the opioid market in order to maximize profits over compliance with the law when McKinsey knew or should have reasonably known that there would likely be significant regulatory scrutiny of the opioid industry and significant risk that Endo would be subject to both civil and criminal liability as a result of implementing the aforementioned sales and marketing strategies.

287.    Endo has been substantially damaged as a direct and proximate result of the actions of McKinsey in aiding and abetting the breaches of fiduciary duty of the Endo plc Directors.

288.   Accordingly, Plaintiff is entitled to judgment against McKinsey in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**(Aiding and Abetting Breach of Fiduciary Duty by the Endo Health Solutions and Endo Pharmaceuticals Directors)**

289.   Plaintiff repeats and realleges each and every allegation in the previous paragraphs as though fully stated herein.

290.   Each of the Endo Health Solutions and Endo Pharmaceuticals Directors owed fiduciary duties of loyalty and care to their respective entities, including the obligation to (i) ensure that Endo complied with applicable laws and regulations, (ii) sell opioid products in a legal and ethical manner, (iii) observe and respond appropriately to "red flags" in promoting Opana ER, and (iv) not promote profits over compliance with the law.

291.   The Endo Health Care Solutions and Endo Pharmaceuticals Directors, acting both individually and collectively, breached their duties of loyalty and care by, among other things:

- Causing, or ignoring red flags and failing to prevent, Endo's deceptive and unlawful sales and marketing practices, which involved mismarketing Opana ER, exaggerating its benefits, and downplaying its risks, thus causing widespread addiction, harm and death and exposing Endo to hundreds of millions of dollars of resulting liability.

- Repeatedly and systematically prioritizing profits over compliance with the law.

292.   McKinsey knew that the Endo Health Solutions and Endo Pharmaceuticals Directors had the aforementioned fiduciary duties.

293.   McKinsey knowingly participated and/or substantially assisted in those breaches of fiduciary duty by the Endo Health Solutions and Endo Pharmaceuticals Directors by, among other things, (i) advising Endo with respect to the reformulation of Opana ER and marketing it as "designed to be crush-resistant," (ii) developing and assisting Endo in implementing aggressive sales and marketing strategies for Endo's opioid products that were deceptive and misleading as

to the efficacy and risks associated with opioids, (iii) failing to adequately counsel Endo on compliance with statutes and regulations prohibiting the deceptive marketing of its opioid products, and (iv) advising Endo to increase its presence in the opioid market in order to maximize profits over compliance with the law when McKinsey knew or should have reasonably known that there would likely be significant regulatory scrutiny of the opioid industry and significant risk that Endo would be subject to both civil and criminal liability as a result of implementing the aforementioned sales and marketing strategies.

294.    Endo has been substantially damaged as a direct and proximate result of the actions of McKinsey in aiding and abetting the breaches of fiduciary duty of the Endo Health Solutions and Endo Pharmaceuticals Directors.

295.    Accordingly, Plaintiff is entitled to judgment against McKinsey in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
**(Aiding and Abetting Breach of Fiduciary Duty by the Endo Health Solutions
and Endo Pharmaceuticals Officers)**

296.    Plaintiff repeats and realleges each and every allegation in the previous paragraphs as though fully stated herein.

297.    Each of the Endo Health Care and Endo Pharmaceuticals Officers owed fiduciary duties of loyalty and care to their respective entities, including the obligation to (i) ensure that Endo complied with applicable laws and regulations, (ii) sell opioid products in a legal and ethical manner, (iii) observe and respond appropriately to "red flags" in promoting Opana ER, and (iv) not promote profits over compliance with the law.

298.    The Endo Health Solutions and Endo Pharmaceuticals Officers, acting both individually and collectively, breached their duties of loyalty and care by, among other things:

- Causing, or ignoring red flags and failing to prevent, Endo's deceptive and unlawful sales and marketing practices, which involved mismarketing Opana ER, exaggerating its benefits, and downplaying its risks, thus causing widespread addiction, harm and death and exposing Endo to hundreds of millions of dollars of resulting liability.

- Repeatedly and systematically prioritizing profits over compliance with the law.

299.    McKinsey knew that the Endo Health Solutions and Endo Pharmaceuticals Officers had the aforementioned fiduciary duties.

300.    McKinsey knowingly participated and/or substantially assisted in those breaches of fiduciary duty by Endo Health Solutions and Endo Pharmaceuticals Officers by, among other things, (i) advising Endo with respect to the reformulation of Opana ER and marketing it as "designed to be crush-resistant," (ii) developing and assisting Endo in implementing  aggressive sales and marketing strategies for its opioid products that were deceptive and misleading as to the efficacy and risks associated with opioids, (iii) failing to adequately counsel Endo on compliance with statutes and regulations prohibiting the deceptive marketing of its opioid products, and (iv) advising Endo to increase its  presence in the opioid market in order to maximize profits over compliance with the law when McKinsey knew or should have reasonably known that there would likely be significant regulatory scrutiny of the opioid industry and significant risk that Endo would be subject to both civil and criminal liability as a result of implementing the aforementioned sales and marketing strategies.

301.    Endo has been substantially damaged as a direct and proximate result of the actions of McKinsey in aiding and abetting the breaches of fiduciary duty of the Endo Health Solutions and Endo Pharmaceuticals Officers.

302.    Accordingly, Plaintiff is entitled to judgment against McKinsey in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty by the Par Pharmaceutical Directors)

303.    Plaintiff repeats and realleges each and every allegation in the previous paragraphs as though fully stated herein.

304.    Each of the Par Pharmaceutical Directors owed fiduciary duties of loyalty and care to their respective entities, including the obligation to (i) ensure that Par complied with applicable laws and regulations, (ii) sell opioid products in a legal and ethical manner, (iii) observe and respond appropriately to "red flags" in promoting Opana ER, and (iv) not promote profits over compliance with the law.

305.    The Par Pharmaceutical Directors, acting both individually and collectively, breached their duties of loyalty and care by, among other things:

- Causing, or ignoring red flags and failing to prevent, Par from maintaining and/or expanding its presence in the generic opioid market while knowing of the risk of addiction that opioid products posed to the general public and the prospect of abuse and diversion of opioids that Par sold and that there would likely be significant regulatory scrutiny of the opioid industry and significant risk that Par would be subject to both civil and criminal liability as a result of its opioid-related activities.

- Repeatedly and systematically prioritizing profits over compliance with the law.

306.    McKinsey knowingly induced and/or participated in those breaches of fiduciary duty by the Par Pharmaceutical Directors by, among other things, upon information and belief, advising Par Pharmaceutical to maintain and/or increase its presence in the generic opioid market, at a time when the opioid crisis was spiraling out of control.

307.    Par Pharmaceutical has been substantially damaged as a direct and proximate result of the actions of McKinsey in aiding and abetting the breaches of fiduciary duty of the Par Pharmaceutical Directors.

308.    Accordingly, Plaintiff is entitled to judgment against McKinsey in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty by the Par Pharmaceutical Officers)

309.    Plaintiff repeats and realleges each and every allegation in the previous paragraphs as though fully stated herein.

310.    Each of the Par Pharmaceutical Officers owed fiduciary duties of loyalty and care to their respective entities, including the obligation to (i) ensure that Par complied with applicable laws and regulations, (ii) sell opioid products in a legal and ethical manner, (iii) observe and respond appropriately to "red flags" in promoting Opana ER, and (iv) not promote profits over compliance with the law.

311.    The Par Pharmaceutical Officers, acting both individually and collectively, breached their duties of loyalty and care by, among other things:

- Causing, or ignoring red flags and failing to prevent, Par from maintaining and/or expanding its presence in the generic opioid market while knowing of the risk of addiction that opioid products posed to the general public and the prospect of abuse and diversion of opioids that Par sold and that there would likely be significant regulatory scrutiny of the opioid industry and significant risk that Par would be subject to both civil and criminal liability as a result of its opioid-related activities.

- Repeatedly and systematically prioritizing profits over compliance with the law.

312.    McKinsey knowingly induced or participated in those breaches of fiduciary duty by the Par Pharmaceutical Officers by, among other things, upon information and belief, advising Par Pharmaceuticals to maintain and/or increase its presence in the generic opioid market, at a time when the opioid crisis was spiraling out of control.

313.    Par Pharmaceutical has been substantially damaged as a direct and proximate result of the actions of McKinsey in aiding and abetting the breaches of fiduciary duty of the Par Pharmaceutical Officers.

314.    Accordingly, Plaintiff is entitled to judgment against McKinsey in an amount to be determined at trial.

### SEVENTH CAUSE OF ACTION
### Avoidance of Fraudulent Conveyances
### (11 U.S.C. § 544(b)(1); 12 Pa. C.S.A. §§ 5104(a)(2), 5105)

315.    Plaintiff repeats and realleges each and every allegation in the previous paragraphs as though fully stated herein.

316.    ██████████████████████████████████████████████████

██████

317.    Each of the Obligations were incurred by or on behalf of Endo, ████████████

███████████████████████████████████████████████████████

██████, to or for the benefit of McKinsey.

318.    Each of the Transfers was made by or on behalf of Endo, ████████████████

███████████████████████████████████████████████████████

██████, to or for the benefit of McKinsey.

319.    Endo, ███████████████████████████████████████████

████████████████████████████████████████████████, did not receive a reasonably equivalent value in exchange for the Obligations and Transfers because the services provided exposed Endo, ███████████████████████████

███████████████████████████████████████████████████████

██████, to deepening enterprise-threatening litigation and contingent liabilities, as well as regulatory and criminal liability.

87

320.    Endo, ███████████████████████████████████████████

████████████████████████████████████████████████, incurred

the Obligations and made the Transfers at a time when it (i) was engaged or was about to engage

in a business or a transaction for which its remaining assets were unreasonably small in relation to

the business or transaction; (ii) intended to incur, or believed or reasonably should have believed

that it would incur, debts beyond its ability to pay as they became due; and/or (iii) was either

insolvent or became insolvent as a result of the Obligations and Transfers.

321.    Consequently, the Obligations and Transfers were constructively fraudulent and

should be avoided pursuant to 11 U.S.C. § 544(b)(1) and 12 Pa. C.S.A. §§ 5104(a)(2), 5105.

## EIGHTH CAUSE OF ACTION
### Avoidance of Fraudulent Conveyances
### (11 U.S.C. § 544(b)(1); NYDCL §§ 273-275)

322.    Plaintiff repeats and realleges each and every allegation in the previous paragraphs

as though fully stated herein.

323.    ████████████████████████████████████████████████

████

324.    Each of the Obligations were incurred by or on behalf of Endo, ███████████████

██████████████████████████████████████████████████████████

████, to or for the benefit of McKinsey.

325.    Each of the Transfers was made by or on behalf of Endo, ███████████████████

██████████████████████████████████████████████████████████

████, to or for the benefit of McKinsey.

326.    Endo, ███████████████████████████████████████████

████████████████████████████████████████████████, did not

receive fair consideration in exchange for the Obligations and Transfers because the services

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

provided exposed Endo, ████████████████████████████████████████

████████████████████████████████████████████████████████, to

deepening enterprise-threatening litigation and contingent liabilities, as well as regulatory and

criminal liability.

327.    Endo, ██████████████████████████████████████████

████████████████████████████████████████████████, incurred

the Obligations and made the Transfers at a time when it (i) was either insolvent or rendered

insolvent as a result of the Obligations and Transfers; (ii) was engaged or was about to engage in

a business or a transaction for which the property remaining in its hands was unreasonably small

capital; and/or (iii) intended or believed that it would incur debts beyond its ability to pay as they

matured.

328.    Consequently, the Obligations and Transfers were constructively fraudulent and

should be avoided pursuant to 11 U.S.C. § 544(b)(1) and NYDCL §§ 273-275.

**NINTH CAUSE OF ACTION**
**Recovery of Avoided Conveyances**
**(11 U.S.C. § 550(a))**

329.    Plaintiffs repeat and reallege each and every allegation in the previous paragraphs

as though fully stated herein.

330.    Plaintiffs are entitled to avoid the Obligations and Transfers pursuant to section

544(b)(1) of the Bankruptcy Code and applicable state law (collectively, the "Avoidable

Conveyances").

331.    Pursuant to section 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover

from McKinsey the Avoidable Conveyances, plus interest thereon to the date of payment and the

costs of this action.

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]

332.    McKinsey was the initial transferee of the Avoidable Conveyances or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Avoidable Conveyances were made.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court enter judgment against McKinsey and grant the following relief:

a.    Recovery against McKinsey in an amount to be determined at trial;

b.    Awarding Plaintiffs prejudgment and post-judgment interest at the maximum rate permitted by law; and

c.    Any further relief as the Court deems just, proper or equitable under the circumstances.

Dated:  New York, New York
        August 15, 2024

SEWARD & KISSEL LLP

By:  ___/s/ Mark D. Kotwick___

John R. Ashmead
Mark D. Kotwick
Laura E. Miller
Andrew J. Matott
One Battery Park Plaza
New York, NY 10004
(212) 574-1200

*Attorneys for Plaintiff
Matthew Dundon, Trustee of
the Endo GUC Trust*

## Schedule A



92

## Schedule B



SK 38844 0001 11407467 vFINAL

93

All Redactions Approved Per Order Granting Motion to File Under Seal in Case No. 22-22549 [Dkt. 4494]