UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

<u>FOR PUBLICATION</u>

| | |
|---|---|
| In re:<br><br>ENDO INTERNATIONAL PLC, *et al.*,[1]<br><br>　　　　Debtors. | Case No. 22-22549 (JLG)<br>Chapter 11 |
| MATTHEW DUNDON, TRUSTEE OF<br>THE ENDO GUC TRUST,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>MCKINSEY & COMPANY, INC. AND<br>MCKINSEY & COMPANY, INC. UNITED<br>STATES,<br><br>　　　　Defendants. | Adv. Pro. No. 24-07027 (DSJ) |

<u>**DECISION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS**</u>

**APPEARANCES:**

**SEWARD & KISSEL LLP**
*Counsel for Plaintiff Matthew Dundon, Trustee of the Endo GUC Trust*
One Battery Park Plaza
New York, NY 10004
By:　　John R. Ashmead
　　　　Mark D. Kotwick
　　　　Laura E. Miller
　　　　Andrew J. Matott

**GLENN AGRE BERGMAN & FUENTES LLP**
*Counsel for Defendants McKinsey & Company, Inc. and McKinsey & Company, Inc. United States*

---

[1] The last four digits of Endo International plc's tax identification number are 3755. Due to the large number of Debtors in the chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo.

1185 Avenue of the Americas, 22nd Floor
New York, NY 10036
By:    Andrew K. Glenn
       Jed L. Fuentes-Skinner
       Marissa E. Miller

**DAVID S. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    <u>INTRODUCTION</u>

Before the Court is a motion to dismiss an opioid-related adversary proceeding in which a

trustee charged with acting for unsecured creditors of a reorganized pharmaceutical company

seeks to hold the company's former corporate strategy consultant liable for the alleged massive

destruction of corporate value that the company experienced after the company energetically

pursued sales-maximizing strategies espoused by the consultant, from which addiction, related

injuries, and ultimately, unsustainable liabilities followed.

Like other pharmaceutical companies, Endo International plc and its related entities

("**Endo**" or "**Debtors**")[2] manufactured, marketed, promoted, sold, and distributed opioid

products, in addition to marketing non-opioid products. Seeking to increase the profitability of its

opioid business, Endo engaged the consulting services of McKinsey & Company, Inc. and

McKinsey & Company, Inc. United States ("**McKinsey**" or "**Defendants**"). According to the

complaint, McKinsey professionals designed and helped implement aggressive sales-expanding

strategies and practices that increased Endo's short-term revenues, which led to rampant opioid

abuse and addiction, and, eventually, to unsustainable liabilities for Endo. Ultimately, Endo

spent years defending thousands of lawsuits, filed for Chapter 11 bankruptcy protection from the

---

[2] Unless there is need to specify, this Decision refers to the Debtor entities collectively as Endo. These Debtor entities include Endo International plc, Endo Health Solutions Inc., Endo Pharmaceuticals, Inc., and Endo U.S. Inc.

2

avalanche of opioid litigation and liabilities the company faced, and entered a plea deal with the

United States Department of Justice for its role in the opioid crisis.

Endo's bankruptcy led to the creation of a trust charged with seeking recoveries for the

benefit of Endo's general unsecured creditors. The trustee, Matthew Dundon ("**Trustee**" or

"**Plaintiff**"), has filed this action, in which he asserts claims against McKinsey on various legal

theories, all of which involve contentions that McKinsey injured Endo by designing and helping

to implement opioid sales-maximizing strategies that ultimately led to massive losses and

liabilities. The complaint is detailed below, but in general it asserts that McKinsey served as

Endo's long-time consultant, and induced, encouraged, and facilitated reckless maximization of

sales of Endo's opioid products, leading to improper uses of Endo products, widespread

addiction and other harms, and, eventually, massive and unsustainable corporate liabilities and

costs. Broadly speaking, the complaint seeks damages from McKinsey on three types of theories.

The first is that Endo's retention of McKinsey included indemnification provisions under which

the Trustee (standing in Endo's shoes) is entitled to at least $1.5 billion to compensate it for

harms flowing from McKinsey's negligence in pushing Endo into calamitous opioid sales

practices. The second is that McKinsey is liable to the Trustee standing in Endo's shoes for

corporate economic harm because McKinsey aided and abetted breaches of fiduciary duty by

Endo's directors and officers. And the third is that McKinsey must repay to the Trustee the

amount of certain Endo payments to McKinsey (in the principal amount of roughly $8.5 million)

on the theory that those payments constituted constructive fraudulent transfers.

McKinsey has moved to dismiss the complaint.

For reasons explained further below, the Court partially grants (in most instances without

prejudice) and partially denies the motion. The only claim that is not dismissed is the portion of

3

the indemnification claim that arises from costs Endo incurred other than settlement payments. The Court is scheduling a conference at or after which it will determine whether this decision and order should be deemed a report and recommendation requiring further review by an Article III court, while also addressing next steps in the litigation.

## II.    BACKGROUND

### A.  The Parties

The plaintiff in this action is Matthew Dundon, not in any individual capacity but solely in his capacity as the trustee for the Endo GUC Trust (the "**GUC Trust**"), which was established pursuant to the Fourth Amended Joint Chapter 11 Plan of Reorganization of Endo International plc and its Affiliated Debtors (the "**Plan**"), [*Fourth Amended Joint Chapter 11 Plan of Reorganization of Endo International plc and its Affiliated Debtors*, Case No. 22-22549 (JLG), Dkt No. 3849], and the Endo GUC Trust Agreement dated April 23, 2024, by and among (i) the Trustee, (ii) UMB Delaware Inc, as Delaware Trustee, (iii) Endo International plc, and (iv) Endo, Inc., acting on behalf of itself and as successor-in-interest to the estates of the above-captioned debtors and debtors-in-possession. *See* Complaint ("**Complaint**" or "**Compl.**"), *Matthew Dundon, Trustee of The Endo GUC Trust v. McKinsey & Company, Inc. and McKinsey & Company, Inc. United States*, Case No. 24-07027, Dkt. No. 1 ¶ 16. The GUC Trust's beneficiaries are certain of Endo's unsecured creditors, including, among others, thousands of women implanted with defective vaginal mesh products and victims of the opioid crisis. *See id.* ¶¶ 16–17.

The non-party Debtors and its affiliates are comprised of various corporate entities, which are summarized below in the order in which they appear in the Complaint:

4

- Non-party Endo International plc ("**Endo plc**"), the ultimate parent of the Endo enterprise, is an Irish public limited company that is both incorporated and headquartered in Dublin, Ireland.
- Non-party Endo Health Solutions Inc. ("**Endo Health Solutions**") is incorporated in Delaware and headquartered in Malvern, Pennsylvania. Prior to May 23, 2012, Endo Health Solutions was known as Endo Pharmaceuticals Holdings Inc.
- Non-party Endo Pharmaceuticals, Inc. ("**Endo Pharmaceuticals**") is incorporated in Delaware and headquartered in Malvern, Pennsylvania.
- Non-party Endo U.S. Inc. ("**Endo U.S.**") is incorporated in Delaware and headquartered in Malvern, Pennsylvania.
- Non-party Par Pharmaceutical Holdings, Inc. ("**Par Holdings**") is incorporated in Delaware and headquartered in Chestnut Ridge, New York. Par was acquired by Endo plc in September 2015, and during the relevant time period, was an operating company of Endo plc.
- Non-party Par Pharmaceutical Companies, Inc. ("**Par Companies**") is incorporated in Delaware and headquartered in Chestnut Ridge, New York. Par Companies is a wholly owned subsidiary of Par Holdings.
- Non-party Par Pharmaceutical, Inc. ("**Par Pharma Inc.**" individually, and together with Par Holdings and Par Companies, "**Par**" or "**Par Pharmaceutical**") is incorporated in Delaware and headquartered in Chestnut Ridge, New York. Par Pharma Inc. is a wholly owned subsidiary of Par Companies.

*Id.* ¶¶ 20–27. The Debtors and their affiliates are pharmaceutical companies that manufactured, marketed, promoted, sold, and distributed extended-release opioid drugs containing oxymorphone throughout the United States. *See id.* ¶¶ 22–23. Specifically, Endo Health Solutions and Endo Pharmaceuticals were both involved in manufacturing, marketing and distributing Endo's branded and generic opioids—Endo Health Solutions focused on drug development and Endo Pharmaceuticals focused on drug sales. *See id.* Endo U.S. is the immediate parent of Endo Health Solutions and Endo Pharmaceuticals, *id.* ¶ 24, and Endo plc is the ultimate parent of the entire Endo enterprise. *Id.* ¶ 21. Endo acquired Par Pharmaceutical—generic opioid manufacturers—in 2015. *Id.* ¶¶ 190–91.

Defendants are "one of the oldest, largest, and perhaps most prestigious, management consulting firms in the world," providing "strategic advice and direction to managers, directors, and owners of a multitude of companies in myriad industries," including the pharmaceutical

5

industry. *Id.* ¶¶ 57, 65, 67. Defendant McKinsey & Company, Inc. is incorporated and headquartered in New York, and Defendant McKinsey & Company, Inc. United States is an entity incorporated in Delaware and headquartered in New York. *Id.* ¶¶ 18–19.

**B. Endo's Opioid Sales and Its Relationship with McKinsey**

Prior to the 2000s, Endo sold an immediate release oxymorphone tablet under the brand name Numorphan, which quickly gained notoriety for what users described as a quick and sustained effect. *See id.* ¶ 54. In the early 2000s, Endo began planning for what was ostensibly a relaunch of Numorphan, rebranded as Opana. *See id.* ¶ 55. Opana pills were manufactured in two forms: an immediate release tablet ("**Opana IR**") and an extended-release tablet ("**Opana ER**"). *Id.* Opana ER and a reformulated version of Opana ER were Schedule II drugs under the Controlled Substances Act, meaning drugs "with a high potential for abuse," with use potentially leading "to severe psychological or physical dependence." *Id.* ¶ 47. In 2006, the U.S. Federal Drug Administration ("**FDA**") approved Opana, and shortly thereafter, Endo engaged McKinsey to assist in maximizing Opana's commercial value, among other consulting services. *Id.* ¶ 119. McKinsey reviewed Endo's financials, and by late 2006 and early 2007 McKinsey met with Endo's directors to discuss findings and potential strategic paths forward. *Id.* ¶¶ 120, 121.

1. The Master Services Agreement and Statements of Work

On August 14, 2007, McKinsey and Endo (through Endo Pharmaceuticals Holdings Inc. and its affiliates) finalized a long-term business relationship by executing a Master Services Agreement ("**MSA**"), which governed the work that McKinsey would perform for Endo over the next decade. *Id.* ¶ 123; *see Declaration of Marissa E. Miller in Support of Defendants' Motion to Dismiss* ("**M. Miller Decl.**"), Dkt. No. 18, Ex. 5 (a full copy of the MSA is docketed in this declaration). The MSA set the stage for a series of subsequent agreements that would govern

6

individual projects. Compl. ¶ 248. The Master Services Agreement is governed by New York

law without regard to conflicts of law principles. *See* M. Miller Decl., Dkt. No. 18, Ex. 5, MSA ¶

6. Pursuant to the MSA, McKinsey was to perform work for Endo on a project-by-project basis,

with each individual project governed by a separate Project Work Order and Statement of Work

("**SOW**" or "**Obligation**") agreements consistent with the MSA. Compl. ¶ 123. Under the MSA,

McKinsey was to propose the services that the firm would provide to Endo and how much Endo

would pay for those services. *Id*. If accepted by Endo, each PWO or SOW was executed by Endo

Pharmaceuticals or Endo Pharmaceuticals Holdings Inc. on behalf of each entity and its

affiliates. *Id*.

Between November 9, 2015, and October 10, 2016, Endo executed six SOWs with

McKinsey. *Id.* ¶ 249. Under each agreement, Endo was to pay for advice from McKinsey. *Id.* ¶

247. Under the various SOWs, Endo was to pay McKinsey a total of approximately $8.33

million in fees over the course of 2015 and 2016. *Id.* ¶ 253.

### 2.   The Master Services Agreement Indemnification Provisions

Under the MSA, McKinsey agreed to indemnify and hold Endo harmless from and

against losses resulting primarily from McKinsey's negligence or, in some circumstances not

implicated here, from its gross negligence. *Id.* ¶ 276. The MSA states, in relevant part, that

McKinsey:

> agrees to indemnify and hold harmless [Endo] (including its
> affiliates) and the directors, officers, stockholders, agents and
> employees of [Endo] (and such affiliates) (collectively, "Client
> Indemnified Persons"), from and against all claims, liabilities,
> losses, damages, and expenses as incurred (including reasonable
> legal fees and disbursements of counsel and the costs of McKinsey
> professional time), joint or several (including actions or
> proceedings in respect thereof) (collectively "Losses"), to the
> extent that any such Losses are determined by an arbitration
> pursuant to Section 6 or are otherwise finally determined, as the

7

> case may be, to have resulted primarily from the Applicable
> Standard (as defined below), willful misconduct, or bad faith of
> any McKinsey Indemnified Person toward Client in the
> performance of the services hereunder.

M. Miller Decl., Dkt. No. 18, Ex. 5, MSA ¶ 3(A).

The scope of the MSA's indemnification obligation is limited, however, by a provision stating that "[n]either party shall be liable under this Section 3 for any settlement, compromise or consent to judgment effected without prior written consent, which consent shall not be unreasonably withheld." *Id.* ¶ 3(D).

The "applicable standard" for McKinsey's provision of services under the MSA depends on the nature of the particular engagement:

> For engagements (i) in which McKinsey is working with [Endo]
> with respect to (a) valuing, structuring or negotiating a transaction
> or potential transaction with a third party, or (b) conducting due
> diligence with respect thereto, or (ii) in which Materials or
> information about McKinsey's work is shared with a third party,
> the Applicable Standard shall be gross negligence. For all other
> engagements, the Applicable Standard is negligence.

*See* Miller Decl., Ex. 5, MSA ¶ 3(A); Compl. ¶ 277.

Through the work done through the MSA and various SOWs, Endo alleges that McKinsey led Endo and other pharmaceutical manufacturers "down a dark, dangerous path that resulted in today's current opioid epidemic and the financial ruin of Endo and many other pharmaceutical manufacturers." Compl. ¶ 247. As a result, Endo was subjected to more than 3,100 opioid-related lawsuits. *Id.* ¶ 263.

### 3. McKinsey's Services and Advice

The Trustee alleges that although McKinsey is a preeminent management consulting firm, its "implementation" consulting style involves not only developing strategies for its clients but becoming deeply ingrained in the everyday operations of its client's business and overseeing

8

the implementation of the strategy. *Id.* ¶¶ 57–59. McKinsey "has a broad and deep practice in the pharmaceutical industry, and in particular, the opioid market, with clients ranging from major opioid manufacturers to large wholesale distributors who purchase and distribute opioids." *Id.* ¶ 65. In fact, while working with Endo, McKinsey also advised and promoted similar strategies at other major opioid manufacturers including Purdue, Johnson & Johnson, Teva Pharmaceuticals, and Mallinckrodt. *Id.* ¶ 70. At the same time that McKinsey advised these companies, McKinsey was embedded within every sector of the opioid industry, including distributors and the primary regulator, the FDA. *See id.* ¶¶ 71–104. The Trustee alleges that McKinsey was the architect of a deceptive and aggressive sales and marketing scheme to maximize the sale of opioids and deployed this "playbook" to increase the sales of Johnson & Johnson's opioids Nucynta [*id.* ¶¶ 81–85, 149, 170] and Purdue's OxyContin [*id.* ¶¶ 71–80], and implemented a near-identical strategy to increase the sales of Endo's Opana ER [*id.* ¶¶ 170–71]. The Trustee further alleges that, "[a]s a result, McKinsey was intimately aware that opioids, and especially Endo's Opana, pure oxymorphone twice as potent as Purdue's OxyContin, were highly addictive and unsafe for the treatment of long-term chronic pain." *Id.* ¶ 109.

Endo retained McKinsey in 2007 to advise it on strategic, long-term goals and, following Endo's launch of Opana ER into the United States market, McKinsey's efforts increasingly focused on expanding the promotion and sale of Endo's branded and generic opioid products. *Id.* ¶¶ 119–20. Even before the parties' engagement, Endo's leadership and McKinsey's consultants were purportedly aware of the potential for widespread abuse of Opana ER. *Id.* ¶¶ 137–47. Following a cascade of articles, investigations, and state public health alerts concerning the increasing abuse of Opana ER in addition to the impending expiration of its patent and the expected decrease in profits, Endo, in consultation with McKinsey, devised a plan to

"reformulate Opana ER into a purportedly 'crush-resistant' tablet ("**Reformulated Opana ER**")
and submit[ted] a Supplemental New Drug Application" to the FDA. *Id.* ¶¶ 125–29. Although
the FDA approved Reformulated Opana ER, the agency denied Endo's request to include a
product description of its purported abuse-deterrent properties because the agency determined
that the reformulated opioid was no less abuse-deterring than the original Opana ER. *Id.* ¶¶ 129–
32. Indeed, shortly after its release, reports emerged of the rampant abuse of Reformulated
Opana ER. *Id.* ¶ 136.

In February 2013, Endo hired a new chief executive officer, Rajiv De Silva, a former
leader in McKinsey's Pharmaceuticals and Medical Products Group. *See* Compl. ¶ 150. The
Trustee claims that following De Silva's hiring, McKinsey consultants often interacted directly
with him and maintained weekly performance meetings with him and other Endo senior
management employees at which weekly Endo opioid sales data was reviewed. *Id.* ¶¶ 152–53.

"At the core of McKinsey's scheme to boost Opana ER profits" in the face of the reports
of abuse of the drug was a "complete overhaul of Endo's sales and marketing tactics for the drug,
which McKinsey dubbed 'Sales Force Blitz.'" *Id.* ¶ 169. From 2015 through at least 2016,
McKinsey spearheaded a "sales force blitz" strategy to increase sales of Endo's opioid products.
*Id.* ¶ 7. According to the Plaintiff, the "plan for Sales Force Blitz was to assign more sales
representatives to push Opana ER to prescribers via 'targeting' the 'sweet spot of doc[tors]'
amenable to prescribing the drug in greater quantities." *Id.* ¶ 172. This strategy also included
targeting healthcare providers that McKinsey knew prescribed large volumes of opioids,
redeploying sales representatives to hit target goals, increasing sales quotas, and focusing on
selling higher doses of Opana ER. *Id.* As McKinsey recommended, Endo hired hundreds of sales
representatives to conduct in-person marketing of Opana ER and Reformulated Opana ER to

healthcare providers. *See* M. Miller Decl., Dkt. No. 18, Ex. A, Sched. A ¶ 10. Specifically, Endo

sales representatives marketed Reformulated Opana ER to prescribers by touting Opana ER's

purported abuse deterrence, crush resistance and/or tamper resistance. *See id.* Moreover, certain

Endo sales managers were even aware that certain sales representatives were making claims

regarding reformulated Opana ER's purported abuse deterrence, crush resistance, and/or tamper

resistance during sales calls. *See id.* The Trustee claims that McKinsey "encouraged" Endo's

directors and officers to "effectively work around the FDA's concerns" about the abuse potential

of Reformulated Opana ER and to disseminate marketing materials implying that Reformulated

Opana ER was abuse-deterrent. Compl. ¶ 157.

McKinsey not only designed and advised Endo with regard to its Sales Force Blitz

strategy, the consulting company spearheaded its day-to-day execution. *Id.* ¶ 176. "McKinsey

curated and maintained control over a list of prescriber 'targets' who McKinsey believed would

more readily prescribe Opana ER; liaised directly with third-party contractors to develop that

target list; and personally trained Endo's sales force on how to persuade targeted healthcare

providers to prescribe Opana ER." *Id.* ¶¶ 176, 177–89. As a result of McKinsey's tactics to target

high-prescribing doctors and "push false messaging that Reformulated Opana ER was safer than

its original formulation and less likely to be abused or diverted," Opana ER sales stabilized from

its previous decline due to generic drug competition. *Id.* ¶ 189. In fact, "reports in November

2016 revealed that although 24,400 health care providers were writing prescriptions for

Reformulated Opana ER, nine percent of those providers wrote 50% of all Opana ER

prescriptions, validating McKinsey's efforts to target high volume prescribers of Opana ER." *Id.*

In 2015, the Trustee alleges upon information and belief that McKinsey advised Endo

regarding its $8 billion acquisition and integration of a leading generic opioid manufacturer, Par

Holdings, Par Companies, and Par Pharma Inc., to "boost Endo's profits through the sale of opioids—both branded and generic." *Id.* ¶¶ 190–91. The Trustee contends that, as with Endo's directors and officers, Par's directors and officers were aware of the abuse and misuse of its opioid products. *Id.* ¶ 192. Following the 2015 acquisition, the boards and management of Endo and the Par began to overlap such that the companies "were effectively operated as a single entity, with a single vision and strategy to maximize the sale of opioids." *Id.* ¶ 194. Tasked with determining how to maximize profits at the Par entities, McKinsey advised the company to increase its presence in the generic opioid market while discontinuing sixty-seven of its non-opioid products. *Id.* ¶ 195–97.

### C. Endo's Legal Issues and Bankruptcy

Throughout 2016, McKinsey continued to advise Endo to maximize opioid sales, even as federal and state authorities began investigating Endo's deceptive marketing practices. *Id.* ¶ 201. In March 2016, Endo entities agreed to an "Assurance of Discontinuance" with the New York State Attorney General concerning Endo's improper marketing practices for Opana ER. *Id.* ¶ 202. The Assurance of Discontinuance stated that "[t]he Attorney General found that Endo improperly marketed Opana ER to be crush resistant, when Endo's own studies showed that the pill could be crushed and ground." *Id.* ¶ 202. The Assurance of Discontinuance also stated that the state's investigation "revealed that Endo had no meaningful program in place to ensure that its sales representatives were not encouraging healthcare providers engaged in abuse and diversion to write more prescriptions for Opana ER." *Id.* ¶ 203. Even after the Assurance of Discontinuance, the Complaint alleges that McKinsey did not stop advising Endo's salesforce to continue its "Blitz" and pursue high-prescribing doctors aggressively and that with McKinsey

12

input, Endo waited until June 2016 to instruct sales representatives not to discuss Opana ER
being abuse deterrent or crush resistant with doctors. *Id.* ¶ 205–06.

In June 2017, the FDA requested that Endo remove Reformulated Opana ER from the
market "due to the public health consequences of abuse." *Id.* ¶ 213. Endo agreed to remove
Reformulated Opana ER from the market a month later. *Id.* Since then, Endo has been named in
over 3,500 lawsuits, resulting in, among others, $1.2 billion in damages and settlements, $344
million in defense costs, and $240 million in professional fees in connection with its bankruptcy
proceedings. *Id.* ¶¶ 225–29, 280. On February 28, 2024, Endo entered into a civil settlement
agreement ("**DOJ Settlement**") with the United States Department of Justice ("**DOJ**") through
which Endo pled guilty to a pled guilty to a misdemeanor violation of the Food, Drug, and
Cosmetic Act. *See* M. Miller Decl., Dkt. No. 18, Ex. 3, Ex. A at 1. In connection with this
agreement, Endo was subjected to a criminal fine of over $1 billion and criminal forfeiture of
over $475 million. *See id.* at 3.

Likewise, McKinsey has been named in hundreds of lawsuits across the country arising
from its role in the opioid crisis and has paid nearly $1 billion to settle just a fraction of these
proceedings. Compl. ¶¶ 220–21. For example, McKinsey entered into a deferred prosecution
agreement in December 2024 in which McKinsey agreed to pay $650 million to resolve the
federal government's criminal and civil investigation into the consulting firm's consulting work
with Purdue regarding the sales and marketing of OxyContin. *See Declaration of Laura E. Miller
in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss the Complaint*, Dkt. No.
28, Ex. B.

On August 16, 2022, Endo filed voluntary petitions under Chapter 11 of the Bankruptcy
Code in this Court. *Id.* ¶ 263. More than a year and a half later, on March 22, 2024, this Court

entered an order confirming Endo's Plan. *See* M. Miller Decl., Dkt. No. 18, Ex. 1 (attaching the

Plan, Case No. 22-22549 (JLG), Dkt No. 3849). As stated, pursuant to Section 6.2 of the Plan

and the Endo GUC Trust Agreement dated April 23, 2024, Matthew Dundon became Trustee for

the GUC Trust. *See* Compl. ¶ 16. A GUC Trust—short for General Unsecured Creditors Trust—

is a post-confirmation litigation and distribution vehicle created in a Chapter 11 bankruptcy case

to handle claims of general unsecured creditors. The Endo Plan and GUC Trust Agreement

provided that the Debtors and holders of the Trust Transferred Assets would transfer "all claims

against the GUC Excluded Parties (each as defined in the Plan), including Defendants," to the

GUC Trust for the benefit of unsecured creditors. *Id.* ¶¶ 16–17. The GUC Trust's beneficiaries

are a subset of Endo's unsecured creditors including, among others, thousands of women

implanted with defective vaginal mesh products and victims of the opioid crisis. *Id.* ¶ 17. Endo's

opioid creditors received hundreds of millions of dollars of cash from the beneficiaries of the

GUC Trust and other Endo creditors who otherwise had a claim to that cash, in partial exchange

for granting the GUC Trust rights to these causes of action. *Id.*.

On July 24, 2024, three weeks before filing this action, the Trustee filed a separate

lawsuit against the directors and officers of Endo, seeking damages for those individuals'

conduct. *See* M. Miller Decl., Dkt. No. 18, Ex. 2. That case remains pending in this Court. *See*

*generally Dundon v. De Silva, et al.*, Adv. Case No. 24-07022 (DSJ) (Bankr. S.D.N.Y. July 24,

2024).

### D.  Procedural Background of this Action

On August 15, 2024, the Trustee filed the Complaint asserting nine causes of action

against McKinsey. *See generally* Compl. On November 11, 2024, McKinsey filed a motion to

dismiss ("**Motion**") all nine causes of action pursuant to Rules 8, 12(b)(1) or 12(b)(6) of the

Federal Rules of Civil Procedure, made applicable to this proceeding by Rules 7008 and 7012 of

the Federal Rules of Bankruptcy Procedure. Dkt. No. 17. The Trustee filed an opposition

("**Opposition**" or "**Opp.**") [Dkt. No. 27], and McKinsey filed a reply ("**Reply**") [Dkt. No. 33].

The Court heard oral argument on March 6, 2025, and reserved decision. This decision's

Discussion sections summarize the parties' arguments.

## III.   <u>JURISDICTION</u>

The Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C.

§§ 157(a)–(c) and 1334(b), and the *Amended Standing Order of Reference M-431*, dated January

31, 2012 (Preska, C.J.). This adversary proceeding presents both "core" and "non-core"

proceedings under 28 U.S.C. § 157(b) and (c), and, as noted in this decision's conclusion, the

Court directs the parties to discuss at an upcoming conference the extent to which this Court has

the authority, on consent or otherwise, to enter a final judgment. If and to the extent necessary,

the Court is prepared to enter a further order deeming this decision to constitute a report and

recommendation subject to review by an Article III judge before entry of a final judgment.

Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409

because this adversary proceeding arises under and in connection with cases commenced under

the Bankruptcy Code.

## IV.   <u>LEGAL STANDARD ON THE MOTION</u>

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the

court must assess the legal sufficiency "of the allegations in support of a complaint in light of the

pleading requirements" set forth in Rule 8 of the Federal Rules of Civil Procedure. *In re Revlon,

Inc.*, No. 22-10760 (DSJ), 2023 WL 2229352, at *10 (Bankr. S.D.N.Y. Feb. 24, 2023) (quoting

*In re Extended Stay, Inc.*, Case No. 09-13764, 2020 WL 10762310, at *5 (Bankr. S.D.N.Y. Aug.

8, 2020)). To survive a Rule 12(b)(6) motion, a plaintiff must show that the complaint

"contain[s] sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible

on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007)). Courts apply the "[t]wo working principles" articulated in *Ashcroft v.*

*Iqbal* to evaluate a motion to dismiss. *In re Tops Holding II Corp.*, 646 B.R. 617, 646 (Bankr.

S.D.N.Y. 2022) (quoting *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d

705, 717 (2d Cir. 2012)).

First, "[w]hile legal conclusions can provide the framework of a complaint, they must be

supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Rule 8's pleading

standard does not necessitate detailed factual allegations, but "demands more than an unadorned,

the-defendant-unlawfully-harmed-me accusation." *Id.* at 678. In evaluating factual sufficiency,

the court must accept all factual allegations set forth in the complaint as true and draw all

reasonable inferences in the plaintiff's favor. *Id.* In doing so, the court must be able to identify

the elements of each cause of action and determine whether the complaint states sufficient facts

to support recovery. *Id.* at 675.

Second, "only a complaint that states a *plausible* claim for relief survives a motion to

dismiss." *Id.* at 679 (emphasis added). The determination of whether a complaint states a

plausible claim for relief is a "context-specific task that requires the reviewing court to draw on

its judicial experience and common sense." *Id.* "To be plausible, the complaint need not show a

probability of plaintiff's success, but it must evidence more than a mere possibility of a right to

relief." *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197 (2d Cir.

2013) (internal citations omitted). "Because plausibility is a standard lower than probability, a

given set of actions may well be subject to diverging interpretations, each of which is plausible."

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012). Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (internal citations omitted).

On a motion to dismiss pursuant to Rule 12(b)(6), "courts must consider the complaint in its entirety as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). In doing so, the Court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference" as well as any documents "integral" to the complaint, *i.e.*, "where the complaint 'relies heavily upon [the document's] terms and effects.'" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)). Defendants filed numerous documents in support of their respective motions. *See supra* Section II. D. Some of those documents are mentioned, cited, or relied on by the Plaintiff in the Complaint, and others are docketed in the main Chapter 11 case for Endo.

## V.   <u>DISCUSSION</u>

This decision addresses the Trustee's causes of action in the order set forth in the Complaint.

### A.  Indemnification

The first count of the Complaint asserts that the Trustee, standing in Endo's shoes, is contractually entitled to indemnification under the MSA "for the costs Endo incurred due to McKinsey's reckless opioid marketing and sales strategies." Compl. ¶ 10. As noted, under the

MSA, McKinsey agreed to indemnify and hold Endo harmless for losses arising primarily from McKinsey's negligence (the contractually specified standard for the types of claims asserted here). *See* M. Miller Decl., Dkt. No. 18, Ex. 5, MSA ¶ 3(A); *id.* ¶ 276. The asserted losses include costs of defending against investigations and lawsuits, liabilities arising from Endo's marketing of opioid products, and, specifically, negotiated settlement payments to resolve governmental and/or private claims arising from Endo's opioid sales. Compl. ¶ 280. As paragraph 280 of the Complaint alleges and McKinsey emphasizes, the stakes are enormous; by McKinsey's calculation, the Trustee seeks indemnification for more than $1.2 billion in settlement payment amounts and an additional roughly $344 million in legal fees and other costs. *See* Motion at 26.

McKinsey asserts two grounds for dismissal of the Trustee's indemnification claims, one of which if adopted would cover the entirety of the indemnification claim based on New York's public policy against indemnification for intentional torts, and the second of which would bar "only" the Trustee's demand for indemnification for Endo's $1.2 billion in settlement payments in connection with opioid litigation or investigations, the latter argument being that Endo never sought or secured McKinsey's advance written consent for settlements and that any recovery therefore is barred under the express terms the MSA. *See* M. Miller Decl., Dkt. No. 18, Ex. 5, MSA ¶ 3(D) ("Neither party shall be liable under this Section 3 for any settlement, compromise or consent to judgment effected without prior written consent, which consent shall not be unreasonably withheld.").

By way of preview and for reasons detailed below, the Court rejects the first argument as unsupported by facts alleged in the Complaint or otherwise chargeable against the Trustee in this motion to dismiss the Complaint. New York public policy does indeed preclude indemnification

for liability arising from intentional torts. But the Court cannot conclude, based solely on facts alleged in the Complaint or other sources that can be considered on a motion to dismiss, that Endo acted with the requisite intent to harm or injure others.

The Court agrees, however, that the Trustee has not plausibly alleged a breach of a contractual indemnification obligation under the MSA for settlement or consent judgment payments by Endo. The Complaint does not allege that Endo requested or obtained McKinsey's prior written consent to any settlements, as the MSA expressly required; in fact, the Complaint appears not even to allege generally that Endo complied with applicable conditions precedent under the contract. McKinsey adamantly insists that no such consent was requested or given, but the question is whether the Complaint states a claim, so McKinsey's representations carry no weight in deciding the Motion. But here, the Complaint is insufficient. There is serious question whether the key provision as worded constitutes a condition precedent as opposed to a contractual provision that must be considered as part of the Trustee's prima facie pleading obligation to establish a breach of contract. Moreover, even assuming the provision merely establishes a condition precedent, the Court concludes for reasons detailed below that, despite the existence of some inconsistent case law as to whether a plausible breach claim can be stated in the absence of an allegation that a condition precedent was met, the better-reasoned and most on-point authority establishes that a failure to allege compliance with a condition precedent to an indemnification requirement can support dismissal on a motion to dismiss, and does so here given the importance and clarity of the dispositive consent issue.

### 1. Parties' Arguments

As more briefly noted above, McKinsey raises two main arguments. The first is that all indemnification claims of the Trustee are barred by New York's public policy-based prohibition

of requiring indemnifications for the consequences of a plaintiff's own intentional torts. Motion

at 26–27. McKinsey points to the Complaint's allegation that the directors and officers were

repeatedly informed of the abuse and misuse of Endo's opioid products, but to boost profits, they

continued to spearhead and approve aggressive and deceptive marketing plans. *See* Reply at 22

(citing Compl. ¶¶ 141–42, 158–59, 161–62, 169–76, 192, 196–97, 236, 238–39, 245–46, 291,

298, 305). McKinsey argues that these admissions in the complaint demonstrate that the Trustee

himself has pleaded Endo's intentionality and intent to harm others. Reply at 22–23. McKinsey

further contends that Endo made judicially binding admissions of intentional misconduct when

(1) Endo entered into a plea agreement with the DOJ and pled guilty to a misdemeanor violation

of the Food, Drug, and Cosmetic Act, (2) Endo entered into a civil settlement with the DOJ, and

(3) the Trustee filed a separate breach-of-fiduciary-duty action alleging misconduct by Endo's

directors and officers. Motion at 2; *see also* M. Miller Decl., Dkt. No. 18, Ex. 3. McKinsey

emphasizes that even the Complaint in this action alleges that Endo's directors and officers were

repeatedly informed of the abuse and misuse of Endo's opioid products but continued to

spearhead and approve aggressive and deceptive marketing plans. *See* Reply at 22 (citing Compl.

¶¶ 141–42, 158–59, 161–62, 169–76, 192, 196–97, 236, 238–39, 245–46, 291, 298, 305)

Additionally, McKinsey argues that even if indemnification was available for intentional

torts, the Trustee is precluded from asserting recovery for the settlement payments (again,

reportedly in excess of $1.2 billion) because the MSA contained a condition precedent requiring

Endo to seek and obtain McKinsey's written consent for "any settlement, compromise or consent

to judgment" for which indemnity was sought. Motion at 2. McKinsey contends and the Trustee

does not dispute that the Complaint contains no allegation of advance notice to McKinsey or

written consent by McKinsey. Motion at 2; M. Miller Decl., Dkt. No. 18, Ex. 5, MSA ¶ 3(D)

("Neither party shall be liable under this Section 3 for any settlement, compromise or consent to judgment effected without its prior written consent, which consent shall not be unreasonably withheld.").

The Trustee's Opposition contends that the New York public policy-based case law barring indemnification for intentional torts is narrow and requires both a finding of intentional conduct and an intention to harm or injure others. Opp. at 32. The Trustee contends that nothing McKinsey has identified establishes any conduct chargeable to Endo or its officers that constitutes an intentional tort, or that demonstrates the intent to harm or injure others. Opp. at 32–33. McKinsey's Reply reiterates and reinforces its initial contentions. *See generally* Reply.

    2.  <u>Discussion – Public Policy Against Indemnification for Intentional Torts</u>

    *a.  Legal Standard*

As an initial matter, the Trustee's claim for contractual indemnification claim undisputedly is governed by New York law through the application of the MSA's choice-of-law clause. *See* M. Miller Decl., Dkt. No. 18, Ex. 5, MSA ¶ 7 ("This agreement and the proposals shall [] be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of law principles[.]"); Motion at 27 n.19.

While New York law treats indemnification agreements according to principles of contract law, *see Weissman v. Sinorm Deli, Inc.*, 88 N.Y.2d 437, 446 (1996) (noting that it is axiomatic that an indemnity contract is interpreted "to effectuate the intention of the parties as expressed in the unequivocal language" of the contract), New York law embraces a public policy exception to that rule that prohibits a party from indemnifying itself against its own intentional torts. *Barbagallo v. Marcum LLP*, No. 11-CV-1358, 2012 WL 1664238, at *4–7 (E.D.N.Y. May 11, 2012) (dismissing indemnification claim for damages and defense costs because "intentional

torts . . . cannot be indemnified against either by contract or common law"). This New York

public policy-based rule precludes indemnification both for the obligation to pay damages arising

from intentional torts, and for the costs associated with defending against intentional tort claims.

*See Barbagallo*, No. 11-CV-1358, 2012 WL 1664238, at *5 ("Permitting recovery for the

defense of such claims would contradict the 'fundamental principle that no one shall be

permitted to take advantage of his own wrong' by allowing it to avoid one of the costs imposed

by intentional tort liability—i.e., the costs of defending itself against these claims."). Although

this exception frequently is applied in the context of insurance contracts, New York courts apply

the same rule when evaluating contractual indemnification provisions in other contexts. *Cf.*

*Barbagallo*, No. 11-CV-1358, 2012 WL 1664238, at *4 (applying New York intentional tort

indemnification bar in context of an employment contract).

The New York "public policy exception for intentionally harmful conduct is a narrow

one, under which it must be established that the [defendant] acted intentionally, but further, that

it acted with the intent to harm or injure others." *Lawrence v. Cont'l Cas. Co., Inc.*, No. 12-CV-

412, 2013 WL 4458755, at *6 n.12 (E.D.N.Y. Aug. 16, 2013) (quotation marks omitted)

(quoting *J.P. Morgan Secs. Inc. v. Vigilant Ins. Co.*, 21 N.Y.3d 324, 335 (2013)); *Campers'*

*World Intern., Inc. v. Perry Ellis Intern., Inc.*, No. 02 CIV 453, 2002 WL 1870243, at *6

(S.D.N.Y. Aug. 13, 2002); *In re Residential Cap.*, LLC, 524 B.R. 563, 596 (Bankr. S.D.N.Y.

2015). The enforcement bar therefore applies only to the extent the damages flow from the

demonstrated intentional causation of harm. *In re Residential Cap., LLC*, 524 B.R. 563, 596

(Bankr. S.D.N.Y. 2015) (citing *Austro v. Niagara Mohawk Power Corp.*, 66 N.Y.2d 674, 676

(1985)).

Courts are not quick to stretch the bar on indemnity for intentional torts. For example, in

*J.P. Morgan Secs. Inc. v. Vigilant Ins. Co.*, the court denied the movant's motion to dismiss

plaintiff's claim for indemnification because the movant had not sufficiently demonstrated that

the plaintiff intended to cause harm despite a Securities and Exchange Commission order

"undoubtedly finding the [plaintiff]'s numerous securities law violations to be willful." *J.P.*

*Morgan Secs. Inc. v. Vigilant Ins. Co.*, 21 N.Y.3d 324, 335 (2013). Similarly, in *Gibbs-Alfano v.*

*Burton*, the Second Circuit held that an indemnification clause remained enforceable where the

"party seeking indemnification settled, without admitting liability, claims against it alleging

intentional wrongdoing." 281 F.3d 12, 21 (2d Cir. 2002). The Second Circuit concluded that in

the absence of a judgment of intentional conduct on the part of the indemnitees, New York's

public policy does not prevent the enforceability of an indemnification clause. *Id.*

### b.  *Analysis*

The New York public policy-based bar on indemnification for intentional torts does not

justify dismissal of the Trustee's claim for contractual indemnification. The requisite intent is not

established by any or all of Endo's allegations of director and officer misconduct, Endo's civil

settlement, and /or its misdemeanor plea. Rather, McKinsey's motion shows the existence of

factual issues requiring further development to resolve issues of intent.

First, while the complaint alleges that Endo's former directors and officers breached their

fiduciary duties, [*see* Compl. ¶¶ 230–46], accepting this allegation as true does not support a

finding that Endo acted with the specific intent to harm others. The public policy exception to

indemnification is not triggered merely by allegations of willful misconduct or breach of

fiduciary duties. *See Great Am. Ins. Co. v. Houlihan Lawrence, Inc.*, 449 F. Supp. 3d 354, 367

(S.D.N.Y 2020) ("claims of breach of fiduciary duty . . . do not require intentionality");

*Goldfarb*, 53 N.Y.2d at 400 (indemnitee not barred by his "gross negligence, recklessness or

wantonness"). Rather, evidence of breaches of fiduciary duties may lead to the discovery of "a

business purpose which had an intended result of causing harm, but this is a factual issue" that is

not appropriate for a motion to dismiss. *Bank of N.Y. v. Neumann*, 216 A.D.2d 189, 190 (1st

Dep't 1995). This Court is thus unable to conclude that the Trustee's allegations against Endo's

own directors and officers for breach of fiduciary duty establishes that Endo's conduct

constituted an intentional tort.

Second, also unfounded is McKinsey's contention that the intentional tortiousness of

Endo's conduct is established by Endo's DOJ Civil Settlement Agreement. *See* M. Miller Decl.,

Dkt. No. 18, Ex. 3, Ex. B. On May 30, 2023, Justice Department's Civil Division, Fraud Section

filed Claim No. 3157 on behalf of various federal agencies against Endo in its bankruptcy case,

"alleging that from 2011 to 2017 Endo knowingly caused the submission of false and fraudulent

claims to federal healthcare programs for prescriptions of Opana ER without a medically

accepted indication." *See* M. Miller Decl., Dkt. No. 18, Ex. 3, Ex. B at PDF p. 57. However, in

its settlement with the Justice Department, Endo explicitly denied wrongdoing, stating that

"[t]his Agreement is neither an admission of wrongdoing or liability by Endo or by the Debtors

nor a concession by the United States that its claims are not well founded. Endo and the Debtors

deny all allegations in Claim No. 3157 and deny that they engaged in the Covered Conduct." *See*

M. Miller Decl., Dkt. No. 18, Ex. 3, Ex. B at PDF p. 58. Endo's express denial of wrongdoing

cannot be construed as an admission that it committed an intentional tort.

Similarly, Endo's misdemeanor plea under the Food, Drug, and Cosmetic Act is not an

admission of intentional wrongdoing. The DOJ Civil Division, Consumer Protection Branch

charged Endo with a "misdemeanor violation of the Food, Drug, and Cosmetic Act ("**FDCA**"),

contrary to . . . [21 U.S.C. §§ 331(a), 333(a)(1), and 352(f)(1)] in that [Endo] caused the introduction and delivery for introduction into interstate commerce of Opana ER, a drug that was misbranded in that the drug's labeling lacked adequate directions for use." M. Miller Decl., Dkt. No. 18, Ex. 3 at PDF p. 108. In Endo's plea agreement, it admitted responsibility "for the misbranding of reformulated Opana ER by marketing the drug in a manner designed to convey abuse deterrence, but with a label that failed to include adequate directions for use for its claimed abuse deterrence, in violation of the Federal Food, Drug, and Cosmetic Act." M. Miller Decl., Dkt. No. 18, Ex. 3, Ex. B, Sched. A. ¶ 16. Misdemeanor violations of 11 U.S.C. § 331 can be established without a finding of knowledge or intent. *See, e.g.*, *United States v. Hiland*, 909 F.2d 1114, 1127–28 (8th Cir. 1990) ("Under § 333(a)(1), neither knowledge nor intent is required for a misdemeanor violation of § 331.") (citing *United States v. Park*, 421 U.S. 658, 668–73 (1975)); *United States v. Marschall*, 82 F.4th 774, 779 (9th Cir. 2023) (referencing 21 U.S.C. §§ 331, 352 and the omission of any scienter requirement from the language of these various provisions). Accordingly, Endo's plea agreement admitting to misbranding its products in violation of the FDCA provisions referenced above does not demonstrate the requisite intention to harm.

Thus, the Court cannot now conclude that New York's public policy exception for intentional torts bars Endo's contractual indemnification claim against McKinsey. The motion to dismiss the claim on this basis is therefore denied.

3. Discussion – MSA Consent Requirement for Indemnification of Settlement Payments

*a. Legal Standard*

To establish a claim for a breach of contract under New York law, "a plaintiff must prove (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Terwilliger v. Terwilliger*, 206 F.3d 240, 246 (2d Cir. 2000) (quoting *First Investors*

*Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998) (in turn quoting *Rexnord*

*Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994))) (internal quotations omitted).

Further, on an issue to which the parties devote great attention, a party does not have a

valid breach of contract claim "where the party seeking to enforce the contract has failed to

perform a specified condition precedent." *POSCO Energy Co. v. FuelCell Energy, Inc.*, 560 F.

Supp. 3d 747, 753 (S.D.N.Y. 2021) (quoting *Phoenix Signal & Elec. Corp. v. N.Y. State Thruway*

*Auth.*, 90 A.D.3d 1394, 1396–97, 935 N.Y.S.2d 201 (3d Dep't 2011)). "[A] condition precedent

is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur

before a duty to perform a promise in the agreement arises.'" *Bank of N.Y. Mellon Tr. Co., N.A.*

*v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 305 (2d Cir. 2016) (internal citation

omitted). "Conditions precedent are not readily assumed. While specific, talismanic words are

not required, the law nevertheless demands that conditions precedent be 'expressed in

unmistakable language.'" *Comerica Leasing Corp. v. Bombardier Inc.*, No. 16 CIV. 614 (PGG),

2019 WL 11027701, at *6 (S.D.N.Y. Sept. 30, 2019). "[W]hen commercial parties expressly

agree to a condition precedent to the creation or enforceability of an obligation and there is no

ambiguity arising out of other language in their contract, the only question for the court is

whether the condition precedent has been complied with." *Id.* (internal citations omitted).

The Federal Rules of Civil Procedure provide that "[a] pleading that states a claim for

relief must contain a short and plain statement of the claim showing that the pleader is entitled to

relief." Fed. R. Civ. P. 8(a)(2). This requirement, of course, is subject to the requirements of

*Iqbal* and *Twombly*, *supra*, that the complaint contain allegations of fact that establish the

plausibility of the plaintiff's claim for relief. Meanwhile, Federal Rule of Civil Procedure 9(c)

provides that "[i]n pleading conditions precedent, it suffices to allege generally that all

conditions precedent have occurred or been performed . . ." Fed. R. Civ. P. 9(c). No express

language contained in FRCP 8(a)(2) and 9(c) requires that the performance or occurrence of a

particular condition precedent be affirmatively pled by a claimant. Fed. R. Civ. P. 8(a)(c); 9(c).

As discussed below, courts have not all agreed about the extent to which *Iqbal*'s pleading

requirements apply and require more when a plaintiff alleges breach of a contract that featured

one or more conditions precedent to a defendant's obligations.

### b.  Analysis

McKinsey contends that the Trustee did not allege, because he cannot, that Endo ever

notified McKinsey or sought and received McKinsey's written consent to enter the settlements

for which Plaintiff is seeking indemnification. Motion at 2, 28. As a result, McKinsey contends

that under the clear and unambiguous terms of the MSA, the company need not indemnify Endo

for those damages—a result that McKinsey argues can be decided on a Rule 12(b)(6) motion to

dismiss. Motion at 28 (citing *Napster, LLC v. Rounder Recs. Corp.*, 761 F. Supp. 2d 200, 209

(S.D.N.Y. 2011) (indemnification claim "dismissed for failure to comply with the advance-

consent provision") and *Erickson Air-Crane Inc. v. EAC Holdings, L.L.C.*, 84 A.D.3d 464, 465

(N.Y. App. Div. 2011) ("Plaintiff's conceded failure to comply with the[] express conditions

when it unilaterally settled certain third-party claims is fatal to its demand for

indemnification.")).

In opposition, the Trustee first observes that the MSA's requirement of notice and written

consent to settlements is relevant to only a subset of the damages for which indemnification is

sought – although as noted McKinsey says this subset is worth more than $1.2 billion. Opp. at 2.

The Trustee alleges several categories of indemnifiable losses other than settlement,

compromises, or consent to judgment payments under Section 3(A) of the MSA, including $240

million in professional fees incurred during Endo's bankruptcy and $344 million incurred in

defending opioid-related lawsuits. *See* Compl. ¶¶ 226, 280. The Trustee further argues that

McKinsey has not shown or even contended that there is any notice or consent condition

precedent to Endo's recovery of non-settlement buckets of indemnifiable losses under the MSA.

Opp. at 34.

Regarding whether Endo sought or obtained prior written consent from McKinsey for

settlements, the Trustee argues that this constitutes an issue of fact that cannot be resolved on a

motion to dismiss. Opp. at 35–36. The Trustee argues that "under New York law, the failure of a

plaintiff to comply with conditions precedent is an affirmative defense." Opp. at 34 (quoting

*Endovasc, Ltd. v. J.P. Turner & Co., LLC*, 169 F. App'x 655, 657 (2d Cir. 2006)). Further,

Plaintiff argues, "the Federal Rules of Civil Procedure . . . do not compel a litigant to anticipate

potential affirmative defenses . . . and to affirmatively plead facts in avoidance of such

defenses." *Id.* (quoting *McGlynn v. Sinovision Inc.*, 2024 U.S. Dist. LEXIS 26641, at *3

(S.D.N.Y. Feb. 15, 2024) (citing *Abbas v Dixon*, 480 F.3d 636, 640 (2d Cir. 2007)); *United Res.

Recovery Corp. v. Ramko Venture Mgmt.*, 584 F. Supp. 2d 645, 657 (S.D.N.Y. 2008) (plaintiff

has "no obligation to affirmatively plead compliance with conditions precedent").

Responding to the authority on which McKinsey relies, the Trustee distinguishes *Napster*

by arguing that the advance-consent provision in that case was broad and applied to all

indemnifiable costs, and the plaintiff had conceded that it had failed to obtain "written consent,"

which was fatal to its claim unlike the facts in this case. Opp. at 35–36. Similarly, the Trustee

notes that the *Erickson Air-Crane* plaintiff had admitted that it failed to comply with a condition

precedent in a stock purchase agreement, which made any demand for indemnification

"contingent" in that case. Opp. at 36; *Erickson Air-Crane Inc. v. EAC Holdings, LLC*, 84 A.D.3d

28

464, 465 (App. Div. 1st Dept.). In the present case, the Trustee emphasizes that the Trustee has

not conceded that Endo failed to comply with a condition precedent; rather, the Trustee asserts

that as a trustee who lacks first-hand knowledge of the underlying events he needs discovery as

to whether Endo complied with the notice and consent condition precedent (a representation that

implicitly concedes or at least suggests that the Trustee presently is unaware of any notice or

consent having been given). *See* Opp. at 36.

Despite the parties' intensive focus on the pleading requirements that apply to the

satisfaction of conditions precedent in a contract, the Court has some uncertainty about whether

the Trustee has even plausibly pled facts establishing a prima facie case that McKinsey breached

a contractual obligation in the first place. The elements of a New York contract claim include a

showing that the plaintiff establish, among other things, performance by the plaintiff and a

breach of an agreement by the defendant counterparty. *Terwilliger*, 206 F.3d at 246. The MSA

could not be more explicit that McKinsey undertook no indemnification obligation whatsoever as

to settlement payments other than as to settlements to which McKinsey gave advance written

consent, which it was not to withhold unreasonably. *See* M. Miller Decl., Dkt. No. 18, Ex. 5,

MSA ¶ 3(D). The Complaint nowhere alleges that such consent was sought or given, and

McKinsey adamantly insists none was supplied; in fact, McKinsey insists that no notice was

given, and the Trustee has not alleged shown otherwise, rather urging that it be allowed to take

discovery to attempt to make its case. In fact, so far as the Court can tell, nothing in the

Complaint even alleges in general terms that Endo complied with conditions precedent to

McKinsey's settlement indemnification obligations. Given the MSA's plain terms, a breach by

McKinsey would consist of a refusal to pay after McKinsey had received notice and consented to

a proposed settlement, and/or damages flowing from an unreasonable refusal to provide such

consent. That has not been alleged, and the Court does not perceive how the Complaint's

nonconclusory allegations of fact meet the pleading requirements enunciated in *Iqbal* and

*Twombly* as to performance under the contract by Endo (including the giving of notice) or breach

(a nonpayment after having given consent or an unreasonable withholding of consent by

McKinsey).

Moreover, even assuming that notice and consent to Endo's settlements are properly

deemed a "condition precedent" to McKinsey's indemnification obligations, the Court adopts

and follows Judge Crotty's analysis in *Napster* and subsequent similar decisions on the facts

present here. The MSA's indemnification provisions are clear and create a bright-line threshold

for the obligation on the part of McKinsey, and the issue is not obscure or one of many possible

conditions precedent such that a detailed recitation of how various requirements were met would

be unreasonable to require. Rather, the written consent requirement is express, objective, clear,

readily determinable, and utterly central to the parties' obligations – McKinsey expected and

required that, and for it to be liable to indemnify Endo for any settlement, it must have consented

to the settlement, subject to the proviso that it would not unreasonably withhold its consent. Yet

not only has there been no allegation of notice or consent, so far as the Court can tell the

Complaint lacks any allegation even generally that Endo or the Trustee satisfied relevant

conditions precedent. The Court therefore at a minimum cannot conclude that the Complaint

pleads "factual content that allows the court to draw the reasonable inference that the defendant

is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.

*Napster* involved indemnification demands made by a music streaming platform,

Napster, against a record label called Rounder with which Napster had entered a streaming

agreement. *See generally* 761 F. Supp. 2d 200 (S.D.N.Y. 2011). Napster sought indemnification

for its settlement costs resolving copyright infringement claims against Napster for streaming allegedly copyright-violative music obtained from the record label. *Id.* The Court granted the record label's motion to dismiss, in relevant part, for "failure to comply with [a contractual] advance consent provision." *Id.* at 202. The contract at issue provided, much like the Endo-McKinsey contract at issue here, that "[n]o payments shall be made nor costs incurred in connection with any such claim without the prior written consent of [the other party], such consent not to be unreasonably withheld." *Id.* at 204. Napster settled the copyright claims it faced and only then turned to its content providers for indemnification. *Id.* at 205. Napster sued Rounder (the record label defendant) and did not specifically allege Rounder's consent to Napster's settlement, but alleged generally that Napster had complied with all conditions precedent. *Id.*

In dismissing Napster's claims, the Court emphasized the pleading requirements that not only must the Federal Rules' textual requirements be met, but that, as the Supreme Court has explained, "[t]o avoid dismissal, the complaint must contain 'enough facts to state a claim to relief that is plausible on its face,' that is to say facts that 'nudge [ ] [the plaintiff's] claims across the line from conceivable to plausible . . . ." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in turn, requires only that the allegations in the complaint "raise a reasonable expectation that discovery will reveal evidence" in support of the claim. *Twombly*, 550 U.S. at 555; *see also Arar v. Ashcroft*, 585 F.3d 559, 617 (2d Cir. 2009). The Court rejected as conclusory and insufficient a general allegation by Napster – seemingly not present in the Trustee's Complaint here – that Napster had followed or satisfied all applicable conditions precedent, and the *Napster* court noted that even that general allegation was inconsistent with an acknowledgement of a lack of notice. 761 F. Supp. 2d at 208. While acknowledging that some

31

cases held that a plaintiff need not allege compliance with specific conditions precedent, the *Napster* court held that those earlier decisions either predated the *Iqbal* and *Twombly* plausibility pleading standard, failed to fully take it into account, or were otherwise distinguishable. *Id.* at 208–09.[3]

The Court agrees that a complaint seeking indemnification for settlements that were subject to an express advance-written-consent requirement cannot fail to allege facts showing that such consent or some other trigger for the defendant's liability exists. And here, the situation is even more stark, as the Court has identified no general allegation of compliance with conditions precedent; the Trustee has identified none, and even if such an allegation were present in the lengthy Complaint, it alone would be insufficient for reasons just stated.

As noted, the Court questions whether such a fundamental deficiency even fits exclusively in the rubric of conditions precedent, or whether it should also be viewed as constituting a part of the plaintiff's prima facie pleading requirement to show a breach. Setting that musing aside, at a minimum, the Court concludes that the Complaint here does not plausibly allege a claim for breach of McKinsey's indemnification obligation relating to settlements.

This conclusion is reinforced by a decision by then-District Judge Nathan, holding that Rule 9(c)'s statement that conditions precedent may be alleged generally does not justify holding pleadings to a standard less rigorous than that required by *Iqbal*. *See Dervan v. Gordian Grp. LLC*, No. 16-CV-1694-SJN, No. 16-CV-1694-AJN, 2017 WL 819494 (S.D.N.Y. Feb. 28, 2017). Like the parties here, the plaintiff in *Dervan*, who alleged his former employer's breach of a

---

[3] The Trustee correctly observes that the holding in *Napster* was buttressed by the Court's observation that the plaintiff there acknowledged noncompliance with a condition precedent even as it generally alleged satisfaction of all conditions, but that observation was by way of reinforcement, not central or necessary to the Court's conclusion that a plausible allegation was required, even of conditions precedent, notwithstanding the wording of Fed. R. Civ. P. 9(c). *See Napster, LLC v. Rounder Recs. Corp.*, 761 F. Supp. 2d 200, 209 (S.D.N.Y. 2011).

severance agreement, argued that under Rule 9(c) his fulfillment of the contract so as to be

entitled to performance by the former employer was adequately alleged by a mere general

averment. *Id.* The Court disagreed, holding in a thorough and persuasive analysis that the *Iqbal*

pleading requirements applied even as to whether a condition precedent were satisfied, because

*Iqbal* expressly reached Rule 9(b) with its comparable language saying "intent" can be alleged

generally. *Id.* at *3–7. Thus, the Court concluded that Dervan had failed to plausibly allege his

own performance under the agreement, and his breach of contract claim accordingly was

dismissed. *Id.*

*Dervan* has been followed by numerous cases for the proposition that "the occurrence or

performance of a condition precedent—to the extent that it need be pled as a required element of

a given claim—must be plausibly alleged in accordance with Rule 8(a)." *Ashland Glob.*

*Holdings Inc. v. Valvoline, Inc.*, No. 21-CV-00498-RA, 2022 WL 219997, at *6 (S.D.N.Y. Jan.

25, 2022) (quoting *Dervan*, 2017 WL 819494, at *6, and citing numerous other decisions that

"followed *Dervan*'s lead"). The *Ashland* court therefore dismissed the complaint.

In the face of this persuasive authority, the Court declines to follow the authorities relied

on by the Trustee, many of which are distinguishable in any event. It is true that the Second

Circuit has not ruled on whether Rule 9(c) requires plaintiffs to affirmatively plead performance

of conditions precedent. *See Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d

639, 648 (E.D.N.Y. 2012). The Trustee identifies a number of earlier decisions declining to

dismiss a complaint (at least one that alleged generally that conditions precedent were satisfied,

as the Complaint here does not) on the rationale that Rule 9(c) authorizes general allegations of

satisfaction of conditions precedent, and/or that a failure to perform a condition precedent is an

affirmative defense that does not support a motion to dismiss.[4] None of these decisions, however, grapple with the analysis of *Napster*, *Dervan*, *Ashland*, and cases discussed in those decisions, all of which insist that the *Iqbal* plausibility applies and requires more than mere conclusory statements, especially where the complaint is so glaringly silent about a central provision.

As the *Ashland* court further held, the resulting dismissal was and should be without prejudice to repleading so that the plaintiff can "amend at least once after having the benefit of a court's reasoning in dismissing" the claim. *Ashland*, 2022 WL 219997, at * 8. As such, the Court rules here: the Trustee's claim for indemnification of its settlement costs is dismissed without prejudice to its right to amend to allege additional facts demonstrating its compliance with the notice and written consent requirement of the MSA's settlement-indemnification provision.

The Court thus grants without prejudice McKinsey's motion to dismiss the Trustee's claim for indemnification for settlement payments, while it denies the motion to dismiss indemnification claims for other asserted expenses.

### B. Aiding and Abetting in the Breach of Fiduciary Duties

The Complaint's next claims assert that McKinsey's conduct aided and abetted breaches of fiduciary duty by Endo officers and directors by encouraging and enabling them to implement

---

[4] *See, e.g.*, *Mendez*, 840 F. Supp. 2d at 648 (acknowledging inconsistent case law and holding that the pleading of performance of specific conditions precedent is not required) (citing *Kiernan v. Zurich Cos.*, 150 F.3d 1120, 1124 (9th Cir. 1998) ("Rule 9(c) does not expressly require that performance of conditions be pled, it merely sets forth the manner in which such pleadings should be made.")); *Baraliu v. Vinya Capital, L.P.*, No. 07 Civ. 4626, 2009 U.S. Dist. LEXIS 35712, at *5 (S.D.N.Y. Mar. 31, 2009) ("Under the Federal Rules, a plaintiff is required to 'allege generally that all conditions precedent have occurred or been performed.' Fed. R. Civ. P. 9(c). Plaintiff fails to do so, and in fact admits in another part of his complaint that the conditions precedent were not satisfied, and hence this claim must be dismissed."); *Randolph Equities, LLC v. Carbon Capital, Inc.*, No. 05 Civ. 10889, 2007 U.S. Dist. LEXIS 21670, at *4 (S.D.N.Y. Mar. 26, 2007) ("Defendants' contention that Rule 9(c) mandates Plaintiffs to plead with specificity the performance of each condition precedent is misguided."); *United Res. Recovery Corp. v. Ramko Venture Mgmt.*, 584 F. Supp. 2d 645, 657 (S.D.N.Y. 2008) (plaintiff has "no obligation to affirmatively plead compliance with conditions precedent"); *CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.*, No. 03 Civ. 7936, 2006 U.S. Dist. LEXIS 31395, at *4 (S.D.N.Y. May 18, 2006) (holding that plaintiff failed to state a claim because plaintiff failed to allege, even generally, that the conditions precedent were performed or had occurred).

reckless sales-maximization strategies that fueled the opioid crisis, resulting in heavy corporate

liabilities. *See* Compl. ¶¶ 282–314 (Second through Sixth Causes of Action).

McKinsey moves to dismiss each of these counts on identical grounds: that the claims are

barred under the *Wagoner* and *in pari delicto* doctrines, and that the claims are time-barred. The

Trustee disagrees. The parties' contentions are detailed in the course of the following discussion,

which begins with the time-bar question.

### 1. Statute of Limitations

A claim may be dismissed as time-barred at the motion to dismiss juncture "only if a

complaint clearly shows the claim is out of time." *Harris v. City of N.Y.*, 186 F.3d 243, 250 (2d

Cir. 1999).

The Complaint was filed on August 15, 2024, but the parties agree that the relevant point

for computing the timeliness of the Trustee's claims was Endo's bankruptcy petition date,

namely, August 16, 2022. Compl. ¶ 20; 11 U.S.C. § 108(a) (imposing two-year toll of unexpired

statutes of limitations as of a debtor's bankruptcy petition date).

Pertinent to the possible claim accrual date, the Complaint alleges that McKinsey worked

with Endo over an extended time including "[t]hroughout 2016," [Compl. ¶ 201], and the

Trustee's opposition to the motion to dismiss advances no possible accrual date after 2016. *See*

Opp. at 31 ("the Trustee has alleged actionable misconduct as late as 2016"). The Complaint

alleges that the FDA made adverse regulatory findings in March 2017 and that Endo agreed to

withdraw its reformulated Opana ER product from the market in July 2017 [Compl. ¶¶ 211,

213], although "residual sales" of Opana ER continued into 2018 [Compl. ¶ 217] and Endo

thereafter continued to sell generic versions of its product or opioid products that relied on Endo

patents [Compl. ¶ 216].

35

The parties disagree about what limitations period applies. McKinsey urges the Court to apply New York's three-year statute of limitations pursuant to CPLR 214(4) and Pennsylvania's two-year statute of limitations pursuant to 42 Pa. C.S.A § 5524(7) for the aiding and abetting breach of fiduciary duty claims (Counts II—VI), keying off of the latest McKinsey conduct alleged in the Complaint, namely, activities throughout 2016. *See* Motion at 25–26; Reply at 17–20; Compl. ¶ 201. The Trustee argues that the applicable statute of limitations is six years pursuant to CPLR 213(7) as to the New York-based Par Pharmaceutical, with additional time tacked on due to executive orders issued by the governor of New York during the COVID-19 pandemic which tolled the statute of limitations for 228 days. Opp. at 26–30. The Trustee contends that Pennsylvania law (pertinent to domestic Endo entities other than the Par Pharmaceutical entities) and Irish law (pertinent to Endo Plc) allow a six-year period, either explicitly or, in the case of Ireland, as a matter of laches case law. *Id.*

The Court thus must begin by identifying the applicable law. The Court applies the law of the forum state – New York – to determine which statute of limitations to apply. *Halperin v. Morgan Stanley Inv. Mgmt. (In re Tops Holding II Corp.)*, 646 B.R. 617, 692 (Bankr. S.D.N.Y. 2022). Where another jurisdiction's law may apply, New York law calls for applying the shorter of the relevant New York limitations period, or the other jurisdiction's limitations period. *See* CPLR 202; *Sutton v. Tapscott*, 120 F.4th 1115, 1121 (2d Cir. 2024). The Court's analysis therefore begins with a review of the possible sources of law and the applicable provisions under each.

### a.  New York Law

The parties agree that New York law applies to Endo affiliate Par Pharmaceutical, which was headquartered in New York, so this discussion addresses the sole applicable time bar as to

Par while also addressing one pertinent period as to the other Endo entities in light of the requirement of the New York borrowing statute to apply the shorter of New York's and the other relevant jurisdiction's limitations periods.

New York's relevant law is complex, and parsing the relevant strands is a somewhat time-consuming exercise. By way of overview, for reasons about to be explained, the applicable New York statute of limitations for the types of aiding and abetting claims brought by the Trustee is generally three years, because the relief sought is monetary rather than equitable and the claims do not sound in fraud. The other key issue, advanced although somewhat conclusorily by the Trustee, is that the Trustee nevertheless is entitled to rely on a six-year term provided by New York's CPLR 213(7) for suits by a corporation against its officers and/or directors for a number of types of harms those officials caused the corporation to experience. The case law is not consistent whether a bankruptcy trustee could ever be entitled to bring such a claim, although there is significant authority in favor of authorizing such claims by a trustee. Even assuming a trustee could bring such a claim, the Court concludes that CPLR 213(7) is inapplicable to the claims against McKinsey here because the claims are not leveled against corporate officers or directors, but rather, in a suit in which no director or officer is even a party, are brought against a consultant on an aiding and abetting theory (among other grounds). The statute specifies that only claims against officers and directors fall within the scope of CPLR 213(7), no prior case has authorized reliance on CPLR 213(7) in suits against parties other than officers and directors, and the Court concludes that the use of the statute in such an expansive manner would be contrary to the CPLR's language and would harmfully allow artful plaintiffs to evade clear, independent, expressly applicable and shorter limitations periods merely by asserting that third parties helped directors harm companies.

Under New York law, the limitations period applicable to aiding and abetting fiduciary duty breaches varies depending on the nature of the claim and/or the remedy sought.

Sections 213 and 214 of the New York CPLR "do not specify the statute of limitations period in which claims of . . . aiding and abetting breach of fiduciary duty must be brought." *AJ Ruiz Consultoria Empresarial S.A. v. Banco Bilbao Vizcaya Argentaria, S.A.*, No. AP 21-01213 (LGB), 2024 WL 460482, at *16 (Bankr. S.D.N.Y. Feb. 6, 2024), *report and recommendation adopted*, No. 24-CV-3466 (JGLC), 2025 WL 934416 (S.D.N.Y. Mar. 27, 2025). Relevant case law has concluded that "[t]he statute of limitations for a claim of aiding and abetting a breach of fiduciary duty is the same limitations period that would apply to the underlying breach," where the underlying claim is sounded in fraud. *Balta v. Ayco Co.*, LP, 626 F. Supp. 2d 347, 359 (W.D.N.Y. 2009) (citing *Williams v. Sidley Austin Brown & Wood, LLP*, 15 Misc. 3d 1125(A) at *5, 841 N.Y.S.2d 222 (N.Y. Sup. Ct. 2007)); *see also* CPLR 213(8) ("an action based upon fraud" has a statute of limitations the "greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it"); *In re Signature Apparel Grp. LLC*, 577 B.R. 54, 82 (Bankr. S.D.N.Y. 2017) ("A six year statute of limitations applies to breach of fiduciary claims . . . where the cause of action is based on actual fraud.") (citing *Kaufman v. Cohen*, 307 A.D.2d 113, 117, 760 N.Y.S.2d 157, 164 (N.Y. 2003)); *In re Lifetrade Litig.*, No. 17-CV-2987 (JPO), 2023 WL 6215332, at *2 (S.D.N.Y. Sept. 25, 2023), *on reconsideration in part*, No. 17-CV-2987 (JPO), 2024 WL 1892254 (S.D.N.Y. Apr. 30, 2024). An exception to this rule is that "courts will not apply the fraud Statute of Limitations if the fraud allegation is only incidental to the claim asserted; otherwise, fraud would be used as a means to litigate stale claims." *Kaufman*, 307 A.D.2d at 119 (quoting *Powers Mercantile Corp. v.*

38

*Feinberg*, 109 A.D.2d 117, 120, 490 N.Y.S.2d 190, 192–93 (N.Y. App. Div. 1985), *aff'd sub*

*nom. Powers Mercantile Co. v. Feinberg*, 67 N.Y.2d 981, 494 N.E.2d 106 (N.Y. 1986)).

   The statute of limitations for aiding and abetting breach of fiduciary duty claims not

sounding in fraud is limited to three years if "the remedy sought is purely monetary in nature."

*See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139, 907 N.E.2d 268

(N.Y. 2009) (citing CPLR 214(4)). However, it is six years where "the relief sought is equitable

in nature." *Id.* (citing CPLR 213(1)). Meanwhile, "where an allegation of fraud is essential to a

breach of fiduciary duty claim, courts have applied a six-year statute of limitations under CPLR

213(8)." *Id.* (citing *Kaufman v. Cohen*, 307 A.D.2d 113, 119, 760 N.Y.S.2d 157 (N.Y. App. Div.

2003)). In other words, for the longer, six-year statute of limitations to apply, the cause of action

must either (1) seek an equitable remedy,[5] or (2) seek relief for a breach of fiduciary that is

rooted in fraud.[6]

   The facts alleged in the Complaint make clear that neither scenario is present here. The

Complaint does not allege fraudulent conduct either on McKinsey's part, or on Endo's

fiduciaries' part, instead alleging facts that, if assumed true, allege negligence (perhaps to a

heightened degree, such as gross or reckless conduct) and breaches of a duty of care. Meanwhile,

the Complaint seeks monetary damages from McKinsey. *See* Compl. ¶ 90 ("Prayer for Relief"

---

[5] *See Carlingford Ctr. Point Assocs. v. MR Realty Assocs., L.P.,* 772 N.Y.S.2d 273, 274 (N.Y. App. Div. 2004) ("A breach of fiduciary duty claim is governed by either a three-year or six-year limitation period, depending on the nature of the relief sought . . . [t]he shorter time period applies where monetary relief is sought, the longer where the relief sought is equitable in nature . . . ."); *Cooper v. Parsky,* 140 F.3d 433, 440–41 (2d Cir. 1998) (recognizing that a six-year statute of limitations only controls claims for breach of fiduciary duties seeking equitable relief); *Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia,* 23 F. Supp. 2d 439, 452 (S.D.N.Y. 1998) (same) (citing *Philip Morris Inc. v. Heinrich,* No. 95 CIV. 0328 (LMM), 1996 WL 363156, at *16 (S.D.N.Y. June 25, 1996)); *Golden Pac. Bancorp v. F.D.I.C.,* 273 F.3d 509, 518 (2d Cir. 2001) (same, discussed by *Fezzani v. Bear, Stearns & Co.,* No. 99 CIV. 0793 (RCC), 2004 WL 1781148, at *2–3 (S.D.N.Y. Aug. 10, 2004) and *Wagley v. JP Morgan Chase Bank, N.A. as trustee of Mary Penney Wagley Irrevocable Tr.,* No. 18 CIV. 8668 (PGG), 2020 WL 5768688, at *6 (S.D.N.Y. Sept. 26, 2020)).

[6] *See IDT Corp.,* 12 N.Y.3d at 139; *Cohen v. S.A.C. Trading Corp.,* 711 F.3d 353, 361 & n.3 (2d Cir. 2013) (citing CPLR 213(8)).

seeking "[r]ecovery against McKinsey in an amount to be determined at trial" and "[a]warding

Plaintiffs prejudgment and post-judgment interest at the maximum rate permitted by law"). The

Complaint does also seek "[a]ny further relief as the Court deems just, proper or equitable," *see

id.*, but the primary thrust of the Complaint is to demand monetary damages, and, because the

Complaint concerns historic conduct that is not ongoing and that arose in a since-discontinued

commercial relationship, the Court cannot envision equitable relief that could result from the

action. *See Bascuñan v. Elsaca*, No. 15 CIV. 2009 (GBD), 2021 WL 3540315, at *7 (S.D.N.Y.

Aug. 11, 2021) (a review of the complaint made it clear that what plaintiff sought was money

damages). Further, the fact that what the Trustee seeks is monetary damages weighs in favor of

classifying the breach of fiduciary claims against the Par entities as legal claims. Thus, New

York law's three-year limitations period applies.

        In turn, there is no dispute that the last McKinsey conduct relevant to the Trustee's aiding

and abetting breach of fiduciary claims occurred no later than 2016, and so these claims are

accordingly time-barred (unless the Trustee is saved by CPLR 213(7), discussed below). *See

CPLR 214(4). This conclusion is buttressed by additional case law that McKinsey emphasized

arising from cases that featured allegations similar to those here. *See Global Crossing Estate

Rep. v. Winnick*, 2006 WL 2212776, at *18 (S.D.N.Y. 2006) (applying three-year period to

breach of fiduciary duty claim advanced by estate representative of bankrupt corporation); *Tatko

v. Sheldon Slate Prods. Co., Inc.*, 769 N.Y.S.2d 626, 628 (N.Y. App. Div. 2003) (applying three-

year period to breach of directors' fiduciary duties claim in derivative action).

        The Trustee has failed to grapple either with this case law, or with the reality that New

York law differentiates among the types of claims and misconduct at issue in determining what

limitations period applies. Rather, the Trustee somewhat cursorily argues for a blanket six-year

40

period, citing CPLR 213(7). CPLR 213(7) supplants the "general rule [of CPLR 213(1)] in

particular circumstances." *In re Lifetrade Litig.*, No. 17-CV-2987 (JPO), 2023 WL 6215332, at

*2 (S.D.N.Y. Sept. 25, 2023), *on reconsideration in part*, No. 17-CV-2987 (JPO), 2024 WL

1892254 (S.D.N.Y. Apr. 30, 2024); *see also Roslyn Union Free Sch. Dist. v. Barkan*, 16 N.Y.3d

643, 648, 950 N.E.2d 85, 87 (2011). But the text of CPLR 213(7), which where applicable

imposes a six-year statute of limitations, makes clear that its coverage does not extend to this

case; it covers only "an action by or on behalf of a corporation against a present or former

director, officer or stockholder for an accounting or to procure a judgment on the ground of

fraud, or to enforce a liability, penalty or forfeiture, or to recover damages for waste or for an

injury to property or for an accounting in conjunction therewith." CPLR 213(7).

Some but not all courts have applied the six-year statute of limitations under CPLR

213(7) for claims brought by a bankruptcy trustee against a corporation's directors or officers on

behalf of the corporation. *See FDIC v. Bober*, No. 95 CIV. 9529 (JSM), 2000 WL 235271, at *3

(S.D.N.Y. Mar. 1, 2000) (noting that, contrary to the discussion in *Purves v. ICM Artists,

Ltd.,* 119 B.R. 407 (S.D.N.Y.1990), the plain language of CPLR 213(7) is not limited to

derivative actions but covers any action "brought by or on behalf of a corporation"); *Pereira v.

Centel Corp. (In re Argo Communs. Corp.)*, 134 B.R. 776, 787–88 (Bankr. S.D.N.Y.

1991) ("Based on the plain language of [CPLR] 213(7), the same statute of limitations must

apply when a corporation asserts its own cause of action and when a shareholder asserts the same

cause of action on the corporation's behalf. Consistent with this interpretation, the statute

encompasses both actions 'by' and those 'on behalf of' a corporation.'"). Accordingly, there is a

strong argument, not decided by the Court here, that CPLR 213(7) does not apply solely to

shareholder derivative actions, as suggested by McKinsey. *See Lippe v. Bairnco Corp.*, 230 B.R. 906, 913–14 (S.D.N.Y. 1999); *Argo Commc'ns Corp.*, 134 B.R. at 787; Reply at 18.

However, the statute on its face does not apply to the Defendants in this action. McKinsey is not a present or former "director[], officer[], or stockholder[] of a corporation on whose behalf the action was being brought." *Grika v. McGraw*, 55 Misc. 3d 1207(A) at *12, 57 N.Y.S.3d 675 (N.Y. Sup. 2016), *aff'd sub nom. L.A. Grika on behalf of McGraw*, 161 A.D.3d 450, 76 N.Y.S.3d 546 (N.Y. 2018). At least one court in this Circuit has considered whether CPLR 213(7) applies to *de facto* directors, officers, or shareholders and concluded that it does not. *See Steinfeld v. Richard A. Eisner & Co., LLC (In re Gen. Vision Servs., Inc.)*, No. 05-01759 (SMB), 2006 WL 687162, at *3 (Bankr. S.D.N.Y. Mar. 13, 2006), *order aff'd, appeal dismissed*, 423 B.R. 790 (S.D.N.Y. 2010), and *order aff'd, appeal dismissed*, 423 B.R. 790 (S.D.N.Y. 2010). The *Steinfeld* court examined an analogous situation from *Trinity Coop Apartments*, a New York Appellate Division case, where the defendants sued "were not officers, directors or shareholders of the plaintiff, but allegedly controlled the plaintiff's officers and directors." *Id.* (citing *Trinity Coop. Apts., Inc. v. J.S. Bldg. Corp.*, 270 N.Y.S.2d 644, 645 (N.Y. App. Div. 1966)). There, the Appellate Division ruled that these defendants "may have controlled the persons who were nominally the officers and directors of plaintiff did not render the 6–year Statute of Limitations . . . applicable to them." *Trinity Coop. Apts.*, 270 N.Y.S.2d at 645. Relying on *Trinity Coop Apartments*, *Steinfeld* held that the general, three-year statute of limitations for injuries to property, *see* CPLR 214(4), controls even if the defendants are *de facto* officers, directors, or shareholders. *Steinfeld*, 2006 WL 687162, at *3 (CPLR 213(7) governs claims against *nominal* officers, directors and shareholders, but does not apply to *de facto* officers, directors and shareholders).

42

Similarly, Defendants here are two corporations in the McKinsey corporate umbrella who are third parties accused of harming Endo entities by their consulting activities, with one alleged mechanism of harm being aiding and abetting in breaches of fiduciary duties by certain former directors and officers of the debtor-corporations at issue. *See* Compl. ¶¶ 18–19. The limited authority on point has rejected applying the longer limitation period of CPLR 213(7) to such claims. Rather, as one court held, "a breach of fiduciary duty derivative claim seeking only monetary damages against a defendant who is not a 'director, officer or shareholder' of the company is not a claim governed by CPLR 213(7), and thus is subject to a three-year statute of limitations." *Grika v. McGraw*, 55 Misc. 3d 1207(A) at *11 (applying a three-year statute of limitations to a cause of action alleging a claim for aiding and abetting a breach of fiduciary duty) (citing *Bd. of Managers of Chelsea 19 Condo. v. Chelsea 19 Assocs.*, 73 A.D.3d 581, 582, 905 N.Y.S.2d 8, 10 (N.Y. App. Div. 2010)). Earlier case law also has concluded that where claims for aiding and abetting breach of fiduciary are brought against non-directors or officers, a Trustee's reliance on CPLR 213(7) is misplaced. *See In re Invs. Funding Corp. of N.Y. Sec. Litig.*, 523 F. Supp. 533, 547 (S.D.N.Y. 1980). Such a result would ignore the plain language of CPLR 213(7), which applies specifically and exclusively to claims against directors and officers, and it would contravene the notion, espoused in *Kaufman*, that courts should not allow CPLR 213(7) to be "used as a means to litigate stale claims." 307 A.D.2d at 119.

The Trustee has filed a separate adversary proceeding against former Endo directors and/or officers of the debtor corporations. *See* Compl. ¶¶ 187–213; *see also Dundon v. De Silva, et al.*, Adv. Case No. 24-07022 (DSJ) (Bankr. S.D.N.Y. July 24, 2024), Dkt. No. 1. Nothing in this Decision is intended to bind any party in that litigation, which may present different issues

or arguments that the Court has not considered here. Be that as it may, the Trustee's reliance on

CPLR 213(7) here fails.

As shown above, then, New York law establishes a three-year limitations period for the

types of claims at issue here. And those claims thus expired no later than the end of 2019, well

before the COVID-related tolling measures adopted by New York took effect, and well before

August 2022 petition date.

The Trustee's opposition contends that Pennsylvania law provides additional protections

in the form of a "discovery" rule and/or an "adverse domination" doctrine. Opp. at 29–30. The

Trustee's Opposition does not present argument that similar doctrines apply and are satisfied

here under New York law, and so the Court need not and cannot address whether either doctrine

extends the applicable statute of limitations under New York law.

### b.  Pennsylvania and Ireland Law

Because New York's borrowing statute requires applying the shorter of the relevant

limitations periods under New York law or the law of any other relevant jurisdiction, the Court's

New York law holding alone is fatal to all of the Trustee's aiding-and-abetting claims. Moreover,

at least the claims for which Pennsylvania law arguably could apply (meaning those involving

Endo entities other than Par and Endo Plc) likewise are untimely as a matter of Pennsylvania

law, thus creating an independent reason to dismiss those claims.

Under Pennsylvania law, claims for aiding and abetting breach of fiduciary duty are

subject to a two-year statute of limitation. *See* 42 Pa. C.S. § 5524; *Weis-Buy Servs., Inc. v.

Paglia*, 411 F.3d 415, 422 (3d Cir. 2005) (applying Pennsylvania statute of limitation to breach

of fiduciary duty claim); *Appel v. Kaufman*, 481 F. App'x 774, 776 (3d Cir. 2012); *In re

Swarthmore Grp., Inc.*, 667 B.R. 258, 270 (Bankr. E.D. Pa. 2025). The six-year statute of

limitations prescribed by 42 Pa. C.S.A. § 5527(b) ("Any civil action or proceeding which is neither subject to another limitation specified in this subchapter . . . must be commenced within six years.") is inapplicable here because the statute of limitations for causes of action for breach of fiduciary duty is provided in 42 Pa. C.S. § 5524. The Trustee's argument to the contrary is unfounded, and depends on cases involving conduct that preceded 1982, when Pennsylvania enacted legislation expanding its pre-existing two-year limitations period to include claims "founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, deceit or fraud." 42 Pa. C.S.A. § 5524(7). McKinsey cites an array of post-amendment cases establishing that Pennsylvania has applied the two-year period to breach of fiduciary duty claims accruing after 1982. *See* Reply at 19 n.12 (citing numerous cases). The Trustee did not meaningfully or successfully controvert this showing at oral argument.

Additionally, and contrary to the Trustee's arguments, neither the "discovery rule" nor the "adverse domination" doctrine tolls the applicable Pennsylvania statute of limitations, at least to a sufficient degree to render the claims timely under Pennsylvania law. *See* Opp. at 29–30.

The discovery rule provides that "[w]here a plaintiff could not reasonably have discovered his injury or its cause . . . Pennsylvania courts have applied the discovery rule to toll the statute of limitations. Where the discovery rule does apply, the two-year period on legal malpractice actions begins to run where the plaintiff knew or in the exercise of reasonable diligence should have known of the injury and its cause." *Knopick v. Connelly*, 639 F.3d 600, 607 (3d Cir. 2011) (citations omitted); *see also Beauty Time, Inc. v. VU Skin Systems, Inc.*, 118 F.3d 140, 144 (3d Cir. 1997). The discovery rule delays the running of the statute of limitations where "despite the exercise of reasonable diligence," a plaintiff cannot know that he is injured

45

and by what cause. *Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005). Here, the Debtor and its

directors and officers were incontrovertibly on notice that a claim had accrued when "Endo

Health Solutions and Endo Pharmaceuticals entered into an Assurance of Discontinuance with

the New York State Attorney General concerning their improper marketing practices for Opana

ER" in March 2016, [Compl. ¶ 202], long before the filing of this Complaint in August 2024 or

even the bankruptcy petition date. The Complaint makes inescapable that Endo's engagement of

McKinsey and McKinsey's sale-maximization efforts were sought and approved by Endo's

leadership, the antithesis of the type of concealed fraudulent conduct that the discovery rule is

designed to allow to be addressed. And the Trustee has presented no law showing that his

subsequent appointment somehow resets or revives the discovery rule. *See* Reply at 20 (stating

that the Trustee's argument was flatly rejected in both *Seitz v. McCauley (In re Marchese)*, 2018

Bankr. LEXIS 2105 (Bankr. E.D. Pa. 2018) (the case cited by the Trustee in support of this very

argument) and *In re National Forge Co.*, 344 B.R. 340 (W.D. Pa. 2006)).

Facts alleged in the Complaint, both individually and collectively, also establish that the

adverse domination doctrine is inapplicable, and, specifically, that it fails to extend the two-year

limitations period that applies to Pennsylvania-headquartered Endo entities; at a minimum, any

possible toll would not reach the August 2022 petition date.

Courts have previously applied the adverse domination doctrine to toll Pennsylvania's

statute of limitations where appropriate. *See Resolution Tr. Corp. v. Farmer,* 865 F.Supp. 1143,

1151 (E.D. Pa. 1994); *In re Lloyd Securities, Inc.,* 153 B.R. 677, 684–85 (E.D. Pa. 1993); *In re

Numedco,* 1991 WL 204908 (Bankr. E.D. Pa. 1991). To survive a motion to dismiss, the Trustee

must plead facts "to raise a claim of control of Debtor by the [defendants]," *In re Sverica

Acquisition Corp., Inc.*, 179 B.R. 457, 470 (Bankr. E.D. Pa. 1995), thereby making it a factual

inquiry. *See Hayward v. Medical Center of Beaver County,* 530 Pa. 320, 608 A.2d 1040, 1043
(Pa. 1992) (citing *Smith v. Bell Telephone Co. of Pa.,* 397 Pa. 134, 142, 153 A.2d 477, 481 (Pa.
1959)). And in Pennsylvania, "the plaintiff must negate the possibility that an informed person or
persons could have induced the corporation to initiate suit" and "must show that those in such
position were active participants in true wrongdoing, that is, their conduct was more culpable
than mere negligence." *Farmer*, 865 F. Supp. at 1157.

The Complaint merely alleges that the identified directors and officers served at Endo
Health Solutions and Endo Pharmaceuticals from 2013 to 2019. *See* Compl. ¶¶ 30–33, 35–38. Of
these individuals, the last departure of an Endo Health Solutions director or officer occurred in
2019 (when the last allegedly involved Par director also stopped serving) and the last departure
of an Endo Pharmaceutical director or officer occurred in 2016 (the last year in which McKinsey
is alleged to have committed any liability-generating acts). *See* Compl. ¶¶ 30–39. Even taking as
true the Trustee's assertion that the limitations period did not begin to run until the last of the
alleged "wrongdoer" directors departed in 2016 or, for that matter, even in 2019, *see* Opp. at 30,
the Pennsylvania statute of limitations nevertheless would have expired by sometime in 2021—
well before these Chapter 11 cases were commenced. The Court therefore need not examine at
this stage whether there existed non-culpable actors who, in theory, could have pursued claims
during the relevant period or induced Endo to do so, including shareholders proceeding
derivatively. *See Farmer*, 865 F. Supp. at 1156 (noting that "the plaintiff must negate the
possibility that an informed shareholder or director could have induced the corporation to initiate
suit"). Ultimately any such argument might face an uphill battle, as McKinsey (the defendant)
has not plausibly been alleged to have exercised the required degree of control, and all that has

been alleged about the Endo entities is a mix of corporate leaders who left on dates ranging between 2016 and 2019.

The Trustee also argues that "fact issues remain as to whether [the Pennsylvania and Irish statute of limitations] periods reach back to an earlier time than New York's statute of limitations . . . thus warranting application of the New York limitations period." Opp. at 31. Here, the Trustee again refers to the adverse domination doctrine, *see id.*, which the Trustee argues would extend the Pennsylvania or Irish statute of limitations periods longer than New York statute of limitations period, thereby warranting the application of the New York statute under New York's borrowing statute. *See* CPLR 202. The argument pressed by the Trustee during the hearing and in his briefing depended on the incorrect assertion that a six-year New York statute applies, which, as discussed, is not the case here. And as previously discussed, even the most generous reading of the facts of the Complaint while applying the adverse domination doctrine would still cause the Pennsylvania statute of limitations to expire well before the petition date.

Thus, given that Pennsylvania's statute of limitations is shorter than that of New York's, the Court applies Pennsylvania's statute of limitations to bar the Trustee's claims for aiding and abetting breach of fiduciary duty as those claims pertain to the Endo Health Solutions and Endo Pharmaceuticals entities. *See* CPLR 202.

Finally, the Court assumes as correct the Trustee's contention, not meaningfully rebutted by McKinsey, that Irish law would apply a laches theory to these claims as to Endo International plc, and that the practical result under Irish law would be that claims brought within six years would not be rejected on laches grounds. Because the New York borrowing statute applies the shorter of New York's and other jurisdictions' statute of limitations under New York choice of law principles, *see* CPLR 202, the Trustee's claims for aiding and abetting breach of fiduciary

48

duty by the directors of the Endo International plc entity (Count II) are time-barred by virtue of the required application of New York law, *see* CPLR 214(4), even if Irish law prescribed a longer statute of limitations for this cause of action.

c.   <i>Conclusion</i>

To recap, all claims of aiding and abetting fiduciary breach are time-barred as to all relevant corporations by virtue of New York's limitations period. In addition, to the extent those claims implicate or are premised on events by or involving entities as to which Pennsylvania law applies, those claims are also, and independently, time-barred by operation of Pennsylvania law. To guard against unfair prejudice to the Trustee in the event the Complaint's timeliness deficiencies result from curable drafting gaps rather than insurmountable merits flaws, dismissal on this basis is without prejudice to a possible amendment by the Trustee. *Cf. Ashland*, 2022 WL 219997, at * 8 (allowing plaintiff to "amend at least once after having the benefit of a court's reasoning in dismissing" the claim).

2.   <i>Wagoner</i> and <i>In Pari Delicto</i> Doctrines

In brief, the *in pari delicto* doctrine, where applicable, bars certain wrongdoers from recovering against individuals who assisted them in their own culpable conduct. Here, McKinsey argues that the Complaint makes clear that Endo itself initiated and pursued its opioid-sale maximization scheme, in part by hiring McKinsey. McKinsey argues that New York's *in pari delicto* doctrine squarely bars recovery in this circumstance. Moreover, McKinsey also argues (overbroadly) that the *Wagoner* standing doctrine adopted by the Second Circuit deprives the Trustee of standing to seek to recover here due to the clear applicability of New York's *in pari delicto* bar.

49

The *Wagoner* and *in pari delicto* doctrines do warrant dismissal of some of the Trustee's claims, namely those that depend on New York law, but portions of the Trustee's claims are governed by Pennsylvania and/or Ireland law and, as will be seen, cannot appropriately be dismissed under the *Wagoner* and *in pari delicto* doctrines. That is so because those jurisdictions require a more flexible, equitable analysis that cannot properly be resolved at the motion to dismiss stage, at least on the pleadings in this case. And, although McKinsey is correct that the *Wagoner* doctrine applicable in the Second Circuit creates a federal-law limitation on the standing of bankruptcy trustees to pursue relief, that doctrine does not support a blanket ban whenever New York's substantive law would bar the claim; rather, the doctrine requires looking to the relevant law governing the Trustee's substantive claims to determine whether the Trustee is pursuing a claim that belongs to creditors rather than the corporation, and/or whether the Trustee is pursuing relief on a theory that cannot prevail as a matter of law. Thus, in cases such as this one where the *in pari delicto* doctrine is the main substantive law at issue, whether *Wagoner* bars recovery depends on whether governing substantive law presents a flat bar that justifies dismissal. New York's stringent *in pari delicto* doctrine presents such a bar on the facts pled here, but Pennsylvania's and Ireland's laws do not.

As detailed below, McKinsey is correct about the substance of New York's *in pari delicto* doctrine, but overstates the impact here of the *Wagoner* doctrine, which holds that trustees lack standing to bring an action that the pre-petition debtor corporation could not have successfully brought, but which does not impose a blanket ban of all claims by a trustee against aiders and abettors of corporate wrongdoing. Rather, whether *Wagoner* bars recovery requires consideration of the underlying applicable substantive law. And in the case of the laws of Pennsylvania and Ireland, the required equitable analysis cannot be resolved through this motion

to dismiss. That reality precludes dismissing claims as to which Pennsylvania's or Ireland's law applies based on the *Wagoner* doctrine.

### a. Legal Background – the Wagoner Doctrine

The Constitution limits federal courts' power to deciding cases or controversies. U.S. Const. art. III, § 2, cl. 1. "The doctrine of standing is derived directly from this constitutional provision. It focuses upon the party seeking to invoke federal jurisdiction, rather than upon the justiciability of the issue at stake in the litigation." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1091 (2d Cir. 1995) (internal citations omitted).

Binding Second Circuit precedent instructs that "[u]nder the Bankruptcy Code the trustee stands in the shoes of the bankrupt corporation and has standing to bring any suit that the bankrupt corporation could have instituted had it not petitioned for bankruptcy." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991) (citing 11 U.S.C. §§ 541–42). "It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." *Id.* (further citations omitted). This rule has become known as "the *Wagoner* rule."[7] Courts have somewhat-confusingly and inconsistently referred to it both as a rule "followed in New York" and as a "federal rule of standing." *Compare, e.g.*, *In re ICP Strategic Income Fund, Ltd.*, 730 F. App'x 78, 82 (2d Cir. 2018) ("According to the *Wagoner* rule, followed in New York, the *in pari delicto* doctrine applies to successors in interest of wrongdoers, including bankruptcy trustees and foreign liquidators.") (citing *Mediators, Inc. v. Manney* (*In re Mediators,*

---

[7] This rule applies to committees of creditors that sue on behalf of a bankrupt debtor. *See The Mediators, Inc. v. Manney* (*In re The Mediators, Inc.*), 105 F.3d 822, 825–26 (2d Cir. 1997). It also applies to a litigation trustee like the Trustee who brings this action. *O'Connor v. DL-DW Holdings, L.L.C.* (*In re Extended Stay, Inc.*), No. 11-02254 (JLG), 2020 WL 10762310, at *54 (Bankr. S.D.N.Y. 2020 (citing *Kirschner v. Grant Thorton LLP* (*In re Refco, Inc. Secs. Litg.*), 628 F. Supp. 2d 432 (S.D.N.Y. 2008)).

51

*Inc.*), 105 F.3d 822, 825–26 (2d Cir. 1997))), *with In re Food Mgmt. Grp., LLC*, 380 B.R. 677,

694 (Bankr. S.D.N.Y. 2008) ("The *Wagoner* rule as applied in the Second Circuit is a federal

rule of standing."). The *Wagoner* decision itself speaks in terms of standing. *See, e.g.*, *Wagoner*,

944 F.2d at 118 ("the trustee stands in the shoes of the bankrupt corporation and has standing to

bring any suit that the bankruptcy corporation could have instituted had it not petitioned for

bankruptcy"; a "bankruptcy trustee has no standing generally to sue third parties on behalf of the

estate's creditors, but may only assert claims held by the bankrupt corporation itself"; and claims

for aiding and abetting a fraud by the bankrupt entity are beyond trustee's "capacity to sue

because the claims were never part of the assets of the bankrupt. . ."). Applying these principles,

the *Wagoner* court held that "when a bankrupt corporation has joined with a third party in

defrauding its creditors, the trustee cannot recover against the third party for the damage to the

creditors." *Id.* In turn, the *Wagoner* court continued, the court must determine whether the

allegedly culpable non-debtor entity "could have been liable on any legal theory presented," and,

"[n]ormally, this would include not only a determination that the right would run to the

corporation rather than to its creditors, but also a determination that [the bankrupt corporation]

would have been able to withstand a motion to dismiss for failure to state a claim." *Id.* at 119.

*Wagoner* went on to consider yet another complexity not present here — the possible

applicability of an arbitration agreement. But for purposes of this decision, the key takeaways are

that (1) the *Wagoner* doctrine turns on whether a trustee has standing to pursue relief; (2) this

question requires consideration both of whether the bankrupt corporation itself, but for the

bankruptcy, possessed and had the right to bring the claim; and (3) the trustee's standing also can

be defeated by the inability of the bankrupt corporation's hypothetical claim to withstand a

motion to dismiss, because, if the corporation could not have survived such a motion, then there

would be no viable or meaningful corporate right for the trustee to pursue in court.

### b. Parties' Contentions and Discussion

McKinsey asserts that this rule bars the Trustee's action because "[a] claim against a third

party for defrauding a corporation with the cooperation of management accrues to creditors, not

to the guilty corporation." *Hirsch*, 72 F.3d at 1094 (2d Cir. 1995) (quoting *Shearson Lehman

Wagoner*, 944 F.2d at 120). In McKinsey's argument, any allegation by the Trustee that it

injured the Debtor's creditors in cooperation with the Debtors' officers and directors only gives

rise to claims belonging to those creditors, rather than the Debtors, thereby depriving the Trustee

of standing. McKinsey strenuously argues that, as the federal constitution defines this Court's

jurisdiction, applying the *Wagoner* rule requires only consideration of federal law. In support of

this argument, McKinsey contends that the Second Circuit has applied the *Wagoner* rule even

when evaluating claims arising from law other than New York law. *See* Reply at 4 (citing

*Hirsch*, 72 F.3d at 1094).

McKinsey oversimplifies and overstates the preclusive effect of the *Wagoner* doctrine.

*Hirsch* itself states "[w]hether the rights belong to the debtor or the individual creditors is a

question of state law." *Hirsch*, 72 F.3d at 1093 (internal citations omitted). After having noted

that that the complaint in *Hirsch* identifies two types of wrongdoing, "(1) the distribution of

misleading PPMs to investors; or (2) the provision of deficient professional services directly to

Googel, Sisti, and Colonial," 72 F.3d at 1092, the Second Circuit panel continued, "Connecticut

law has recognized the standing of creditors to maintain causes of action for negligence, breach

of fiduciary duty, and fraud in precisely these circumstances," *Hirsch*, 72 F.3d at 1093 (citing,

*inter alia*, *Tackling v. Shinerman*, 630 A.2d 1381, 1384 & n.2 (1993) (Connecticut law

53

recognizes liability in negligence of attorneys and accountants to third parties whose reliance is foreseeable without regard to privity)). Thus, it is clear that on some level, application of the *Wagoner* rule requires an analysis of state law. Specifically, it requires determining whether the Trustee's claims alleging that McKinsey aided and abetted breaches of fiduciary duty would vest, under the relevant state law, in the Debtors or in the Debtors' creditors.

To answer that question of vesting, the Court must first determine which state law governs the Trustee's aiding-and-abetting claims by performing a choice-of-law analysis. McKinsey contends that New York law governs; the Trustee argues that either Pennsylvania or Irish law governs at least as to Debtors that had their headquarters or principal place of business in Pennsylvania or Ireland. Opp at 13. The parties agree that New York's substantive law governs any claims that McKinsey aided or abetted others' breaches of fiduciary duties to Par Pharmaceuticals (which includes Par Pharmaceutical Holdings, Inc., Par Pharmaceutical Companies, Inc., or Par Pharmaceutical, Inc.).

Traditionally, performing a choice of law analysis begins with determining whether the relevant jurisdictions' laws actually conflict. Here, they do.

In New York, "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." *Wagoner*, 944 F.2d at 120 (citing, *inter alia*, *Barnes v. Schatzkin*, 212 N.Y.S. 536, 537 (App. Div. 1st Dep't 1925)). "According to the allegations of the amended complaint, the [persons in control of the bankrupt company] and the defendants were joint tort-feasors. The claims on which the plaintiff seeks to recover were never part of the assets of [the debtor], nor did they arise in favor of the plaintiff as trustee in bankruptcy. They belonged to various creditors." *Barnes*, 212 N.Y.S. at 537.

By contrast, under Pennsylvania law, claims for aiding and abetting managers' and directors' breach of fiduciary duty to belong to the corporation. *See In re Adelphia Commcn's Corp.*, 365 B.R. 24, 45–46 & n.68 (Bankr. S.D.N.Y. 2007) (citing *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 348 (3d Cir. 2001)). Courts applying Pennsylvania law reached this conclusion despite the controlling officers and directors of the bankrupt corporations being the wrongdoers. *See In re Adelphia Commcn's Corp.*, 365 B.R. 24, 32, 45–46 (Bankr. S.D.N.Y. 2007) (describing the wrongdoers as including the debtor's "former management" yet still holding that claims for aiding and abetting those former managers' breaches of fiduciary duty belong to the debtor under Pennsylvania law). Meanwhile, as to Irish law, the Trustee has provided a declaration of an Irish law expert which McKinsey has not rebutted, contending that, although Ireland does not have a well-developed *in pari delicto* doctrine, Irish courts likely would borrow from English common law, which provides a relatively flexible, equity-driven approach somewhat akin to Pennsylvania's. See *Declaration of Ruairi Rynn in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss the Complaint* ("**Rynn Decl.**"), Dkt. No. 30. The Irish law declaration also asserts that the "principles underlying the *Wagoner* doctrine, and its overall effect, would run contrary to general principles of Irish insolvency law insofar as it provides that a claim should accrue to a company's creditors rather than to a liquidator (or an equivalent such as a trustee in this instance) acting in the collective interests of the Company's creditors and for the benefit of that company's insolvency estate." Rynn Decl., Dkt. No. 30 ¶ 35; *see also id.* ¶ 36.

This differing law requires that, to the extent New York law applies, the *Wagoner* doctrine applies and bars the Trustee's claims, both because under New York law those claims belong to creditors rather than first to the bankruptcy corporation and thence to the Trustee, and

because, in any event, New York's strict *in part delicto* doctrine would require the granting of a

motion to dismiss. By contrast, the laws of Pennsylvania and Ireland both have a more flexible *in

pari delicto* (or equivalent) doctrine that does not support granting a motion to dismiss for failure

to state a claim, and both jurisdictions appear not to preclude lawsuits by culpable corporations

for harms to that corporation itself by others.

To backtrack analytically, it is necessary to more carefully explain what law applies, and

why.

Absent an implication of important federal bankruptcy policy, bankruptcy courts apply

the choice-of-law rules of the states in which they sit. *Bianco v. Erkins* (*In re Gaston & Snow*),

243 F.3d 599, 605–07 (2d Cir. 2001); *Statek Corp. v. Dev. Specialists, Inc.* (*In re Coudert Bros.

LLP*), 673 F.3d 180, 187–88 (2d Cir. 2012). The parties have identified no important federal

bankruptcy policy implicated in this case, so the Court applies New York's choice of law rules.

New York courts approach this issue in two ways – either by following New York's traditional

"interests analysis" test it uses for normal tort claims, or by following the "internal affairs

doctrine" which applies the law of the corporation's state of incorporation. *In re Adelphia

Commc'ns Corp.*, 365 B.R. at 39 ("The New York cases that address choice of law issues

applicable to claims for aiding and abetting breaches of corporate fiduciary duty are split on

whether the law of the *state of incorporation* or the law of the *state with the greatest interests*

applies.").

The most-thoroughly-reasoned decision applying New York choice of law rules in

determining whether to apply the internal affairs rule or interests analysis to claims for aiding

and abetting breaches of fiduciary duty chooses to use the interests analysis. New York rejects

"any automatic application of the so-called 'internal affairs' choice-of-law rule." *Id.* at 40

(quoting *Greenspun v. Lindley*, 330 N.E.2d 473, 478 (N.Y. 1975)). The allegations in the

Complaint concern McKinsey's relationship with the Debtors, rather than "the nature or extent of

the fiduciary duties that were owed . . . or the extent to which fiduciary duties were breached."

*Id.* at 41. Accordingly, "[t]here is no risk that different courts might reach different conclusions

as to the applicable standards for appropriate officer or director conduct, or as to claims for

failure to satisfy these standards." *Id.* Additionally, the Court notes that none of the allegations

specifically concern activities that occurred in Delaware or Ireland, the Debtors' places of

incorporation.

Thus, "[t]here are no compelling reasons to apply the 'internal affairs' doctrine here,

since the claims do not involve 'matters peculiar to the relationships among or between the

corporation and its current officers, directors, and shareholders.'" *Id.* (quoting *Edgar v. MITE

Corp.*, 457 U.S. 624, 645 (1982)). For this reason, this Court will apply the "the law of the

jurisdiction with the greatest interest in the dispute." *Id.* at 40.

McKinsey and the Trustee dispute which jurisdiction has the greatest interest in this

dispute. McKinsey asserts that New York has the greatest interest, while the Trustee argues that

Ireland has the greatest interest for debtor Endo plc and that Pennsylvania has the greatest

interest for all debtors other than Par Pharmaceutical Holdings, Inc., Par Pharmaceutical

Companies, Inc., and Par Pharmaceutical, Inc.

The weight of the law favors the Trustee, as the authorities the Trustee cites have closer

factual similarities to this case than the authorities cited by McKinsey. This Court has stated,

"[t]he tort is deemed to have occurred where the related economic losses resulting from the tort

had been sustained. In the case of a tort for aiding and abetting breach of fiduciary duty, related

economic losses have been deemed to have been incurred in the relevant corporation's principal

place of business." *In re Hydrogen, L.L.C.*, 431 B.R. 337, 350 (Bankr. S.D.N.Y. 2010) (citing, *inter alia*, *In re Adelphia Commc'ns,* 365 B.R. at 39). "The jurisdiction with the greatest interest is that of the principal place of business, where any injury as a consequence of any aiding and abetting would have been suffered." *In re Magnesium Corp. of Am.*, 399 B.R. 722, 742–43 (Bankr. S.D.N.Y. 2009) (applying New York law to evaluate an aiding-and-abetting breach of fiduciary duty claim regarding a corporation headquartered in New York and incorporated in Delaware). McKinsey's main argument to the contrary is that Endo entered a substantial settlement leading to significant liability as a result of a lawsuit or investigation brought by the New York State Attorney General, but, as the Trustee points out, the Endo entities were based in Pennsylvania and felt the economic impact of that and other settlements there, and New York's settlement was but one of six settlements – not the sole driver of Endo's legal or economic woes.

McKinsey cites *Anwar v. Fairfield Greenwich Ltd.*, which does involve aiding-and-abetting breach of fiduciary duty claims, but this case's "core facts implicated in every cause of action . . . center on conduct that occurred in New York." 728 F. Supp. 2d 372, 400 (S.D.N.Y. 2010). But *Anwar* involved plaintiffs "widely dispersed throughout the world and their injury was sustained in various 'locations with only limited connection to the conduct at issue,'" a web of financial connections that sprawled across the globe. *Id.* By contrast, in this case, the place where the alleged harms were primarily felt was in each entity's headquarters and principal place of business, which was Pennsylvania in the case of the Endo Debtors. This case also involves the far fewer parties compared to the large and diffuse plaintiff class in *Anwar*, where it was hard to locate a central locus of harm from the alleged conduct. Thus, *Anwar*'s reasoning has less relevance and cannot overcome the clear rules set out by *In re Hydrogen L.L.C.* and *In re Magnesium Corp. of Am.*

Similarly, *Solow v. Stone* does not establish that New York has the greatest interest in this dispute. *See* 994 F. Supp. 173 (S.D.N.Y. 1998). It does not appear that the parties in that case ever contested which jurisdiction had the greatest interest in the dispute, and as that court commented, "it appears that the acts giving rise to the aiding and abetting . . . claims took place, in significant part, in New York . . . . In any case, it appears that there is no jurisdiction with an interest greater than New York's with respect to these tort claims." *Solow v. Stone*, 994 F. Supp. 173, 177 (S.D.N.Y.), *aff'd*, 163 F.3d 151 (2d Cir. 1998). Here, in addition to the predominant locus of harm being in Pennsylvania, the Trustee identifies Pennsylvania as the headquarters of Endo Health Solutions, Endo Pharmaceuticals, and Endo U.S. and pleads that McKinsey met and presented to numerous leaders of these entities and other debtor entities outside of New York, *see, e.g.* Compl. ¶¶ 119–21, 128, 154–55, drawing the reasonable factual inference from the Complaint that meetings or presentations to the Debtors' directors or senior management occurred at the headquarters of these debtor entities. For this reason, *Solow* cannot overcome the clear rules set out by *In re Hydrogen L.L.C.* and *In re Magnesium Corp. of Am*. For the same reasons, *In re Allou Distributors, Inc.* does not persuade this Court to find New York has the greatest interest in the dispute before this Court. *See* 387 B.R. 365 (Bankr. E.D.N.Y. 2008). In that case, "the acts giving rise to the claim [were] alleged to have taken place in whole or in large part, in New York" and "the alleged fraudulent transfers were made by Allou from its headquarters in New York to or for the benefit of the Corporate Defendants which are alleged to be New York corporations." *Id.* at 396.

McKinsey further cites *Cromer Fin. Ltd. v. Berger* for the principle that "New York [] has a strong interest in regulating the conduct of an entity which relies in its marketing and in the performance of its work on the implicit representation that it has conformed its conduct to the

standards set in New York[.]" 137 F. Supp. 2d 452, 493 (S.D.N.Y. 2001). However, that case

lacks the persuasive power to displace *In re Hydrogen L.L.C.* and *In re Magnesium Corp. of*

*Am.*'s rules. The *Cromer Fin. Ltd.* opinion acknowledges that, under the interests analysis

performed under New York's choice of law rules, "a court's paramount concern is the locus of

the fraud, that is, the place where the injury was inflicted, as opposed to the place where the

fraudulent act originated. The place in which the injury is deemed to have occurred is usually

where the plaintiff is located." *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y.

2001) (internal quotations omitted) (quoting *Rosenberg v. Pillsbury Co.*, 718 F. Supp. 1146,

1150 (S.D.N.Y. 1989) (citing *Sack v. Law*, 478 F.2d 360, 365–66 (2d Cir. 1973)); *see also*

*Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 292

(S.D.N.Y. 2000)). That case departed from these general rules only because "a substantial

portion of the fraudulent conduct has occurred in New York," "actions were in furtherance of a

fraud created and perpetuated in—with its 'locus' in—New York," and key business decisions

relevant to the claims occurred in New York. *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452,

461, 492–93 (S.D.N.Y. 2001) (the investment manager in question made the investment

decisions at issue in New York, and a New York-headquartered investment bank held all assets

in question, while the offshore fund managed by the investment manager "had no offices,

employees, or operations of its own"). Just like *Fairfield Greenwich*, and unlike this case, the

*Cromer Fin. Ltd.* litigation arose out financial fraud with a clear nexus in New York. By contrast,

the Debtors other than Par operated their businesses from Pennsylvania and Ireland, and the

Court draws from the Complaint the inference that important actions by McKinsey occurred in or

were directed at those locations while clearly causing harms focused there. The allegations in

this case do not involve a web of financial transactions and related activity with no clear locus

other than New York. That fact pattern commonly appears in claims for aiding-and-abetting breaches of fiduciary duty arising from Ponzi schemes or other financial frauds, which this case is not.

Lastly, the other cases cited by McKinsey fail to persuade on this choice-of-law issue because they do not analyze choice of law in the context of a claim for aiding and abetting breach of fiduciary duty. *See Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs., Ltd.*, No. 94 CIV. 5620 (JFK), 1999 WL 64283, at *2 (S.D.N.Y. Feb. 8, 1999); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 47 (2d Cir. 2013) (further citations omitted). For these reasons, if the Trustee has any claims against the defendant for aiding and abetting alleged breaches of fiduciary duty, they accrued under the laws of the headquarters jurisdiction of each debtor.

Thus, the Court will apply the law of the headquarters of each debtor to determine whether the Complaint states a claim for aiding and abetting breaches of fiduciary duties owed to such debtor. For Par, New York law applies – as noted above, the parties do not dispute this. For the remaining debtors other than Endo International plc, Pennsylvania law applies. For Endo International plc, Irish law applies.

### 3.   The *In Pari Delicto* Defense

McKinsey, throughout its briefing, argues that the *in pari delicto* defense bars the Trustee's claims for aiding and abetting breach of fiduciary duty. The New York *in pari delicto* doctrine holds that "one wrongdoer may not recover against another." *Picard v. J.P. Morgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC.)*, 721 F.3d 54, 63 (2d Cir. 2013) (citing *Kirschner v. KPMG LLP,* 938 N.E.2d 941, 950 (N.Y. 2010)). Pennsylvania also recognizes this doctrine, *Feld & Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick & Cabot*, 458 A.2d 545, 548

(Pa. Super. Ct. 1983), though, as discussed below, Pennsylvania and New York take different

approaches to it. It is unclear whether Irish law recognizes this defense, but Irish law does apply

a similar concept comparable to Pennsylvania's approach to *in pari delicto*. Below, the Court

addresses this defense under the law of all three relevant jurisdictions. As a global matter, the

law that that governs an *in pari delicto* defense comes from the same jurisdiction as the law that

gives rise to the claim. *See ICP Strategic Credit Income Fund, Ltd. v. DLA Piper L.L.P (U.S.)* (*In

re ICP Strategic Credit Income Fund Ltd.*), 568 B.R. 596, 608. (S.D.N.Y. 2017), *aff'd sub nom.

In re ICP Strategic Income Fund, Ltd.*, 730 F. App'x 78 (2d Cir. 2018).

### a. New York: Par

New York applies the *in pari delicto* defense strictly. "Indeed, the principle that a

wrongdoer should not profit from his own misconduct is so strong in New York that we have

said the defense applies even in difficult cases and should not be 'weakened by exceptions.'"

*Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464, 938 N.E.2d 941, 950 (2010) (quoting *McConnell

v. Commonwealth Pictures Corp.,* 166 N.E.2d 494, 497 (N.Y. 1960)). To that end, "the doctrine

can apply on a motion to dismiss if its application is 'plain on the face of the pleadings.'"

*Deangelis v. Corzine* (*In re MF Glob. Holdings Ltd. Inv. Litig.*), 998 F. Supp. 2d 157, 189

(S.D.N.Y. 2014), *aff'd sub nom. In re MF Glob. Holdings Ltd. Inv. Litig. (DeAngelis v. Corzine)*,

611 F. App'x 34 (2d Cir. 2015). Furthermore, as under New York law, "[a] claim against a third

party for defrauding a corporation with the cooperation of management accrues to creditors, not

to the guilty corporation," *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir.

1991) (citing, *inter alia*, *Barnes v. Schatzkin*, 212 N.Y.S. 536, 537 (App. Div. 1st Dep't 1925)),

so application of *in pari delicto* may deprive the Trustee of standing. *In re Verestar, Inc.*, 343

B.R. 444, 480 (Bankr. S.D.N.Y. 2006) ("Since the District Court Complaint itself alleges the

facts that give rise to an *in pari delicto* defense, the Committee's aiding and abetting and conspiracy claims against the Bear Stearns Defendants must be dismissed under the *Wagoner* doctrine and *in pari delicto.*") (internal citations omitted). As noted above, "[t]he debtor's misconduct is imputed to the trustee because, innocent as he may be, he acts as the debtor's representative." *Picard v. J.P. Morgan Chase & Co.* (*In re Bernard L. Madoff Inv. Sec. LLC.*), 721 F.3d 54, 63 (2d Cir. 2013) (citing *Wight v. BankAmerica Corp.,* 219 F.3d 79, 87 (2d Cir. 2000)).

As the Debtors, being corporations rather than individuals, "must act solely through the instrumentality of their officers or other duly authorized agents," they "must, therefore, be responsible for the acts of [their] authorized agents even if particular acts were unauthorized." *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 950 (N.Y. 2010) (citing, *inter alia*, *Ruggles v. American Cent. Ins. Co. of St. Louis,* 21 N.E. 1000, 1002 (N.Y. 1889)). The law imposes this rule because "the principal is generally better suited than a third party to control the agent's conduct." *Id.* at 951.

The Trustee's complaint reveals that the Debtors' directors and officers took at least equal part in the wrongs the Trustee alleges McKinsey committed against the Debtors: "McKinsey advised Endo's Boards of Directors to increase promotional resources in its pain division," Compl. ¶ 121; "in 2016, Endo poured an additional $21 million into sales and marketing for, among other things, 'pain sales force expansion,' and that of the $240.2 million spent on sales and marketing that year, approximately 23% (or $110 million) was devoted to Endo's pain division," Compl. ¶ 175; "McKinsey encouraged Endo's leadership to effectively work around the FDA's concerns about the ability to abuse Reformulated Opana ER." Compl. ¶ 157; Endo's leadership executed on that encouragement when "De Silva [Endo's CEO] met with

Susan Hall, Endo Health Solutions' Chief Scientific Officer and Global Head of R&D and
Quality, to discuss proposing updated labeling to the FDA. Even though De Silva and Hall were
aware of the extensive abuse of Reformulated Opana ER by injection, the proposed labeling
contained the statements that 'OPANA ER has physicochemical properties that are expected to
reduce abuse via the intranasal route. The in vitro data demonstrate that OPANA ER has
physicochemical properties expected to deter abuse via injection,'" Compl. ¶ 161, which
"conveyed the false expectation that Reformulated Opana ER would deter abuse," *id.*;
"McKinsey's recommendations, upon information and belief, were approved by the Boards of
Endo and Par, and implemented by Endo and Par management with McKinsey's assistance over
the following year." Compl. ¶ 197; "Endo, with the knowledge and assistance of McKinsey at
every step of the way, misleadingly promoted Opana ER products as having a lower potential for
abuse, hired sales representatives to target high volume prescribers of Opana ER and designed
compensation structures to encourage them to push the sales of Opana ER, utilized a speaker
program to pay millions of dollars to prescribers, and promoted misleading and harmful
narratives about 'pseudoaddiction.'" Compl. ¶ 237. Thus, as New York law would require
dismissal on *in pari delicto* grounds of any claims asserting aiding and abetting breaches of
fiduciary duty, the *Wagoner* doctrine would strip the Trustee of standing to bring the aiding-and-
abetting breach of fiduciary duty claims under New York law.

> b. *The Non-Statutory Insider and Adverse Interest Exceptions Do
>    Not Apply*

The Trustee responds that the Complaint adequately alleges McKinsey "was a non-
statutory insider," Opp. at 15, such that the New York aiding-and-abetting breach of fiduciary
duty claims should survive because "[t]he *Wagoner* rule does not protect insiders." *Feltman v.
Kossoff & Kossoff LLP* (*In re TS Emp., Inc.*), 597 B.R. 543, 550 (Bankr. S.D.N.Y. 2019) (citing

*In re Optimal U.S. Litig.*, 813 F. Supp. 2d 383, 400 (S.D.N.Y. 2011) ("[I]n pari delicto does not apply to the actions of fiduciaries who are insiders in the sense that they either are on the board or in management, or in some other way control the corporation.") (internal quotations omitted)). "The insider exception derives from the notion that it would be inequitable to allow an insider to rely on *in pari delicto* imputation because it would essentially shield the insiders from the consequences of their own handiwork." *Id.* (quoting *In re PHS Grp. Inc.*, 581 B.R. 16, 30–31 (Bankr. E.D.N.Y. 2018)).

"The Bankruptcy Code defines an 'insider' [to include] a 'director of the debtor[,] officer of the debtor[, or] person in control of the debtor." *Feltman v. Kossoff & Kossoff LLP* (*In re TS Emp., Inc.*), 597 B.R. 543, 550 (Bankr. S.D.N.Y. 2019) (quoting 11 U.S.C. § 101(31)(B)). However, the Code's list of persons and entities that qualify as insiders does not define itself as exclusive, and for that reason, one can qualify as a "non-statutory insider." Courts examine the following factors to identify non-statutory insiders:

> (1) the close relationship between the debtor and the third party; (2) the degree of the individual's involvement in the debtor's affairs; (3) whether the defendant had opportunities to self-deal; and (4) whether the defendant holds or held a controlling interest in the debtor corporation.

*Feltman v. Kossoff & Kossoff LLP* (*In re TS Emp., Inc.*), 597 B.R. 543, 550 (Bankr. S.D.N.Y. 2019) (quoting *In re PHS Grp. Inc.*, 581 B.R. 16, 33 (Bankr. E.D.N.Y. 2018)) (internal citations omitted). Relatedly, "[t]he non-statutory insider need not have actual control over the Debtor; rather, the question there 'is whether there is a close relationship between debtor and third party and anything other than closeness to suggest that any transactions were not conducted at arm's length.'" *Pergament v. Anton Inc.* (*In re PHS Grp. Inc.*), 581 B.R. 16, 31 (Bankr. E.D.N.Y. 2018) (quoting *In re Winstar Commc'n Inc.*, 554 F.3d 382, 396–97 (3d Cir. 2009)). The Trustee admits that "[t]he principal consideration in a non-statutory insider analysis is the degree of

control the defendant exercised over the debtor. The insider need not have had actual control over the debtor, only enough control 'to give him or her an opportunity to engage in that bad conduct.'" Opp. at 16 (quoting *Pergament*, 581 B.R. at 32).

Applying these factors and as detailed below, the Trustee has not adequately pled facts plausibly suggesting that McKinsey was a non-statutory insider of Endo. A "close relationship" between the entities has been pled, but Endo officials are alleged to have kept and exercised decision-making authority at all times so that McKinsey lacked authority to make final decisions, an opportunity to self-deal, or a controlling interest at Endo. More specifically, the Trustee has plausibly alleged that McKinsey and the Debtors had a close relationship; this resulted naturally from McKinsey's "implementation consulting" methods. *See* Compl. ¶ 176 ("McKinsey not only advised Endo in connection with the Sales Force Blitz, it spearheaded the day-to-day execution of the strategy."); Compl. ¶ 177 ("McKinsey created and managed a curated list of healthcare providers that Endo salespeople were directed to target (or to exclude from targeting) to prescribe greater amounts of Opana ER."); Compl. ¶ 178 ("Using its patented FieldGuide technology, McKinsey created this list of healthcare professional targets based on the number of Opana ER prescriptions they had prescribed in the past four months. Only physicians with high prescribing rates—at least 48 prescriptions within the past four months—made the list."). These allegations also show McKinsey had a high degree of involvement in the Debtors' affairs. However, the Complaint never alleges that McKinsey had any opportunity to self-deal in its relationship with the Debtors or, with respect to transactions between the Debtors and McKinsey, that they dealt at anything other than arm's length.

The Complaint does not plead that McKinsey installed De Silva, who had worked at McKinsey, as the Debtors' CEO; it pleads that De Silva "was hired as CEO." Compl. ¶ 150.

66

Adopting wording that avoids saying who decided to hire the Debtors' CEO cannot give rise to a
plausible inference that the defendant controlled the Debtors because that CEO had once worked
for the defendant. Moreover, the allegations that post-date Mr. De Silva's hiring do not plausibly
allege that McKinsey controlled the Debtors or had any opportunity to self-deal. For example,
with respect to the FieldGuide technology, for which "Endo paid separately," Compl. ¶ 179, the
Complaint does not plead that McKinsey had the power to cause the Debtors to purchase
FieldGuide data, but rather pleads that "executives had to request data on healthcare providers
directly from McKinsey." Compl. ¶ 179. The Complaint's discussion of FieldGuide represents
the closest it comes to alleging McKinsey had an opportunity to engage in self-dealing, and even
in that discussion it does not plead self-dealing but rather the integration of McKinsey into Endo
operational processes whose adoption resulted from decisions made at and by Endo entities.

The Complaint also alleges no real exercise of control over the Debtors by McKinsey. It
generally alleges "McKinsey [] harmed Endo by recklessly steering Endo's leadership to boost
opioid sales," and "McKinsey continued to push Endo to aggressively market Opana." Compl. ¶¶
124, 141. On specific facts, the Complaint merely alleges that McKinsey told Endo's CEO, a
former McKinsey consultant, that the sales force was "not going after the new targets
aggressively enough" and that sales associates "have to feel accountability to deliver." Compl. ¶¶
188, 205. Beyond that, the Complaint shows that the Debtors' board of directors and
management team held control over the Debtors' business decisions. Compl. ¶ 197
("McKinsey's recommendations, upon information and belief, were approved by the Boards of
Endo and Par, and implemented by Endo and Par management with McKinsey's assistance over
the following year.").

Constructive criticism of the Debtors' sales force sent via email and couched as a business recommendation cannot turn a consultant into a non-statutory insider. The Complaint does not plead that McKinsey imposed consequences on such sales associates, any of their supervisors, or any of the Debtors' directors or officers to make them "feel accountability to deliver." Compl. ¶ 205. These allegations merely establish the "monitoring of a debtor's operations and proffering advice to management." *In re PHS Grp. Inc.*, 581 B.R. 16, 32 (Bankr. E.D.N.Y. 2018) (quoting *In re KDI Holdings, Inc.*, 277 B.R. 493, 511 (Bankr. S.D.N.Y. 1999)). With regards to Par, the Complaint does not plead that McKinsey had an opportunity to engage in self-dealing or held any control over Par. Compl. ¶¶ 190–97. For that reason, the Complaint fails to plausibly allege that McKinsey counts as an insider, either of Par or of the Debtors writ large.

To the miniscule extent McKinsey could have had any degree of "control" over the debtor such that it had the "opportunity to engage in [] bad conduct," *In re PHS Grp. Inc.*, 581 B.R. at 32, the complaint unequivocally shows that the Debtors' directors and officers fully participated in all such bad conduct. The Debtors' directors and officers channeled the Debtors' resources into pushing opioid sales, Compl. ¶¶ 175, 189, they attempted to dodge FDA concerns regarding their opioids' chemical composition and marketing, *id.* ¶¶ 129–36, 156–61, and they routed millions of dollars towards speakers and publications that misleadingly downplayed the risks of opioids. *Id.* ¶¶ 162–68.

The Trustee also has not pled sufficient facts to successfully invoke the adverse interest exception to the *in pari delicto* doctrine. "'[T]his most narrow of exceptions' is reserved for cases of 'outright theft or looting or embezzlement where the fraud is committed *against* a corporation rather than on its behalf.'" *In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 54, 64

(2d Cir. 2013) (quoting *Kirschner,* 938 N.E.2d at 952 (emphasis in original)). As noted above,

the Complaint never plausibly pleads that McKinsey had the opportunity to engage in self-

dealing, let alone that it did so. Throughout the Complaint, the Trustee pleads that McKinsey had

a relentless focus on increasing the Debtors' profits. *See, e.g.*, Compl. ¶ 148. The Trustee cannot

accuse the Defendants of having an interest sufficiently adverse to those of the Debtors to escape

application of the *in pari delicto* defense.

Thus, the Trustee has failed to plead that McKinsey qualifies as an insider in any way or

that McKinsey held an interest adverse to that of the Debtors and the Wagoner doctrine calls for

dismissal of claims for aiding and abetting in breaches of fiduciary duty that arise under New

York law.

### c. *Pennsylvania: Endo Health Solutions and Endo Pharmaceuticals*

Pennsylvania law treats the *in pari delicto* defense as an equitable doctrine that requires

considering the facts and circumstances giving rise to each application. *See In re Adelphia

Commc'ns Corp.*, 365 B.R. 24, 45–46 (Bankr. S.D.N.Y. 2007), *aff'd in part sub nom. Adelphia

Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008), *adhered to on reconsideration*,

No. 05 CIV. 9050 (LMM), 2008 WL 1959542 (S.D.N.Y. May 5, 2008) (". . . the Pennsylvania

Supreme Court has eschewed blind reliance on agency doctrine, and instead has looked to the

extent to which application of *in pari delicto* is equitable under the circumstances."). For

example, in *Universal Builders*, the Pennsylvania Supreme Court distinguished "between

charging a litigant with responsibility for his own unclean hands and charging a principal with

the unclean hands of its agent based solely on agency theory." *See Adelphia*, 365 B.R. at 47

(describing *Universal Builders*, 430 Pa. 550, 555, 244 A.2d 10, 13–14 (1968)). The court stated

that even if the conduct should be imputed solely on the basis of agency theory, the application

of the doctrine is within the discretion of the chancellor, and that discretion should be "applied

cautiously" and "not be invoked if its application will produce an inequitable result." *Universal*

*Builders, Inc.*, 430 Pa. at 555. The court also noted that although the *in pari delicto* doctrine

applies in courts of law and courts of equity, "it generally had been held that the doctrine

operates only to deny equitable, and not legal, remedies," and the court saw no reason to apply *in*

*pari delicto* to deny the plaintiff a legal right. *Id.* at 14. In applying Pennsylvania law, the court

in *Adelphia* concluded that "*in pari delicto* is not a mechanical application of the law of agency

but rather involves discretionary attention to the fairness of applying it to the facts in a given

case. And that is a matter that includes as a factor the extent to which it would be 'at the expense

of innocent creditors.'" 365 B.R. at 48–49 (quoting *Universal Builders Inc.*, 244 A.2d at 14).

Thus, the application of *in pari delicto* under Pennsylvania law is not mechanical and

requires the exercise of judicial discretion informed by balancing the facts of the case to arrive at

a fair, or equitable, result. Here, the Trustee argues, it "would be patently unjust for McKinsey to

use misconduct by Endo's former management—misconduct which McKinsey itself fomented

and steered—as a shield to bar claims brought by the Trustee, who committed no wrongdoing,

and whose beneficiaries are Endo's innocent unsecured creditors." Opp. at 24. McKinsey has not

argued that Pennsylvania law requires a different result, instead contending that any possible

claims under Pennsylvania and Ireland claims are duplicative of claims governed by New York

law, and that only New York law should be applied. *See* Reply at 8–16. As described in more

detail *supra* in the *in pari delicto* analysis regarding New York, the Trustee's Complaint strongly

suggests that the Debtors' directors and officers bore substantial responsibility for the wrongs the

Trustee alleges McKinsey committed against the Debtors, but this reality does not preclude that

consideration of more thoroughly developed facts could eventually show that it would be

70

inequitable to bar the Trustee's claims under the *in pari delicto* doctrine. It is also possible that McKinsey will ultimately successfully advance the defense. But it is too soon to tell what the outcome will be, and premature to dismiss the action as conclusively barred by the *in pari delicto* doctrine.

The Court therefore declines to grant the motion to dismiss based on *in pari delicto* grounds as to the Trustee's aiding and abetting claims that arise under Pennsylvania law. By extension, because Pennsylvania law would not require dismissal on *in pari delicto* grounds of the claims asserting aiding and abetting breaches of fiduciary duty, the *Wagoner* doctrine does not strip the Trustee of standing to bring the aiding-and-abetting breach of fiduciary duty claims to the extent those claims arise under Pennsylvania law, *i.e.*, the claims based on conduct at Endo entities other than the Par companies (as to which New York law controls) and Endo International plc (as to which Irish law controls).

### d. Ireland: Endo International plc

Irish law recognizes a principle similar to *in pari delicto* called *ex turpi causa non oritur actio*, which translates from Latin to mean "action does not arise from a dishonourable cause." Rynn Decl., Dkt. No. 30 ¶¶ 10–13. The Trustee has submitted a declaration of an expert in Irish law, to which McKinsey has submitted no response addressing Irish law. In his declaration, Mr. Rynn explains that while he is unaware of Irish law considering application of these principles "in the context of the attribution to a company of the wrongdoing of its directors" as McKinsey seeks in the Motion, there is English authority that would be persuasive to an Irish court deciding this issue. *Id.* ¶¶ 15–16. According to Mr. Rynn's unrebutted submission, the English Supreme

Court considered this very question in *Bilta (UK) Ltd (in liquidation) v Nazir* and *Singularis Holdings Ltd (in liquidation) v Daiwa Capital Markets Europe Ltd*.[8]

In dismissing an appeal of the decision in *Bilta*, the English court held that the directors who perpetrated the fraud could not attribute their wrongdoing to the company and that *ex turpi causa non oritur actio* could not defeat the company's claim acting through its liquidator against the third parties who assisted the fraud. *See id.* ¶¶ 18–19 (citing *Bilta (UK) Ltd (in liquidation) v Nazir* [2015] UKSC 23, [2016] AC 1, paragraph 7). In support of this determination, Lord Neuberger stated that, "the question is simply an open one: whether or not it is appropriate to attribute an action by, or a state of mind of, a company director or agent to the company or the agent's principal in relation to a particular claim against the company or the principal must depend on the nature and factual context of the claim in question." *See id.* ¶ 20 (quoting *Bilta (UK) Ltd (in liquidation) v Nazir* [2015] UKSC 23, [2016] AC 1, paragraph 9). Similarly, in rejecting the appeal of the decision in *Singularis*, the English Supreme Court applied *Bilta* and held that, "the answer to any question whether to attribute the knowledge of the fraudulent director to the company is always to be found in consideration of the context and the purpose for which the attribution is relevant." *See id.* ¶ 24–25 (quoting *Singularis Holdings Ltd (in liquidation) v Daiwa Capital Markets Europe Ltd* [2019] UKSC 50, [2020] AC 1189, paragraph 34).

Thus, applying Irish law would likely yield the same result as would arise under Pennsylvania law, for reasons just discussed: the *in pari delicto* determination in Ireland is not mechanical, but rather requires a determination based on the facts and circumstances of the case.

---

[8] The full citation to these cases are *Bilta (UK) Ltd (in liquidation) v Nazir* [2015] UKSC 23, [2016] AC 1 and *Singularis Holdings Ltd (in liquidation) v Daiwa Capital Markets Europe Ltd* [2019] UKSC 50, [2020] AC 1189, respectively.

As stated above in the New York-law and Pennsylvania-law analyses, the Trustee's complaint plausibly alleges that the Debtors' directors and officers played a substantial part in the wrongs the Trustee alleges McKinsey committed against the Debtors. The Court does not now know whether the *in pari delicto* defense ultimately will carry the day. At this stage, however, an Irish court would likely conclude that dismissal is premature because deciding the defense's application would require fact-finding to determine whether equity favors barring Plaintiff's claims under the facts of this case.

The Court therefore denies Defendant's motion to dismiss on the basis of *in pari delicto* or *Wagoner* for the aiding and abetting claims to the extent those claims arise under or depend on application of Irish law.

### C. Constructive Fraudulent Transfer

In the final three counts of the Complaint (the Seventh, Eighth, and Ninth), the Trustee seeks to avoid obligations and transactions alleged to be constructive fraudulent transfers, and then, consequently as requested in the Ninth Cause of Action, to recover as avoided transfers the payments that Endo made to McKinsey for its opioid-related consulting services. Compl. ¶ 10. The dollar amount at issue is roughly $8.5 million – a large amount that is dwarfed by the monetary damages requested in the Trustee's aiding and abetting and indemnification claims. *See* Compl. ¶ 253. The Complaint and briefing tend to group together and collectively seek or oppose avoidance of what they term "Transactions" or "Obligations and Transfers," *e.g.*, Compl. ¶¶ 321, 328, 330, but in reality the defined term "Obligation" refers to six "Statements of Work" (again, SOWs) between Endo and McKinsey by which Endo retained McKinsey to perform certain work and Endo agreed to pay McKinsey for that work. Meanwhile, the term "Transfers" refers to payments that Endo made to McKinsey for work completed under those SOWs.

The Complaint's Seventh Cause of Action seeks the avoidance of the Obligations and Transfers under Bankruptcy Code § 544(b)(1) in connection with Pennsylvania state law regarding fraudulent transfers, while the Eighth Cause of Action seems identical relief under the same Bankruptcy Code provision in conjunction with New York fraudulent transfer law. The Ninth Cause of Action complements the Seventh and Eighth causes of action by seeking "recovery of avoided conveyances" pursuant to Bankruptcy Code § 550(a), *i.e.*, actual repayment to the Trustee of the amounts that McKinsey received from Endo on account of the six SOWs at issue.

The basic premise of the Trustee's fraudulent conveyance claims is that, although Endo retained McKinsey and McKinsey performed work under the MSA and the SOWs, the result was so cataclysmic for Endo that even at the time of the agreements and/or performance under the agreements by McKinsey, Endo was insolvent when taking into account the then-present value of the liabilities Endo would eventually incur due to its own actions compounded by McKinsey's wrongheaded strategy. As a result, the Trustee contends, the services rendered did not constitute fair consideration or reasonably equivalent value for the amounts paid by Endo to McKinsey because McKinsey's advice was so destructive as to have no actual value whatsoever, and instead had negative value; the theory advanced is that the Trustee therefore is entitled to avoid and be repaid the amounts Endo paid to McKinsey under the SOWs. *See e.g.*, Compl. ¶ 254 (Endo "received no consideration in exchange for the Transactions except for the keys to its own destruction").

McKinsey responds that Endo got exactly what it bargained for and paid for, namely, agreed-upon opioid-related consulting services. *See* Motion at 30. More precisely and completely, McKinsey seeks dismissal on four bases: (1) the Trustee has failed to plausibly

allege Endo's insolvency as is required to state a fraudulent conveyance claim; (2) the Trustee

has failed to plausible allege that Endo did not receive "fair consideration" or "reasonably

equivalent value" for its payments in light of the absence of any allegation that McKinsey did not

perform work as contemplated by the SOWs; (3) the constructive fraudulent conveyance claims

are stated with insufficient particularity; and (4) those claims are time-barred.

For reasons explained below, the motion to dismiss the fraudulent conveyance claims is

granted with leave for Plaintiff to replead, for failure to plead a lack of fair consideration or

reasonably equivalent value received by Endo in exchange for its payments for contracted-for

services by McKinsey. The Court concludes the Trustee has plausibly alleged all other elements

of a fraudulent conveyance claim, but the facts alleged in the Complaint do not support a

plausible inference that the Obligations themselves (meaning the SOWs) could be set aside as

fraudulent conveyances, nor does the Complaint allege facts from which it can be plausibly

inferred that the contracted-for amounts due and paid by Endo were not in fact due on account of

the antecedent debts owed under the various SOWs by virtue of agreed-upon work that

McKinsey performed. Indeed, the MSA provides that all of McKinsey's work for Endo "shall be

on a project basis," that McKinsey was to submit to Endo a written proposal "outlining the

services to be provided and the estimated costs," and that "[u]pon approval" the parties would

"complete and execute a project work order." M. Miller Decl., Dkt. No. 18, Ex. 5, MSA ¶ 1. The

Trustee has alleged no facts to plausibly suggest that the "Obligations" were not validly entered

into in accord with this agreed process, nor to contest that the resulting payments were for

contractual obligations that arose as a result.

Nevertheless, because the Court does not rule out the possibility that repleading could get the Trustee across the line to plausible fraudulent conveyance claims, the dismissal of those claims is without prejudice to the Trustee's right to attempt to replead.

### 1. Governing Substantive Law

As noted, the Complaint asserts that the Obligations and Transfers can be avoided as constructive fraudulent transfers under § 544 and New York Fraudulent Conveyance Act, New York's Debtor & Creditor Law ("**NYDCL**") § 273–275, and under § 544 and Pennsylvania Uniform Voidable Transfer Act ("**PUVTA**"), 12 Pa. C.S.A. §§ 5104(a)(2), 5105. *See* Compl. ¶¶ 309–21. Section 544(b)(1) of the Bankruptcy Code provides as follows:

> [T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1). This provision permits a trustee to take advantage of state statutes to avoid fraudulent transfers for the benefit of the estate. *See In re Fitzpatrick Container Co.*, 670 B.R. 425, 440 (Bankr. E.D. Pa. 2025). The applicable nonbankruptcy law that the Trustee seeks to apply is, in the alternative, New York law through the NYDCL and Pennsylvania law through the PUVTA.

To the extent a transfer is avoided under section 544 of the Bankruptcy Code through the application of the relevant state's laws, Count Nine of the Complaint pursues recovery "for the benefit of the estate, [for] the property transferred, or, if the court so orders, the value of such property, from . . . the initial transferee of such transfer or the entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1).

2.  Applicable Pleading Standards

Under the Bankruptcy Code in conjunction with the NYDCL and the PUVTA, courts have consistently held that "claims of constructive fraud do not need to meet the heightened pleading requirements of Fed. R. Civ. P. 9(b)." *In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 110 (Bankr. S.D.N.Y. 2011) (quoting *Bank of Commc'ns v. Ocean Dev. Am., Inc.*, No. 07–CIV–4628, 2010 WL 768881, at *6 (S.D.N.Y. Mar. 8, 2010) (claims under the Code and NYDCL do not need to meet Fed. R. Civ. P. 9(b) pleading standards)); *see also In re Atomica Design Grp., Inc.*, 556 B.R. 125, 160 (Bankr. E.D. Pa. 2016) (applying Rule 8 pleading standards to claims under the Code and PUVTA) (internal citations omitted). Rather, the Trustee need only satisfy the pleading standard set forth in Rule 8(a) by providing a "short and plain statement of the claim showing that [the Trustee] is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see also Enron Corp. v. Granite Constr. Co. (In re Enron Corp.),* No. 03–93172, 2006 WL 2400369, at *5 (Bankr. S.D.N.Y. May 11, 2006) ("The Court does not see any reason to break with its precedent in applying Rule 8(a) in evaluating the pleadings in a constructive fraudulent conveyance matter herein."); *Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 319 (Bankr. S.D.N.Y. 1999) ("The pleading of constructive fraud [under the NYDCL], as opposed to actual fraud, must only comply with F.R.C.P. 8(a) . . . ."); *In re Atomica Design Grp., Inc.*, 556 B.R. 125, 160 (Bankr. E.D. Pa. 2016) (holding that claims for constructive fraudulent transfer are not subject to the heightened pleading standard of Rule 9 because "fraud does not have to be proven" thereunder) (internal citations omitted). Claims subject to Rule 8(a)'s pleading requirement must satisfy the plausibility requirement described above and enunciated in *Iqbal* and *Twombly*.

Contrary to McKinsey's assertion that "the Trustee cannot pursue avoidance claims under both Pennsylvania and New York law," [Motion at 36 n.25], a plaintiff may plead constructive

fraudulent conveyance claims in the alternative. *See* Fed. R. Civ. P. 8(d)(2) ("A party may set out

2 or more statements of a claim or defense alternatively or hypothetically, either in a single count

or defense or in separate ones."); *see also Wadsley v. Rev Recreation Grp., Inc.*, No. 1:17-CV-

339-TLS, 2018 WL 1400888, at *4 (N.D. Ind. Mar. 19, 2018) ("Pleading under the laws of three

different states amounts to nothing more than pleading three alternative theories.")

### 3. Detailed Conflict-of-Law Analysis Is Unnecessary Because New York and Pennsylvania Law Do Not Differ in a Way Material to This Case

Because the Complaint asserts alternative theories that the Obligations and Transfers can

be avoided as constructive fraudulent transfers under § 544(b)(1) through the application of

either New York's or Pennsylvania's state avoidance law, the Court must first consider choice of

law principles.

In performing a conflict of law analysis, the Court must follow the choice-of-law rules of

the forum state—in this case, New York. *Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599,

607–08 (2d Cir. 2001); *see also In re Trinsum Grp., Inc.*, 460 B.R. 379, 389 (Bankr. S.D.N.Y.

2011). In New York, "the law of the jurisdiction with the most significant contacts to the relevant

transfers and relevant parties applies to a state constructive fraudulent transfer claim brought

under section 544(b) of the Code. Contacts to be considered include the domicile, residence,

place of incorporation and place of business of the parties; the place of injury; and the place of

injury-causing conduct." *In re Hydrogen,* 431 B.R. 337, 353–54 (Bankr. S.D.N.Y. 2010) (citing

*In re WorldCom, Inc.,* 2003 WL 23861928, at *40 (Bankr. S.D.N.Y. Oct. 31, 2003)). However, if

the possibly controlling jurisdictions have substantively identical law, no further choice of law

analysis is required. *In re Thelen LLP,* 736 F.3d 213, 219 (2d Cir. 2013) (in a case involving

fraudulent conveyance claims to which New York and/or California law may pertain, the court

applied New York choice-of-law rules as the forum state, affirming that "[u]nder New York law,

78

the first step in any case presenting a potential choice of law issue is to determine whether there

is an actual conflict between the laws of the jurisdictions involved") (internal quotations and

citations omitted).

Here, the Trustee has alleged that the Obligations were entered into and the Transfers

were sent by "Endo, through Endo Pharmaceuticals, Inc., Endo Health Solutions Inc., Endo U.S.

Inc., and potentially other affiliated entities acting by its direction and on its behalf." Compl. ¶

249. Both Endo Pharmaceuticals Inc. and Endo Pharmaceuticals Holdings Inc. are incorporated

in Delaware and headquartered in Pennsylvania. Compl. ¶ 249. No party has argued that

Delaware law applies. *See generally* Compl.; Motion. The entities that comprise Par

Pharmaceuticals are based in New York and appear concededly to be governed by New York

law. Because the Trustee has not alleged the transferor Endo-related entities with specificity, the

Court will analyze the constructive fraudulent transfers under the laws of both New York and

Pennsylvania. As will be seen, those two bodies of law do not differ in a way that is material to

the outcome of McKinsey's motion to dismiss, thus obviating the need for a more extensive

choice-of-law analysis. *See, e.g.*, *Thelen*, 736 F.3d at 219.

4.   Counts Seven and Eight: Constructive Fraudulent Transfer Merits

Counts Seven and Eight seek to avoid the "Obligations and Transfers" as constructively

fraudulent under sections 544(b) of the Bankruptcy Code, which allows for the recovery of

voidable transfers under applicable state laws—here, NYDCL[9] §§ 273, 274, and 275, and

PUVTA §§ 5104(a)(2) and 5105, respectively. To state a claim for constructive fraudulent

---

[9] In December 2019, NYDCL was repealed and replaced with the Uniform Voidable Transactions Act ("**UVTA**").
The UVTA became effective on April 4, 2020 but does not apply to transfers occurring before the UVTA's effective
date. N.Y. Debt. & Cred. Law § Ch. 12, art. 10, Refs Annos (McKinney 2020). Accordingly, the Court analyzes
these causes of action under the UFCA because the Obligations were incurred and the Transactions transpired before
April 2020.

transfer under these two states' provisions, the plaintiff must plausibly allege that (1) the transaction was made without "fair consideration" (to the extent New York law applies) or "reasonably equivalent value" (to the extent Pennsylvania law applies), and (2) the that the debtor was insolvent at the time of, or as a result of, the transaction. *See* NYDCL §§ 273; PUVTA §§ 5104(a)(2), 5105; *see also In re Rosenblum*, 545 B.R. 846, 866 (Bankr. E.D. Pa. 2016) (analyzing Sections 5104(a)(2) and 5105 of the Pennsylvania UFTA); *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 802–03 (Bankr. S.D.N.Y. 2005) (analyzing Sections 273–275 of the NYDCL).

McKinsey argues for dismissal of the Complaint on the following grounds: (1) the Trustee has not plausibly alleged that the Obligations and Transfers were without fair consideration or reasonably equivalent value, (2) the Trustee has not plausibly alleged that Endo was insolvent or rendered insolvent as a result of the Obligations and Transfers, (3) the Trustee's claims are time-barred, and (4) the Trustee has not sufficiently particularly pled the Transfers and Obligations.

Again, the Court concludes that the Trustee has not plausibly alleged a claim for constructive fraudulent transfer with respect to Endo's payments to McKinsey under the laws of either New York and Pennsylvania, because he has failed to plausibly allege a lack of "fair consideration" or "reasonably equivalent value."

### a.  Fair Consideration and Reasonably Equivalent Value; Antecedent Debt

McKinsey maintains that the Trustee has not pled facts plausibly alleging an absence of fair consideration and/or reasonably equivalent value because the Complaint contains no factual allegation that McKinsey failed to perform exactly the tasks or services that it was assigned under the MSA and each SOW for which Endo paid contracted-for rates. Put more simply, the

Complaint is premised on the fact that Endo hired McKinsey to perform services, the MSA
specifies that McKinsey's work was to be done on a "project basis" with services and
compensation to be pre-approved by Endo in a specific "project work order" or SOW, and there
is no allegation of fact contesting that McKinsey performed those services or that the payments it
received were due under the governing contracts. Thus, McKinsey argues that Endo's payments
to McKinsey were in satisfaction of antecedent debt that Endo owed on account of each SOW.
As detailed below, case law makes clear that a payment on account of antecedent debt generally
constitutes one for which "fair consideration" or "reasonably equivalent value" is received, in the
form of satisfaction of an otherwise-due payment obligation.

The Trustee's response is twofold. First, the Trustee argues that he is challenging the
"Obligations" themselves as fraudulent conveyances, such that the entire contract under which
each contested payment was made should be set aside, which in turn invalidates or eliminates
Endo's pre-existing contractual obligation to pay McKinsey. Second, the Trustee argues that
even if the SOW itself were not invalidated, the value of work performed was well less than zero
given the corporate harms that Endo experienced as a result of following McKinsey's advice,
and, further, that the SOWs included language by which McKinsey committed to provide
"lasting value" to Endo, a commitment that McKinsey did not satisfy. The Trustee again
contends that McKinsey's asserted failure to deliver "lasting value" breached this contractual
commitment and, thus, made Endo not obliged to pay McKinsey on the SOWs, in addition to
establishing that Endo did not receive "fair consideration" or "reasonably equivalent value" for
its payments.

As detailed below and to summarize the Court's conclusions, the Trustee has not
plausibly alleged that the Obligations themselves satisfy the requirements of an avoidable

81

fraudulent conveyance. Even assuming the adequacy of the Trustee's insolvency allegations,

there is no plausible allegation that, when the "Obligations" (meaning the SOWs or, earlier, the

MSA) were entered, either Endo or McKinsey were not embarking on a an agreement among

sophisticated actors by which Endo would retain and pay McKinsey to provide specified

professional services, which McKinsey would and did provide. Thus, although there is

considerable case law recognizing that ordinarily the value of services provided presents a fact

issue not well suited to being resolved on a motion to dismiss, the lack of a plausible basis to

avoid Endo's retention of McKinsey through the MSA and the SOWs puts the ball in the

Trustee's court to identify some facts to overcome a presumption, also recognized in case law,

that the payment of contractually due amounts represents the satisfaction of an antecedent debt,

which is a paradigmatic form of "fair consideration" or "reasonably equivalent value" to the

paying entity. Cases holding otherwise generally are anchored in some additional invalidating

factor not present here – such as that the payment due under the contract was a product of self-

dealing or other tainted process, or the payment was excessive and was based on subjective and

distorted assertions of obligations, or that the value of the consideration in exchange was

plausibly alleged to be not equivalent to the payment or to a sum certain that was contractually

due.

Here, the only factual allegation in the Complaint that the Trustee argues shows the fees

were not really due or were excessive appears in and near paragraph 250 of the Complaint,

which is an undeveloped allegation that McKinsey failed to deliver "lasting value" as envisioned

by the governing contracts. This allegation merely characterizes what may be a prefatory or

aspirational statement in a contract that is not attached to the Complaint. It does not identify any

basis to invalidate the contracts or excuse payment under them, and neither the Complaint nor

the Trustee's opposition briefing explain what renders payment not due in satisfaction of the

antecedent debt imposed (with Endo's advance approval) by the MSA and the SOWs. To

reiterate in more detail the standard that the Complaint here does not meet, the court must

determine if well-pleaded factual allegations state a "plausible claim for relief." *Iqbal*, 556 U.S.

at 679 (internal citation omitted). A claim is plausible when the factual allegations permit "the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id*. (internal citation omitted). A complaint that pleads only facts that are "merely consistent with

a defendant's liability" does not meet the plausibility requirement. *Id.* at 678 (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). And "[a] pleading that offers 'labels and

conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*.

(quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted). Rather, "[t]he pleadings

must create the possibility of a right to relief that is more than speculative." *Spool v. World Child*

*Int' Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted). Particularly given the

MSA's requirements that all proposed work and compensation must have been pre-approved by

Endo, the Trustee has not plausibly alleged that the payments were not in satisfaction of an

antecedent debt, and, thus, were not made in exchange for "fair consideration" or "reasonably

equivalent value," namely, the elimination (by satisfaction) of Endo's payment obligations to

McKinsey.

If the Trustee believes these deficiencies can be cured by a more detailed repleading, the

Trustee may file an amended complaint in an attempt to do so.

Turning to a more detailed legal analysis that undergirds the broad conclusions just

articulated, the first element that a plaintiff must establish to state a claim for constructive

fraudulent transfer is that the transferor made the transfer or incurred the obligation without

receiving "fair consideration" under New York law or "reasonably equivalent value" under

Pennsylvania law. *See* NYDCL §§ 273, 274, 275; PUVTA §§ 5104(a)(2), 5105.

"Fair consideration" under the NYDCL and "reasonably equivalent value" under both

PUVTA and the Bankruptcy Code are functionally equivalent, apart from the NYDCL's

additional requirement that the transaction had been conducted in "good faith."[10] *See In re*

*Liberty Bridge Cap. Mgmt., GP, LLC*, 670 B.R. 676, 685 n. 35 (S.D.N.Y. 2025) (the NYDCL is

functionally equivalent to "reasonably equivalent value" under the Bankruptcy Code, except for

the additional requirement of good faith); *In re Vivaro Corp.*, 524 B.R. 536, 550 (Bankr.

S.D.N.Y. 2015) ("Courts use the term 'fair consideration' interchangeably with 'reasonably

equivalent value,' relevant in Bankruptcy Code section 548 fraudulent transfer claims, when

examining constructive fraud claims."); *see also Fidelity Bond and Mortgage Co. v. Brand*, 371

B.R. 708, 719–20 (E.D. Pa. 2007) ("The constructive fraud provisions of the PUFTA and the

Bankruptcy Code should be construed and interpreted uniformly because consistency between

the two statutes was a goal of those who drafted the PUFTA and who have since interpreted it.").

As such, at the motion to dismiss stage, a plaintiff stating a claim for constructive fraudulent

transfer in New York "need only allege a lack of reasonably equivalent value ***or*** a lack of good

faith on the part of the transferee," *Geron v. Cent. Park Realty Holding Corp. (In re Nanobeak*

*Biotech Inc.)*, 656 B.R. 350, 363 (Bankr. S.D.N.Y. 2024) (emphasis added) (quoting *Gowan v.*

*The Patriot Grp., LLC (In In re Dreier LLP)*, 452 B.R. 391, 443 (Bankr. S.D.N.Y. 2011),

whereas a plaintiff stating the same claim in Pennsylvania need only adequately allege a lack of

reasonably equivalent value. *See In re Rosenblum*, 545 B.R. 846, 866 (Bankr. E.D. Pa. 2016).

---

[10] As noted above at n.9, UVTA replaced the NYDCL and in doing so, eliminated the requirement for good faith, but because this Court is applying the NYDCL, the requirement of good faith applies.

The Bankruptcy Code does not define "reasonably equivalent value." *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 114 S. Ct. 1757, 128 L. Ed. 2d 556 (1994); *Mellon Bank, N.A. v. The Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L.)*, 92 F.3d 139, 148 (3d Cir. 1996) ("Thus, 'Congress left to the courts the obligation of marking the scope and meaning of [reasonably equivalent value].'") (quoting *In re Morris Communications NC, Inc.*, 914 F.2d 458, 466 (4th Cir. 1990)). However, the Code does define "value" for purposes of fraudulent transfer analysis as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but [value] does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor." 11 U.S.C. § 548(d)(2)(A). Considering the Code's definition of "value" and the absence of a statutory definition for "reasonably equivalent value," courts in the Second and Third Circuits have divided the inquiry into two considerations: (1) whether the transferor received any value at all from the challenge transaction, and (2) whether the value received was reasonably equivalent or approximately equal to the value the transferor gave. *See In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 802–03 (Bankr. S.D.N.Y. 2005); *In re R.M.L., Inc.*, 92 F.3d at 149.

Whether fair consideration or reasonably equivalent value has been given generally is an inherently fact-driven inquiry and not subject to a mathematical formula. *See In re Actrade Fin. Techs. Ltd.*, 337 B.R. at 803. To determine whether reasonably equivalent value was provided, courts in the Second and Third Circuits examine the totality of circumstances of the transaction, including the arms-length nature of the transaction and the good faith of the transferee. *See In re Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 317, 334 (Bankr. S.D.N.Y. 2011) (internal citations omitted) (". . . the Court must ultimately examine the totality of the circumstances, including the arms-length nature of the transaction; and . . . the good faith of the transferee."); *In re David*

*Cutler Indus., Ltd.*, 502 B.R. 58, 73 (Bankr. E.D. Pa. 2013) (internal citations omitted) (courts in

the Third Circuit look to the totality of the circumstances, considering such factors as fair market

value compared to the actual price paid, the arm's-length nature of the transaction, and the good

faith of the transferee). While the foregoing determination is largely factual, courts have

dismissed constructive fraudulent transfer claims where the complaint does not plausibly allege

the absence of fair consideration. *See, e.g.*, *In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147,

172–73 (2d Cir. 2021).

Without more, the just-reviewed case law would suggest that the motion to dismiss

should be denied to allow development of the factual question of whether Endo received "fair

consideration" for its payments, in light of the Trustee's allegation that McKinsey's advice

caused devastating economic harms to Endo. However, the Bankruptcy Code and case law

recognize payment of an antecedent debt as an example of equivalent value when assessing

whether a transaction was either actually or constructively fraudulent – assuming the validity of

the debt in question. 11 U.S.C. § 548(d)(2)(A) (value "means property, or satisfaction or

securing of a present or antecedent debt of the debtor"). Abundant case law deems payment of

antecedent debt generally dispositive as to whether "fair consideration" or "reasonably

equivalent value" has been received. As one court put it, "[i]t is well-settled law that contract

provisions negotiated between parties dealing at arm's length with relative equality of bargaining

power, ought not be disturbed by judicial intervention." *Grey v. FDIC*, 88 Civ. 7452

(MJL)(THK), 1998 U.S. Dist. LEXIS 12653, at *66 n.33 (S.D.N.Y. Aug. 14, 1998); *cf. In re

Enron Corp.*, 357 B.R. 32, 50 (Bankr. S.D.N.Y. 2006) (asserting the presumption of equal value

in contractually agreed upon services and those provided in the context of an employment

agreement); *see also In re Central Illinois Energy Cooperative*, 526 B.R. 786, 791 (Bankr. C.D.

Ill. 2015) ("It is widely recognized by courts that where a debtor makes prepetition payments on a contractual debt, in order for those payments to be avoidable as constructively fraudulent, it is necessary for the trustee to first avoid the underlying contract as a fraudulently incurred obligation."). Accordingly, in *In re All-Type Printing, Inc.*, the court concluded that when a debtor paid an individual, it "received in exchange a dollar-for-dollar satisfaction of the [debt]," which was satisfaction of an antecedent debt, and thus for equivalent value. *See* 274 B.R. 316, 324 (Bankr. D. Conn. 2010).

The Trustee here relies heavily on several courts' recognition that the dispositive effect of a binding contractual obligation can be overcome if the underlying contract itself is avoided or invalid, and here argues that it has alleged a lack of any valid "antecedent debt" by seeking to avoid the Obligations themselves, not just the payments under those agreements. *E.g.*, Compl. ¶¶ 249, 252, 315–28; Opp. at 38. This approach, if successful, would find support in case law, although as noted above, the Trustee has not plausibly alleged the avoidability of the Statements of Work, especially in light of the MSA's clear pre-approval requirements and the lack of allegations showing that those procedures were invalid or not followed. Examples of case law presenting the pleading strategy the Trustee is pursuing include *In re All-Type Printing, Inc.*, in which the court dismissed a fraudulent conveyance claim seeking to avoid a payment, but stated that the result might have been different if the contract itself had been challenged, because "[t]he foregoing conclusion is premised upon the fact that All–Type's *incurring of the [debt]* has not been avoided; the underlying analysis would be different had the Trustee also sought and obtained an avoidance of the incurring of that obligation. In that event the Payments could no longer be supported by the value of debt satisfaction since no debt would exist." 274 B.R. at 324 (emphasis in original); *see also In re Nirvana Rest. Inc.*, 337 B.R. 495, 502 (Bankr. S.D.N.Y.

87

2006) (holding that an obligation that is avoided as fraudulent "cannot serve as fair consideration for [] subsequent [t]ransfers") (internal quotation marks omitted).

Here, however, for reasons already discussed, the Trustee has not alleged facts plausibly stating a claim to disallow the governing contracts, termed the "Obligations" in the Complaint. Rather, as McKinsey observes, there are no facts alleged to call into question that "[t]he Agreements were negotiated at arm's length and with Endo's knowledge of the services McKinsey was to provide, and there are no allegations that the fees agreed to were off-market." Reply at 25; *see* Motion at 30–31. Indeed, as noted, the Master Service Agreement[11] expressly requires that McKinsey's work occur on a "project basis" with a scope of work and estimated compensation specified and pre-approved by Endo.

Having closely studied the Complaint and the MSA as well as the parties' contentions, the Court sees no allegation of fact supporting a plausible inference either that the governing contracts were invalid when entered or that they were not performed by McKinsey such that Endo owed no antecedent debt to McKinsey at the time of the challenged payments.

Turning first in more detail to whether the "Obligations" can be avoided, the proper focus of the reasonably equivalent value inquiry is the specific transaction sought to be avoided, *In re Churchill Mortg. Inv. Corp.,* 256 B.R. 664, 678 (Bankr. S.D.N.Y. 2000), and so the Court must examine the allegations concerning the possible invalidity of those agreements. The Complaint alleges only that the "Obligations" (meaning the SOWs) "required McKinsey to provide services that created lasting value in exchange for payment." Compl. ¶ 250. The Complaint does not attach the Statements of Work, nor does it quote them beyond this rather broad and aspirational language. The Complaint does allege at length, and plausibly, that following the resulting

---

[11] The MSA is integral to or incorporated in the Complaint, and therefore is properly considered in deciding this Motion. *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002).

McKinsey "advice" was catastrophic for Endo, and certainly not something that created lasting

value. But the Court does not see any factual allegation that, at the time of entry into the MSA or

the SOWs, Endo's entry into pre-approved work orders for services specified by a contracting

consultant was anything other than a valid and enforceable forward-looking services agreement

between sophisticated parties—an agreement to retain and pay McKinsey a specified amount for

specified work, which the Court cannot credit as a plausible transfer or conveyance by Endo for

which it did not receive "fair consideration" or "reasonably equivalent value" in the form of

McKinsey's agreement to perform specified professional services. The Trustee thus has failed to

plausibly allege the invalidity of the "Obligations."

The Trustee might also try to contend that the "Obligations," meaning the SOWs, were

breached by McKinsey such that payment was not in fact due. But the Complaint also fails to

identify any specific contractual provision that was breached by McKinsey, and certainly not in a

manner that excused as a contractual matter Endo's obligation to pay McKinsey under the

governing contracts. Although the Trustee quotes contractual language saying McKinsey

undertook to create "lasting value" for Endo, [Compl. ¶ 250], the quoted language sounds

prefatory and aspirational and has not been alleged or shown to be an enforceable metric or

deliverable owed by McKinsey to trigger Endo's payment obligation.

The Trustee does identify and the Court has considered decisions declining to dismiss

complaints where a plaintiff asserted that poor performance under a contract rendered payment

not contractually required. *See* Trustee Opp. at 38–39 (citing *Kirschner v. Large S'holders (In re*

*Tribune Co. Fraudulent Conveyance Litig.)*, 10 F.4th 147, 173–74 (2d Cir. 2021) (dismissal

premature given question as to whether advisors conformed with industry standards and so

delivered value reasonably equivalent to the success fees paid)); *Am. Tissue, Inc. v. Donaldson,*

*Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 106 (S.D.N.Y. 2012); *Silverman v. Meister Seelig & Fein, LLP (In re Agape World, Inc.)*, 467 B.R. 556, 571–72 (Bankr. E.D.N.Y. 2012); *Jacobs v. D'Alessandro (In re Dewey & Leboeuf LLP)*, Nos. 12-12321, 14-01919, 2014 Bankr. LEXIS 4051 (Bankr. S.D.N.Y. Sept. 23, 2014); *Global Crossing Estate Representative v. Winnick*, No. 04-cv-2558, 2006 U.S. Dist. LEXIS 53785, at *33 (S.D.N.Y. Aug. 3, 2006). The Court has identified additional similar decisions. *See Murray v. Prescott, Ball & Turben, Inc. (In re Chicago, Missouri & Western Ry. Co.)*, 124 B.R. 769, 773 (Bankr. N.D. Ill. 1991) (plaintiffs sufficiently alleged they did not receive reasonably equivalent value for the transfers based on the quality of the investment advisors' services); *In re Oakwood Homes Corp.*, 340 B.R. 510, 525 (Bankr. D. Del. 2006) (noting that the "quality of professional services is within the scope of a fraudulent conveyance action," and that inadequately performed professional services could serve as a basis for recovery) (quoting *BCPM Liquidating LLC v. PricewaterhouseCoopers LLP (In re BCP Mgmt.)*, 320 B.R. 265, 280 (Bankr. D. Del. 2005)).

These cases are distinguishable and do not plausibly demonstrate that the facts alleged here are sufficient to overcome the conclusion that here Endo made a payment on account of a valid antecedent debt, and that, as a result, it has not plausibly alleged the absence of fair consideration or reasonably equivalent value. Many involve successful efforts to call into question the validity of the underlying payment obligation that led to the transfer, which as just discussed the Trustee has failed to accomplish here.

*Kirschner*, for example, involved an attempt to avoid "success fees" that had been paid to financial advisers; thus, a challenge to their performance plausibly challenged the contractual existence or amount of a payment obligation in the first place, whereas here the amounts due have not been alleged to be based in part on subjective factors like Endo's long-term results or

90

anything other than a sum certain due under a contract with no alleged irregularity in its

negotiation or adoption. *See* 10 F.4th 147. Similarly, in *Am. Tissue Inc.*, Judge Lynch, then of the

District Court, denied a dismissal motion as to fraudulent conveyance claims against an

investment firm that claimed that the payer of its fees received "equivalent value" in the form of

an equity distribution – a consideration that presents inherent stock valuation and "equivalence"

questions, whereas here Endo received services to which it specifically agreed and for which it

specifically agreed to pay a sum certain in a preapproved Statement of Work. *See* 351 F. Supp.

2d 79. Further, McKinsey's compensation under each Statement of Work has not been alleged to

have been contingent on outcome or any particular deliverable for the services rendered.

Meanwhile, in *Jacobs*, which concerned an attempt to avoid extraordinarily high compensation

paid to a partner in the eventually bankrupt and defunct law firm Dewey Leboeuf, there were

plausible allegations that the partner who received the payments had sufficient decision-making

power that he could unduly influence and taint the firm's payment decision-making, and a

further plausible allegation that "the Contract payments were so exorbitant that they could not be

justified by the services that D'Alessandro performed," thus defeating a presumption that his

compensation must have been for an antecedent debt and thus been accompanied by fair

consideration. *See* 2014 Bankr. LEXIS 4051, at *31. Unlike D'Alessandro, there is no plausible

allegation of undue influence by McKinsey over Endo's decision to enter the contracts at issue,

or over the amount of pre-approved compensation that would be due for the specified services,

and the amount of the payments – approximately $8.5 million in total – is not so high as to be

inherently questionable. *See id.* And in *Winnick*, which arose from the Global Crossing

bankruptcy, the court denied a motion to dismiss a claim to recover $58.7 million in fees paid to

banking professionals for securities offerings and related services, but only where those

91

professionals were alleged to have engaged in self-dealing to such an extent that the legitimacy

of the payment obligation was called into question, especially against a backdrop of triable fact

issues regarding the actual value of what the company received on account of the professional

services it lucratively commissioned. *See* 2006 U.S. Dist. LEXIS 53785.

    *Silverman* is the most analogous and favorable case cited by the Trustee. There, the

Bankruptcy Court for the Eastern District of New York denied a motion to dismiss fraudulent

conveyance claims brought against pre-petition counsel to a debtor that engaged in a Ponzi

scheme on the ground that the value of services rendered presented a fact question. *See* 467 B.R.

556. That decision aligns with the Trustee's theory that a payment of professional fees may be

avoided if the professional services were so incompetent or otherwise flawed as to render the

payment greater than the value received by the company in exchange. *See id.* The *Silverman*

decision is still distinguishable, however. It arose against the backdrop of a Ponzi scheme that

called into question the bona fides of the entity that retained the professional, and the decision

does not reveal indications comparable to those here that have the "badges of regularity," to coin

a phrase – a pre-approved agreement not alleged to have been unusually or excessively priced to

provide specified professional services in exchange for a pre-agreed estimated compensation

amount. *See id.* The Complaint simply does not plausible articulate any way in which the

payments to McKinsey were not earned or due under the contract. Hindsight-backed assertions

that McKinsey's advice proved harmful have not been shown to excuse Endo's contractual

obligation to pay for that advice when the services were rendered and the payment was due under

the governing contracts.

    In sum, the Complaint and the MSA here make clear that Endo voluntarily hired

McKinsey to perform specified services for a pre-agreed fee, that McKinsey did so, and that

McKinsey was paid the resultingly due compensation, while the Complaint identifies nothing that plausibly could invalidate Endo's payment obligations to McKinsey under the governing contracts. The Complaint here thus does not give rise to the sort of plausible triable issue that the court perceived existed in any authority raised by the Trustee, even fully taking *Silverman* into account. The Complaint thus fails to allege the absence of reasonably equivalent value or fair consideration where all available facts indicate that Endo's payments were on account of antecedent debt that Endo owed to McKinsey. This remains true even assuming that McKinsey's work (and Endo's decision-making) caused terrible corporate harm. The Trustee may have a remedy, seemingly most viably for indemnification, but the fraudulent conveyance claims as pled fail to plausibly state a claim.

As noted, the Court will allow the Trustee to replead in an amended complaint to attempt to state additional facts that will support its contention that the amounts paid to McKinsey were not accompanied by a receipt by Endo of fair consideration or reasonably equivalent value.

### b.  Insolvency

Although the insufficient pleading of a lack of reasonably equivalent value or fair consideration is fatal to the Trustee's claim as now pled (subject to possible amendment), the Court will review the remaining applicable elements of the fraudulent conveyance claims. The second element of a constructive fraudulent transfer claim in both New York and Pennsylvania is insolvency. Under both the NYDCL and PUVTA, a transfer made, or obligation incurred by a debtor is voidable as to a creditor if the debtor made the transfer or incurred the obligation at a time when the debtor either was insolvent or was rendered insolvent as a result of the transfer. *See* NYDCL §§ 273; PUVTA §§ 5104(a)(2), 5105. The Trustee's theory of insolvency, while likely challenging to prove and possibly ultimately not viable, does rise to the level of

plausibility, on the theory that when Endo received and followed McKinsey's advice Endo was on the road to economic perdition of such a magnitude that, even discounted for present value as of the time of the "Obligations and Transfers," the impact of future losses rendered Endo balance sheet-negative.

A debtor is presumed insolvent if it is not paying debts as they become due, which has not been alleged to have been the case with Endo, but insolvency can also be proven by demonstrating that the debtor is "book value" insolvent.  *See In re Fitzpatrick Container Co.*, 670 B.R. 425, 441 (Bankr. E.D. Pa. 2025) (citing *In re R.M.L., Inc.*, 92 F.3d 139, 154–55 (3d Cir. 1996)). A debtor is book value insolvent "if, at fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets." PUVTA §§ 5102(a); *see also* NYDCL § 271(a) (a company is insolvent when the "present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured"). To determine insolvency, courts use the "balance sheet" test to evaluate the company's assets and liabilities. *See In re Wonderwork Inc.*, 611 B.R. 169, 211 (Bankr. S.D.N.Y. 2020) ("The NYDCL incorporates a 'balance sheet' test for insolvency.") (quoting *In re Nirvana Rest.*, 337 B.R. 495, 506 (Bankr. S.D.N.Y. 2006)); *In re R.M.L., Inc.*, 92 F.3d 139, 154–55 (3d Cir. 1996). The only potentially salient difference between the insolvency laws of New York and Pennsylvania is that under New York law, if the plaintiff demonstrates the absence of "fair consideration," the court may presume insolvency and the burden shifts to the defendant to rebut it. *See In re Wonderwork Inc.*, 611 B.R. at 211.

Ordinarily, "[t]he operative reference point for determining insolvency is the time at which the transfer took place." *In re Trinsum Grp., Inc.*, 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011). However, while courts cannot presume insolvency from a subsequent insolvency or use

other impermissible hindsight, courts may consider information "originating subsequent to the

transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability as

of the pertinent date, which assures that the valuation is based in reality." *In re Adelphia*

*Commc'ns Corp.*, 512 B.R. 447, 495 (Bankr. S.D.N.Y. 2014), as corrected (Sept. 10, 2014), *aff'd*

*sub nom. In re Adelphia Commc'n's Corp.*, No. 02-41729 REG, 2015 WL 1208588 (S.D.N.Y.

Mar. 17, 2015), *aff'd sub nom. In re Adelphia Commc'n's Corp.*, 652 F. App'x 19 (2d Cir. 2016)

(internal citations and quotations omitted). For example, subsequent discovery of fraud can be

appropriately considered when determining the real financial condition of the debtor at the time

of the transfer. *Id.* at 495 (citing *In re Coated Sales Inc.*, 144 B.R. 663, 668 (Bankr. S.D.N.Y.

1992)). In calculating insolvency, courts also consider contingent liabilities that are capable of

reasonable estimation. *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988); *see*

*also* 5 Collier on Bankruptcy ¶ 548.05(3)(a) (16th ed. 2025). Contingent liabilities must be

discounted by the likelihood that the contingency will occur, and the amount of discount used

often presents factual issues. *See In re Xonics Photochemical, Inc.*, 841 F.2d at 200; *see also In*

*re Wonderwork, Inc.*, 611 B.R. at 211; 5 Collier on Bankruptcy ¶ 548.05(3)(a) (16th ed. 2025).

Courts recognize that "insolvency is ordinarily a question of fact." *In re Tops Holding II*

*Corp.*, 646 B.R. 617, 658 (Bankr. S.D.N.Y. 2022) (quoting *In re Tronox Inc.*, 429 B.R. 73, 98

(Bankr. S.D.N.Y. 2010)). The calculation of insolvency often necessitates expert testimony as to

the value of assets and the exposure to liabilities and requires the court to engage in the technical

exercise of weighing the evidence. *See id.*; *see also* 5 Collier on Bankruptcy ¶ 548.05 (16th ed.

2025). Considering the fact-intensive nature of the insolvency analysis, "courts should not

dismiss a complaint that contains sufficient facts to permit a plausible inference of insolvency

even if the defendant has its own plausible arguments for solvency." *In re Tops Holding II Corp.*,

646 B.R. at 658 (internal quotation marks omitted). Even though a complaint cannot "simply parrot" the applicable statute, a complaint will not be dismissed when the "defendant's allegations of solvency are more probable than the complaint's allegations of insolvency." *Id*. A complaint need not be dismissed if it does not include balance sheet specifics or other specific financial information so long as the face of the complaint allows the court to draw a reasonable inference of insolvency. *Id.* at 658–59 (internal quotation marks omitted); *see also In re Atomica Design Grp.*, Inc., 556 B.R. 125, 166 (Bankr. E.D. Pa. 2016).

      *i.*     *Parties' Arguments*

In the Complaint, the Trustee maintains that Endo was insolvent at the time of the Transactions as the value of its assets "was substantially less than its liabilities." Compl. ¶ 260. In so arguing, the Trustee maintains that even though Endo had a substantial market capitalization at the time of the Transfers and Obligations, Endo was facing enormous, not-yet-recognized liability resulting from the destructive effects of opioids and the breadth of litigation that Endo faced as a result. *See* Compl. ¶ 255. In alleging that Endo was subjected to contingent liabilities, the Trustee contends that, at the time that the Transfers and Obligations were made to McKinsey, Endo was already subject to both lawsuits and government investigations regarding a variety of its products, opioid and otherwise. *Id.* ¶ 256–57. The Trustee claims that Endo "consistently underreported the full scope of the liabilities it faced in order to maintain the façade that its assets exceeded its liabilities," and "underreport[ed] its tax liability by billions of dollars to paint a false picture of financial stability and success." *Id.* ¶ 259. As a result, Endo's fair market value was "grossly exaggerated by several billions of dollars," and a majority of its assets were "comprised of good will and general intangibles." *Id.* ¶ 260. The Plaintiff contends that McKinsey's "reliance on the market capitalization of the stock" as of the petition date fails to

justify dismissal given the Complaint's allegations of Endo's underreporting of its liabilities, the

exaggeration of Endo's fair market value, and the fact that McKinsey's advice was a poison pill

that accelerated Endo's liabilities. Opp. at 41. The Trustee concludes by stating that the lawsuits

were "indicative of Endo's liabilities at the time of the [Transfers and Obligations]." *Id.* at 42.

In opposition, McKinsey terms the Trustee's allegations conclusory, and argues that the

Complaint's factual allegations in fact show that "Endo was neither insolvent at the time of the

Transactions nor rendered insolvent thereby." *See* Motion at 31. McKinsey emphasizes that

Endo's Chapter 11 filing occurred six years after the Transactions were executed, and that, when

the Transfers and Obligations were executed, the "market capitalization of Endo's stock was

worth billions of dollars until immediately before the Chapter 11 filing." *Id.* at 32. McKinsey

further notes that its consulting work resulted in hundreds of millions of dollars of profits and

argues that the $8.33 million dollar Transfers made Endo insolvent would be "implausible." *Id.*

at 32–33. Relatedly, McKinsey maintains that the Trustee's case is predicated on purely

contingent liabilities that resulted from Endo's exposure to opioid litigation, which is

impermissible because the Trustee failed to allege that the potential risk of the contingent

liabilities rendered Endo insolvent *at the time* of the Transfers and Obligations. Reply at 27–28.

McKinsey further argues that a case relied on by the Trustee, *Coated Sales*, does not apply to

fraudulent transfers because the case involved preferential transactions and that the transactions

at issue in *Coated Sales* had been discovered later due to fraud and illegality, neither of which is

alleged to be present here. *Id.* at 28 (citing *In re Coated Sales, Inc.*, 144 B.R. at 666).

    ii.    *Analysis*

Viewing the allegations in the light most favorable to the Trustee, the Court concludes

that the Trustee has alleged facts that supports a plausible inference that Endo was insolvent at

the time of the Obligations and Transfers due to the likelihood of future opioid-related liabilities

that Endo took on by obtaining and following McKinsey's advice, notwithstanding that at the

time its market capitalization appeared to reflect financial soundness. The passage of six years

from the last date of complained-of McKinsey conduct until Endo's bankruptcy petition may

eventually prove decisive in McKinsey's favor, but the Court cannot rule for McKinsey as a

matter of law based on the pleadings in connection with Endo's payments to McKinsey.

First, although the Complaint does not assign any specific value to the liabilities, the

Complaint has sufficiently alleged that Endo was exposed to such massive liabilities and losses

(including $1.2 billion in settlements and hundreds of millions of dollars in other costs), such

that the Complaint supports a plausible inference that Endo was insolvent at the time of the its

payments to McKinsey, even discounting the value of those eventual settlements and other

losses. *See, e.g.*, *In re Amcad Holdings, LLC*, 579 B.R. 33, 39–40 (Bankr. D. Del. 2017) (the

trustee adequately pled insolvency when the Complaint alleged "large payments and payouts"

led to insolvency, and no "specific financial information" was provided); *In re Dewey & LeBoeuf

LLP*, 2014 WL 4746209, No. 12–12321 (MG), at \*12 (Bankr. S.D.N.Y. Sept. 23, 2014) (motion

to dismiss was denied when an insolvency date was not yet fixed but "[s]ubsequent

developments–including the indictments of former senior [Debtor] personnel" support that the

allegations in the complaint provided room for discovery to illuminate an appropriate date before

which no transfer can be recovered). In contrast to McKinsey's assertions, it is permissible when

determining insolvency to consider contingent liabilities, such as liability arising from litigation

and regulatory lawsuits, that are capable of reasonable estimation. *See, e.g., In re Xonics

Photochemical, Inc.*, 841 F.2d at 200.

McKinsey relies on *In re Xonics* to argue that Plaintiff cannot show that Endo's contingent liabilities were greater than its assets, but this argument ignores that although the Seventh Circuit characterized as "absurd" the proposition that that the contingent liabilities in that case were greater than the debtor's assets, the court also observed that it is not impermissible to consider contingent liabilities in an insolvency calculation when those liabilities can be estimated based on the probability of their occurrence. *See In re Xonics Photochemical, Inc.*, 841 F.2d at 200; *see also* Motion at 32. Doing so requires determining the appropriate discount rate to apply to the eventual litigation liability, which will require evidence and expert testimony. *See In re Tronox, Inc.*, 503 B.R. at 315 (weighing competing expert testimony, the court set the value of past tort and environmental claims in order to determine that a debtor was insolvent at the time of its IPO); *see also In re Wonderwork, Inc.*, 611 B.R. at 211 ("The amount of any discount, and hence, the question of solvency, presents an issue for trial."). Thus, although as McKinsey observes the Court must apply a "balance sheet" test to determine whether the liabilities that Endo incurred actually resulted in its insolvency, *see* Motion at 31 (citing *In re Trinsum Grp., Inc.*, 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011)), to the extent the Court must fix a value on contingent liabilities, fact-finding is necessary here to determine the appropriate discount rate and the precise timing of these contingent liabilities as compared to Endo's asset values at the time of the Transactions. That cannot be done at the present stage of this litigation.

Second, despite McKinsey's contentions otherwise, the Complaint plausibly alleges that the Transfers and Obligations occurred when at least some of the liabilities had already been incurred by Endo. Compl. ¶ 256 ("At the time of the [Transfers and Obligations], Endo . . . had already been the subject of lawsuits and government investigations with respect to its marketing and sale of opioid products, including Opana, as well as its products generally."). As noted,

insolvency is measured as of the point at which the transfers occurred and cannot be presumed from a later insolvency, but courts may consider information originating subsequent to the transfer date if it tends to shed light on an accurate, realistic valuation of the company as of the pertinent date. *In re Adelphia Commc'n's Corp.*, 512 B.R. at 495 (quoting *In re Coated Sales Inc.*, 144 B.R. at 668).

For example, the court in *Coated Sales* stated that courts are permitted to use "hindsight" to superimpose "current circumstances" onto "a previous set of circumstances," when subsequent fraud has been discovered. *In re Coated Sales*, 144 B.R. at 668. In that case, the court considered the post-transaction discovery of false accounts, phantom inventory, and illegal transfers to determine the debtor's actual financial condition at the date of the transfers at issue. *Id*. McKinsey attempts to use the *Coated Sales* case to highlight the fact that the court there used hindsight only when there was a subsequent discovery of fraud, and contends that "[h]ere, no fraud or illegality is ever alleged." Reply at 28. This contention ignores the salient similarity of the circumstances here, in which an unacknowledged problem – here large-scale generation of liability through reckless opioid sales practices, whereas in *Coated Sales* the unacknowledged value-destroying factor was fraud – in each case causing a company to underreport or fail to acknowledge liabilities in a way that led to an exaggerated perception of the company's solvency. *See* Compl. ¶ 260. Thus, the circumstances here are not unlike *Coated Sales*, and the Court may consider the fact that the asset valuation could have been lower than reported due to the underreported liabilities Endo faced.

Lastly, one argument of the Trustee fails. The Trustee contends that the claim in Count Seven for constructive fraudulent transfer under the laws of New York is entitled to a presumption of Endo's insolvency because the Trustee has alleged facts sufficient to support a

plausible inference of an absence of "fair consideration." *See In re Wonderwork Inc.*, 611 B.R. at 211. That argument fails (subject to possible repleading) in light of the Court's conclusion that the Trustee has not plausibly alleged an absence of fair consideration for the payments that Endo made.

Nevertheless, and more broadly, even assuming that Endo was achieving near-term profits at the time of the services rendered, McKinsey has not rebutted Endo's possible insolvency because questions of fact exist regarding the appropriate values and timing of the contingent liabilities. Granting the motion to dismiss in light of the facts alleged would involve impermissibly failing to draw plausible inferences in the Trustee's favor, while making possibly plausible but not inescapable inferences in McKinsey's favor. *See In re Tronox Inc.*, 429 B.R. at 91 ("It is also quite irrelevant whether Defendants' [solvency] scenario has 'greater plausibility,' as Defendant assert. For pleading purposes, a defendant's rebuttal of a plaintiff's contentions with its own does not entitle the defendant to dismissal of an action.").

Therefore, the Court concludes that the Trustee has alleged facts that support the inference that Endo was insolvent at the time of the Obligations and Transfers.

> c. *Counts Seven and Eight Should Not Be Dismissed as Time-Barred*

In Counts Seven and Eight, the Trustee asserts claims for constructive fraudulent transfer under the NYDCL and PUVTA. McKinsey[12] asserts that nearly all of Plaintiff's fraudulent transfer claims based in New York are time-barred as most of the relevant Obligations and Transfers occurred outside of New York's six-year limitations period. Motion at 34. Because more than six years passed between the most recent Transfer and the petition date, the Trustee

---

[12] In the Motion, McKinsey did not argue the statute of limitations affirmative defense for the fraudulent transfer claims under Pennsylvania.

relies on the existence of certain predicate or "triggering" creditors that the Trustee claims have

the benefit of an extended period of time within which to file their claims. Opp. at 43–45.

Specifically, the Trustee argues that it can step into the shoes of the Internal Revenue Service

("**IRS**") and the U.S. Department of Health and Human Services ("**HHS**") as triggering creditors

to circumvent New York's statute of limitations. *Id.* McKinsey maintains that the Trustee cannot

rely on these two predicate creditors because (1) the Plaintiff failed to identify which specific

debtor made the transfers at issue and (2) the Plaintiff failed to allege that the IRS and HHS each

independently held a claim against that specific debtor. Motion at 34–36.

As stated above, the Complaint was filed on August 15, 2024, but the parties agree that

the relevant point for computing the timeliness of the Trustee's claims was Endo's bankruptcy

petition date, namely, August 16, 2022. Compl. ¶ 20; 11 U.S.C. § 108(a) (imposing two-year toll

of unexpired statutes of limitations as of a debtor's bankruptcy petition date). Thus, without a

triggering creditor (discussed below), the six-year statute of limitations for these fraudulent

transfer claims under New York law makes timely any claim accruing on or after August 16,

2016.

The Complaint seeks to avoid a series of Transfers dating from March 11, 2015, to

December 20, 2016. *See* Compl., Schedule B. Of the $8.33 million in Transfers the Plaintiff

seeks to avoid, ten transactions totaling $4.83 million occurred before August 16, 2016—

meaning outside of the six-year statute of limitations in New York. *See id.* However, from the

face of the Complaint, two Transfers occurred within the statute of limitations, namely the

October 4, 2016 Transfer totaling $3 million and the December 20, 2016 Transfer totaling

$500,000. Further, five of the six SOWs that the Plaintiff seeks to avoid as constructively

fraudulent Obligations occurred outside of the statute of limitations, but the October 10, 2016

102

SOW was executed within the statute of limitations. In sum, without a triggering creditor, the Trustee's claims for the ten Transfer and five Obligations referenced above are outside of New York's six-year statute of limitations.

Section 544 of the Bankruptcy Code states that a trustee may avoid a fraudulent transfer that is voidable under applicable law "by a creditor"—often referred to as a "golden creditor" or "triggering creditor"—holding an allowable unsecured claim. 11 U.S.C. § 544. "It is not necessary that the claim held by that creditor at the bankruptcy filing be identical to the one held at the time of the fraudulent conveyance, or, under some applicable fraudulent transfer laws, that the creditor even have had a claim at the time of the transfer, only that the petition date creditor could avoid the transfer under applicable non-bankruptcy law." *In re Tops Holding II Corp.*, 646 B.R. at 651 (internal quotations and citations omitted). "[B]efore a trustee is able to utilize applicable state or federal law referred to in Section 544(b), there must be an allegation and ultimately a proof of the existence of at least one unsecured creditor of the Debtor who at the time the transfer occurred could have, under applicable local law, attacked and set aside the transfer under consideration." *In re Wingspread Corp.*, 178 B.R. 938, 946 (Bankr. S.D.N.Y. 1995) (quoting *In re Smith,* 120 B.R. 588, 590 (Bankr. M.D. Fla. 1990)). When using the IRS as the "golden creditor," a ten-year statute of limitations for enforcement is measured from the date of an unpaid tax obligation's assessment, but the IRS need not assess the tax to qualify as a triggering creditor. *See, e.g., Togut v. Perevoski (In re Kossoff PLLC)*, Nos. 21-10699, 22-01141, 2023 Bankr. LEXIS 2554, at *6 (Bankr. S.D.N.Y. Oct. 17, 2023) (citing 26 U.S.C. § 6502(a)(1)).

The Complaint alleges that the IRS filed proofs of claim against at least Endo U.S. Inc., Endo Pharmaceuticals Inc., and Endo Health Solutions Inc. for the "fiscal periods ending in 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2016, 2017, 2018, 2020, and 2021, which were

due and owing at all relevant times, including but not limited to August 16, 2012, through and

including the Petition Date." Compl. ¶ 265–66. Thus, the IRS's status as a triggering creditor

would extend the statute of limitations for fraudulent transfer under New York law to cover all

the relevant Transfers and Obligations.

The Trustee has also asserted the HHS as a golden creditor because the HHS filed a claim

against "Endo International plc and its affiliated debtors," which the Trustee has alleged has a

six-year reach-back period. Compl. ¶ 270–271. In a footnote, McKinsey claims that the HHS's

six-year statute of limitations could not be a triggering creditor for any of the claims because six

years is not enough time to cover any Transfers or Obligations. Motion at 34–35 n.23. At first

blush, the Court is skeptical of the application of the HHS to extend the statute of limitations but

given that the Plaintiff has alleged the IRS as a predicate creditor and that creditor has a ten-year

statute of limitations, the Court declines to decide the arguments relating to HHS at this time.

In response to the Trustee's assertion that the IRS operates as a predicate creditor, the

Defendants maintain that the Trustee must identify a specific unsecured creditor holding an

allowed claim *at that specific transferor* to benefit from a longer statute of limitations and that in

failing to do so, plaintiffs have failed to meet their pleading burden. Reply at 29–30 (citing *In re*

*Tops Holding II Corp.*, 646 B.R. at 655 ("[I]t is the IRS's status as a creditor at the time of the

transfer . . . that gives it standing[.]")). However, this is "contrary to the law of this District,"

which requires only the identification of a triggering creditor to put "defendants on notice of the

creditors who supply the basis for the right to sue, and will permit them to answer, seek relevant

discovery, and defend against these claims." *In re Bernard L. Madoff Inv. Sec. LLC*, 557 B.R. 89,

120 (Bankr. S.D.N.Y. 2016) (quoting *Global Crossing Estate Rep. v. Winnick,* No. 04–CIV–

2558, 2006 WL 2212776, at *11 (S.D.N.Y. Aug. 3, 2006) (Lynch, J)); *Musicland Holding Corp.*

*v. Best Buy Co.* (*In re Musicland Holding Corp.*), 398 B.R. 761, 780 (Bankr. S.D.N.Y. 2008); *In re RCM Global Long Term Cap. Appreciation. Fund, Ltd.,* 200 B.R. 514, 523–24 (Bankr. S.D.N.Y. 1996). The Trustee argues that McKinsey overstated his pleading obligation, adding that discovery is needed to ascertain whether the IRS held a claim against a specific Endo entity, and that in any event, Endo Pharmaceuticals Inc. is alleged as an entity at which the IRS held a claim and that is the same Endo entity that signed the SOWs. *See* Opp. at 44; Compl. ¶ 265. Defendants claim that neither of the *45 John Lofts, LLC* or *Bernard L. Madoff* cases cited by Plaintiff suggest that discovery is appropriate for a plaintiff to assess whether it has sufficiently alleged a golden creditor because, in these cases, standing was at issue not the statute of limitations. Reply at 30 (citing 599 B.R. 730 (Bankr. S.D.N.Y. 2019) and 557 B.R. 89).

For now, the Trustee has adequately alleged that IRS is a triggering creditor so that his claims are timely, pending further development if and as the case goes forward and includes fraudulent conveyance claims. *See 45 John Lofts, LLC v. Meridian Capital Grp., LLC (In re 45 John Lofts, LLC)*, 599 B.R. 730, 742 (Bankr. S.D.N.Y. 2019) ("there is ample authority to suggest that consideration of the qualifying creditor question be left until motions for summary judgment"). Defendants also cite *In re Mallinckrodt PLC*, where the Court dismissed the fraudulent transfer claims in an amended complaint because the plaintiff failed to demonstrate that the IRS had claims against the specific debtor entities that made the transfers and failed to demonstrate that any entity was the alter ego of an entity at which the IRS held a claim. Motion at 35 (citing No. 20-12522 (JTD), 2024 WL 206682, at *39 (Bankr. D. Del. Jan. 18, 2024)). While Plaintiff will ultimately need to demonstrate that the IRS held a claim at the specific transferor entities involved in the Transfers and Obligations, the allegations in the Complaint are sufficient for the Court to plausibly infer that the claims are not facially time-barred and the

cases in this District have found that fact-finding is appropriate to discover whether the specific

debtor-entity has a predicate creditor. *See In re Bernard L. Madoff Inv. Sec. LLC*, 557 B.R. at

120; *45 John Lofts, LLC*, 599 B.R. at 742.

To be sure, to succeed in its claim for Transfers and Obligations occurring before August

16, 2016, the Trustee would need eventually to establish the existence of an unsecured creditor

that has an allowable claim against the specific entity seeking to void the Transfer or Obligation

and that could have pursued that claim at the time of the Transfer or Obligation. But for purposes

of this motion, the Court cannot conclusively determine that the IRS' rights to avoid the

Transfers and Obligations occurring before August 16, 2016 are time-barred.

> ### d.   *Counts Seven and Eight are Pled with Sufficient Particularity to Satisfy Rule 8*

Finally, McKinsey maintains that the Trustee has not met his pleading burden under Rule

8(a)(2) because the Trustee does not plead assertedly necessary details of the Transfers or

Obligations to state a claim for constructive fraudulent transfer. Motion at 33. Specifically,

McKinsey argues that nowhere does the Complaint specify which Endo entity made and which

McKinsey entity received each Transfer, nor does the Complaint specify which McKinsey entity

was owed each Obligation. *Id.* While McKinsey claims that the Trustee's failure to specify

transferors and transferees for each Transfer and Obligation is fatal to Counts Seven and Eight,

the Court concludes that the Trustee generally has provided sufficient information to meet its

pleading requirements under Rule 8(a)(2), except as to the Court's substantive determination that

the Complaint fails to plead a lack of fair consideration or reasonably equivalent value to Endo in

connection with the Obligations and Transfers.

As stated above, claims for constructive fraudulent transfer must satisfy the pleading

standards set forth in Rule 8(a) as opposed to the heightened pleading standards in Rule 9. *See*

*supra* Section II. C. 2.; Fed. R. Civ. P. 8(a)(2); *In re Atomica Design Grp., Inc.*, 556 B.R. 125, 160 (Bankr. E.D. Pa. 2016) (holding that claims for constructive fraudulent transfer are not subject to the heightened pleading standard of Rule 9 because "fraud does not have to be proven" thereunder) (internal citations omitted). At the motion to dismiss stage, a complaint need only allege that the transfer for which avoidance is sought was for less than reasonably equivalent value at a time when the debtor was insolvent, but the complaint must do more than recite the statutory elements of each. *See In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 455–56 (Bankr. D. Del. 2018). The purpose of this pleading requirement is to ensure the defendant receives "fair notice" of the claim and thus, "the sole consideration should be whether, consistent with the requirements of Rule 8(a), the complaint gives the defendant sufficient notice to prepare an answer, frame discovery, and defend against the charges." *In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 111 (Bankr. S.D.N.Y. 2011) (quoting *Nisselson v. Drew Indus., Inc. (In re White Metal Rolling & Stamping Corp.),* 222 B.R. 417, 429 (Bankr. S.D.N.Y. 1998) (internal citations omitted)). Courts have found that "complaints that identify the dates, amounts, source, and transferee of each of the alleged transfers successfully support claims of constructive fraudulent transfer under Fed. R. Civ. Pro. 8(a)(2)'s pleading standard." *In re PennySaver USA Publ'g, LLC*, 587 B.R. at 456 (citing *In re AgFeed USA, LLC*, 546 B.R. 318, 337 (Bankr. D. Del. 2016) ("Here, the complaint identifies the date, amounts, source and transferee of each of the transfers . . . At this stage of the proceedings, the Court concludes that the facts alleged by the Trustee are sufficient to support a claim for constructive fraud under section 548(a)(1)(B).")).

Here, regarding the Obligations, the Complaint identifies the date and group of obligors (Endo Pharmaceuticals and Endo Pharmaceuticals Holdings Inc.) for each Obligation. *See* Compl., Schedule A. The Complaint also identifies McKinsey as the Obligee for each

Obligation. *See* Compl. ¶ 123 ("Each proposal outlined the services that McKinsey would provide to Endo and how much Endo would pay for those services."). The Complaint explains that each SOW "was executed by Endo Pharmaceuticals or Endo Pharmaceuticals Holdings Inc. on behalf of each entity 'and its affiliates,'" and that the "SOWs routinely referred to 'Endo Pharmaceuticals' or simply 'Endo,' highlighting that McKinsey's services were understood to be directed to, and for the benefit of, Endo's business enterprise as a whole." Compl. ¶ 123. For each of the Transfers, the Complaint identifies the date, amount, and group of transferor/transferees. *See* Compl. ¶ 253 ("Endo, through Endo Pharmaceuticals, Inc., Endo Health Solutions Inc., and Endo U.S. Inc., and potentially other affiliated entities acting by its direction and on its behalf, transferred millions of dollars to or for the benefit of McKinsey, including but not limited to no less than $8.33 million to or for the benefit of McKinsey in 2015 and 2016, as reflected on Schedule B."). The Trustee also explains that "[a]lthough the invoices related to the Transfers list only 'Endo Pharmaceuticals,' upon information and belief, the Transfers were effectuated by Endo Pharmaceuticals, Inc., Endo Health Solutions Inc., and Endo U.S. Inc. on behalf of and with funding from other Endo entities." Compl. ¶ 253 n. 6.

These allegations are adequately pled, even though McKinsey argues that to satisfy Rule 8(a), the Trustee must plead the exact debtor-entities that incurred each Obligation and made each Transfer and the exact McKinsey entity that was a party to each Obligation and Transfer. *See* Motion at 33 (citing *In re PennySaver USA Publ'g, LLC*, 587 B.R. 445). In the Complaint, the Trustee has alleged the dates and amounts of each Transfer and has listed a few affiliated Endo entities as transferors and two affiliates McKinsey entities as transferees. *See supra*. From the Complaint, McKinsey can ascertain which Transfers and Obligations Endo seeks to avoid regardless of the fact that McKinsey does not know the exact Endo entity and McKinsey entity

involved. The allegations in the Complaint contain sufficient information for McKinsey to prepare for litigation on the merits as the company is aware of the SOWs and payments that Endo seeks to avoid as constructively fraudulent transfers. Courts have similarly found that listing a few transferors as a group does not result in pleading insufficiency as the defendant has fair notice of the claims against them. *See In re M. Fabrikant & Sons, Inc.*, 394 B.R. 721, 740 (Bankr. S.D.N.Y. 2008) (holding Rule 8(a) was satisfied despite the complaint aggregating transfers over "a period lasting nearly four years" and it was impossible to determine what amount was sought for each transfer); *see also Court–Appointed Receiver for Lancer Mgmt. Group LLC v. 169838 Canada, Inc.,* 2008 WL 2262063 at *3 (S.D. Fla. May 30, 2008) (the identity of the property transferred to each defendant as well as the specifics relating to capacity (i.e., initial transferee, conduit or otherwise) in which defendant received the relevant property need not be alleged to satisfy Rule 8).

Thus, the Trustee has sufficiently alleged the details of the Transfers and Obligations in satisfaction of Rule 8(a), and Counts Seven and Eight are not dismissed on this basis, but again, Counts Seven and Eight are dismissed (without prejudice) because of the Complaint's lack of plausible allegations of the lack of fair consideration or reasonably equivalent value received by Endo on account of its payments to McKinsey.

### D.  Recovery of Voidable Transactions

To the extent a transfer is avoided under section 544 of the Bankruptcy Code through the application of the relevant state's laws, Count Nine of the Complaint pursues recovery "for the benefit of the estate, [for] the property transferred, or, if the court so orders, the value of such property, from . . . the initial transferee of such transfer or the entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1). The parties appear to agree that Count Nine "is

109

wholly dependent upon the successes of the seventh and eight causes of action." Motion at 36. Because the Court has dismissed without prejudice the fraudulent transfer claims of Counts Seven and Eight, Count Nine similarly is dismissed, but will be revived if the Trustee successfully amends his complaint and makes plausible his claims under Counts Seven and Eight.

## VI.   <u>CONCLUSION</u>

For the reasons stated above, McKinsey's motion to dismiss the Complaint is DENIED IN PART solely as to the Trustee's claims for indemnification of amounts other than Endo's settlement payments, and GRANTED in all other respects, without prejudice to repleading to the extent the Trustee believes he can plead additional facts to cure the deficiencies identified in this decision. The parties are to meet and confer and to jointly contact chambers to schedule a conference to discuss next steps in the litigation. That conference should occur within one month of the issuance of this decision and order. Topics for the conference should include, without limitation, (1) whether the Trustee wishes to amend his complaint and, if so, on what schedule and pursuant to what process that should be accomplished, and (2) the extent to which a final judgment by an Article III court will be required, and, in light of that discussion, an explanation of the parties' views on whether this decision and order should be viewed as a report and recommendation that requires further proceedings in District Court. The parties may raise any other topic for discussion that they think will advance the resolution of this case.

IT IS SO ORDERED.


Dated: New York, New York
        September 29, 2025                      *s/ David S. Jones*
                                        Honorable David S. Jones
                                        United States Bankruptcy Judge